UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------X

In re:                                                          :
                                                                :
MATTER OF CERTAIN CLAIMS AND                                    :
NOTICING AGENTS' RECEIPT OF FEES IN                             :        Misc. Pro. No. 22-00401(MG)
CONNECTION WITH UNAUTHORIZED                                    :
ARRANGEMENTS WITH XCLAIM INC.                                   :
                                                                :
---------------------------------------------------------------X

### KROLL RESTRUCTURING ADMINISTRATION LLC'S NOTICE AND STATEMENT IN CONNECTION WITH MISCELLANEOUS PROCEEDING

Kroll Restructuring Administration LLC ("Kroll"), on behalf of itself and its predecessor Prime Clerk LLC ("Prime Clerk"),[1] by and through its undersigned counsel, submits this notice and statement in accordance with and pursuant to the Court's order in the above-captioned miscellaneous proceedings [Docket No. 1] (the "Order").[2]  For the avoidance of doubt, where not expressly distinguished, all references herein to Kroll also refer and apply equally to Prime Clerk.

### PRELIMINARY STATEMENT

Neither Kroll nor its predecessor Prime Clerk ever entered into any arrangement, contractual or otherwise, with Xclaim or any other third party, to provide claims data in exchange for a fee, commission, or any other form of compensation. Kroll has steadfastly declined every effort by Xclaim to enter into an arrangement or relationship and has denied Xclaim's requests for claims data in any format other than as made publicly available on its case websites, despite repeated false and misleading statements made by Xclaim to the contrary.  Kroll firmly believes, as it always has, that any arrangement with Xclaim would run afoul of 28 U.S.C § 156(c), and the

---

[1] Effective March 29, 2022, Prime Clerk LLC changed its name to Kroll Restructuring Administration LLC.  There has not been any change in the company's leadership, ownership, or organizational structure as a result of this name change.

[2] Capitalized terms used but not otherwise defined herein have the meanings assigned to them in the Order.

other statutes, rules, orders, and protocols in the jurisdictions in which Kroll has been retained, and its duties to the Court, its clients, and the public at large.

## RESPONSE TO ORDER

In direct response to the Court's Order, Kroll herby states the following:

- Kroll does not now have, nor has it ever had, any contract or agreement with Xclaim.

- Kroll has never transmitted claims data to Xclaim other than in a format as provided to the public on Kroll's websites.[3]

- Kroll has not received, and does not anticipate, receiving any payments from Xclaim.

- There are no cases in this or any other district in which Kroll served as the court-approved claims agent and Xclaim facilitated trades for which Kroll received or will receive a Fee or any other payment or reimbursement from Xclaim.[4]

- There are no oral or written agreements or arrangements with third parties within five years of the date of the Order in which Kroll, acting in its capacity as a claims agent under 28 U.S.C. § 156(c) as described in the *Madison Square Opinion*, has performed a task that the Clerk could not perform or has received a fee or reimbursement other than from the bankruptcy estate.

---

[3] For the avoidance of doubt, while Kroll has never intentionally transferred claims data to Xclaim in any format, it appears that Xclaim has manually obtained claims data from Kroll's website without Kroll's assistance. *See* Ex. 6, *infra*.

[4] For the avoidance of doubt, upon information and belief, Xclaim has facilitated trades in certain cases in which Kroll served as the court-approved claims agent. Kroll was made aware of Xclaim's facilitation of such trades after they were already completed. Kroll has not received, nor would it accept, any Fee or any other payment or reimbursement from Xclaim in connection with such trades.

- Kroll, in its capacity as a claims agent under 28 U.S.C. § 156(c) as described in the *Madison Square Opinion*, has not received any payments from third parties for performing a task that the Clerk could not perform, nor has Kroll ever received a Fee or reimbursement other than from the bankruptcy estate.

## **ADDITIONAL STATEMENT**

Since early 2020, Xclaim has repeatedly reached out to Kroll seeking to enter into a relationship, and Kroll has consistently rejected Xclaim's offers. Notwithstanding that Kroll has never entered into any agreement or arrangement with Xclaim of any sort—a fact that Xclaim has itself acknowledged in writing—Xclaim has nevertheless, on multiple occasions, made false and misleading statements to creditors, Courts, and industry professionals to the contrary.[5]

In August 2020, in connection with a case then pending in the Bankruptcy Court for the District of Delaware, a creditor forwarded to Prime Clerk an email that he had received from Xclaim, which stated, among other things, that "[Xclaim's] *partner* Prime Clerk notified [Xclaim] that [claimant] filed Proof of Claim [XX]…." (emphasis added).[6] Alarmed by this patently false statement by Xclaim, Prime Clerk responded to the creditor and reassured him that Prime Clerk had not partnered with Xclaim and had not shared his personal information with any third parties other than as posted to the docket and claims register of the case, as Prime Clerk's duties as claims agent required. In addition, Prime Clerk sent an email to Matthew Sedigh, founder and CEO of Xclaim, demanding that Xclaim "cease and desist from making these or other false statements that

---

[5] *See also* Petition, *Notice of Appearance – Matt Sedigh, Founder and CEO of XClaim* (Aug. 19, 2020), quoting Matthew Sedigh ("We've been working with *each of the Claims Agent groups* to synchronize their publicly available claims register databases with our marketplace.") (emphasis added), at https://petition.substack.com/i/845222/notice-of-appearance-matt-sedigh-founder-and-ceo-of-xclaim.

[6] *See* Email from S. Weiner (Prime Clerk) to M. Sedigh (Xclaim), Subject: RE: Claim Filed in the General Nutrition Corporation bankruptcy case (Aug. 28, 2020) [Ex. 1, at p.2]. All exhibits that contain email communications have been redacted for privacy concerns.

involve Prime Clerk, its clients, or their creditors."[7, 8]  Prime Clerk also notified the United States

Trustee for the District of Delaware and counsel to the debtors and creditors' committee in the

relevant case of Xclaim's creditor communication, stressing that Xclaim's statements were not

true, that Prime Clerk had not partnered with Xclaim, that Prime Clerk had not authorized Xclaim

to access any of Prime Clerk's client or creditor information, and that Prime Clerk had demanded

that Xclaim cease and desist from contacting creditors and making these false statements.[9]

A few months later, in December 2020, Prime Clerk became aware that Xclaim's website

was displaying the trademarked logo of one or more of Prime Clerk's clients without

authorization.  To avoid any connection being drawn between Xclaim and Prime Clerk, on

December 4, 2020, Prime Clerk again emailed Mr. Sedigh and requested that he "remove this

reference and refrain from future use of or reference to any of our clients on [Xclaim's]

website."[10]  Mr. Sedigh acknowledged receipt of the December 4 email, but to date, Mr. Sedigh

has ignored Prime Clerk's request and Xclaim continues to display the trademarked logos of

various Prime Clerk (and Kroll) clients without their consent.[11]

Notwithstanding these repeated efforts by Prime Clerk to make clear to Xclaim that it

must cease its attempts to suggest a connection, affiliation, or endorsement by Prime Clerk, over

the past year and a half Mr. Sedigh has continued to reach out to members of Prime Clerk's

---

[7] *Id*. at Ex. 1, at p.1.

[8] Mr. Sedigh responded by acknowledging that this was a false statement, that no affiliation existed between Prime Clerk and Xclaim, and assured Prime Clerk that no such statements would be made in the future.  *See* Email from M. Sedigh (Xclaim) to S. Weiner (Prime Clerk), Subject: [EXTERNAL] Re: Claim Filed in the General Nutrition Corporation bankruptcy case (Aug. 28, 2020) [Ex. 2].

[9] *See* Email from S. Weiner (Prime Clerk) to J. Leamy (U.S. Trustee, D. Del.), Subject: FW: Claim Filed in the General Nutrition Corporation bankruptcy case (Aug. 31, 2020) [Ex. 3].

[10] Email from S. Weiner (Prime Clerk) to M. Sedigh (Xclaim), Subject: X-Claim Website (Dec. 4, 2020) [Ex. 4].

[11] *See* Xclaim website, at www.x-claim.com (currently displaying logos for LATAM Airlines, Washington Prime Group, Mallinckrodt plc, Hertz, Tailored Brands, and Frontier Communications (among other debtors), each of which is a Kroll client).

management to obtain an agreement with Prime Clerk (now Kroll) for exclusive access to electronic claims data. On several occasions, Mr. Sedigh has sent members of Prime Clerk's management unsolicited emails touting the value of the trades his company has facilitated as a result of their manually copying public claims data from Prime Clerk's website and the potential commission to Prime Clerk associated therewith:

- December 4, 2020: "Our activity in Prime Clerk cases…This won't change regardless of which cases we highlight." The email also included a chart showing nearly $50 million in "value" across eight of Prime Clerk's cases.[12]

- April 26, 2021: "As you know, ***XCLAIM has been manually copying all public claims data from Prime Clerk's website***. . . . In the first six months of trading activity on the XCLAIM Marketplace, ***we settled more than $15 million of trades. Of that, $3.2 million occurred in Prime Clerk cases***. … There is $550 million of General Unsecured Debt in the Hertz case. ***We charge buyers a 1% commission, and we pay our Claims Agent partners a 10% processing fee from the commissions we collect. That represents a $550,000 top-line revenue opportunity for Prime Clerk*** (without considering the market expansion to come from secondary trading)."[13]

- July 7, 2021: "In Q2 XCLAIM settled $21,712,040 of traded claims, a 242% increase from our Q1 volume."[14]

In addition to multiple sets of financial data, the April 26, 2021 email also included a draft "Exclusive Claims Data Access Agreement" (which, by its terms, appears to violate, among other things, the Delaware Claims Agent Agreement (as defined and discussed below)).[15] Mr. Sedigh further boasted that Xclaim was "active in all court districts," and had "record[ed] more

---

[12] Email from M. Sedigh (Xclaim) to S. Weiner, S. Waisman (Prime Clerk), Subject: X-Claim Website (Dec. 4, 2020) [Ex. 5].

[13] Email from M. Sedigh (Xclaim) to C. Pullo, A. Adler, B. Steele (Prime Clerk), Subject: [EXTERNAL] XCLAIM < > PRIME CLERK (Apr. 26, 2021) (with attachments) (emphasis added) [Ex. 6].

[14] *See* Email from M. Sedigh (Xclaim) to C. Pullo (Prime Clerk), Subject: [EXTERNAL] XCLAIM Update (July 7, 2021) [Ex. 7].

[15] *See* Ex. 6.

than 300 trades on court dockets across the country."[16]  Prime Clerk was not swayed by this information, did not sign the agreement, and dismissed Mr. Sedigh and his email.

Even more egregiously, Xclaim's quest for Kroll's electronic claims data has continued even following the July 20, 2022 bench ruling in *In re Madison Square Boys & Girls Club, Inc.* where Judge Lane found, among other things, that Xclaim's data access agreement violated the bankruptcy fee schedule.[17]  Specifically, on July 25, 2022, less than one week after that hearing, a representative from Xclaim sent a letter to Kroll requesting that Kroll deliver the "[o]fficial claims register for [another case pending in the Bankruptcy Court of the Southern District of New York], including but not limited to all publicly available data associated with each creditor in .csv or comparable electronic format and copies of all proofs of claim identified to each creditor listed in the claims register."[18]  Xclaim asserted that the Office of the Clerk of the Court had "instructed [Xclaim] to contact [Kroll] directly" for such record.[19]  The letter offered to pay Kroll $31.00 per-record as "the fee for reproducing and transmitting a copy of an electronic record stored outside the court's electronic case management system" pursuant to section 1(b) of the Bankruptcy Court Miscellaneous Fee Schedule as referenced in 28 U.S.C. §§ 1930(b) and 1914(b).[20]  Kroll did not provide the information in the format requested and instead advised Xclaim that the records and documents they had requested are publicly available free of charge at Kroll's case website.  Kroll did not accept any funds from Xclaim for such data.

---

[16] *Id.*

[17] *In re Madison Square Boys & Girls Club, Inc.*, Case No. 22-10910 (SHL) [ECF No. 82].

[18] Ltr. from A. Glantz (Xclaim) to A. Adler (Kroll), dated July 25, 2022 (credit card information redacted) [Ex. 8].

[19] *Id.*

[20] *Id.*

In summary, Kroll has always maintained that absent approval from the Court or its clients,[21] providing Xclaim (or any other third party) the claims data that Kroll collects in any manner, other than as made publicly available on Kroll's case websites (let alone collecting an unsanctioned Fee or commission for doing so), would be inconsistent with the statutes, rules, orders, and protocols governing Kroll's appointment as a claims agent, would be outside of the purview of Kroll's authority, and would violate our agreements with, and obligations to, the Court and our clients.

## **RATIONALE**

As stated above, Kroll believes that any arrangement with Xclaim would be contrary to its statutory and contractual obligations as an agent of the Clerk of the Court, violative of the statutes, rules, orders, and protocols governing its appointment as claims agent, and would be otherwise inappropriate.

First and most importantly, the data that Xclaim is seeking to purchase is not Kroll's property to sell. Kroll collects and holds such data as an agent of the Clerk of the Court, as appointed by the Court at the request of its debtor clients. But for its role as such, Kroll would not be in possession of such data or have the ability to sync the data in the manner that Xclaim has requested.

Second, the Xclaim data access agreement requires the claims agent to take actions that violate the specific terms of the Claims Agent Service Level Agreement between the Delaware Bankruptcy Court and all claims agents (including Kroll) (the "Delaware Claims Agent Agreement"). Specifically, the Delaware Claims Agent Agreement requires, among other things,

---

[21] From time to time, upon order of the Court or at the direction of debtor's counsel, Kroll has, without charge, provided an excel claims report to third parties.

that "Privileged access [to Delaware Bankruptcy Court] data is only used by *authorized staff* for *those tasks that specifically require it*." (Emphasis added).[22]  An agreement with Xclaim would certainly require the claims agent to perform tasks outside of those specifically required and would provide Xclaim with privileged and unauthorized access to court data even though Xclaim lacks a specific need for access to such data.  Additionally, the agreement Xclaim proposed to Prime Clerk required Prime Clerk to set up a "Prime Clerk-owned Secure File Transfer Protocol (SFTP) server" and provide up to five (5) *Xclaim personnel* named credentials to *access the server*.[23] (Emphasis added).

Third, as stated by Judge Lane, performing the services requested by Xclaim would create a perceived, if not actual, conflict of interest for the claims agent in the case because the claims agent would stand to benefit monetarily from case activities unrelated to its duties as claims agent.  "Specifically, [there would be a] pecuniary interest in maximizing the volume of claims trades in a case to increase the amount of the [fee payable to the claims agent]."[24]  Thus, even if legally permissible, the claims agent would need to constantly file declarations as part of its disclosure obligations as a case professional and inform the court and all parties in interest of its connections to creditors each time a trade was facilitated by Xclaim in its various cases.  If ever the conflict became too great, the claims agent could be at risk of removal from its role as claims agent in the case—a risk that no claims agent should ever subject a client to due to the significant disruption that it would cause and the additional costs that the estate would incur to bring in a new claims agent at that juncture.  Nor should a claims agent ever want to draw

---

[22] *See* Excerpt from Delaware Claims Agent Agreement, Section 4. Security, Privileged Account Access (emphasis added) [Ex. 9].

[23] *See* Ex. 6, Attachment – Exclusive Claims Data Access Agreement, at Exhibit A § 1.1.1.

[24] *Madison Square Opinion*, Fn. 16.

attention away from the more pressing matters in a case or be the cause of additional fees being borne by the estate.

Fourth, Section 107 of the Bankruptcy Code requires that court records be "open to examination by an entity at reasonable times without charge."[25]  Practically speaking, in cases without a claims agent, examination of court records occurs in person, at the Clerk's Office, during business hours, with the implied costs of travel and closures due to inclement weather or other emergencies.  In contrast, Kroll generally provides access to case records on its website twenty-four hours a day, every day of the year, without charge and eliminating any need for travel and related costs.  In rough numbers, while the Court provides free access to these records for approximately 2,000 hours per year solely at their Clerks' Offices, Kroll makes these records available to all stakeholders and the public world-wide for over 8,750 hours per year.[26]

Despite this robust public access, Xclaim is seeking preferential treatment for one reason only—to make its business model more lucrative for itself and its shareholders.  Rather than employ people to collect this data manually from claims agents' websites, as the multitude of claims traders (including Xclaim) have done for years, Xclaim would like to foist the costs of this effort on Kroll, debtors' estates, and the public.  Preparing claims data in Xclaim's desired format would require significant time and resources to be expended by Kroll, creating not only additional financial expense for debtors' estates, but also detracting Kroll's workforce from important case-related matters.

---

[25] 11 U.S.C. § 107(a).

[26] For example, in the Southern District of New York, the Clerk's Office is open Monday through Friday, 8:30 a.m. through 5:00 p.m. (except federal holidays). The Delaware Clerk's Office hours are Monday through Friday, 8:00 a.m. through 4:00 p.m. (except federal holidays).  Roughly speaking, this results in approximately 40 hours/week, 2,080 hours/year. Kroll's website is available 24/7/365.  The only exception to this near universal access has been a limited amount of technical downtime of one hour and forty-five minutes so far in 2022, representing a website uptime of 99.971%.

Scraping Kroll's website,[27] one of Xclaim's suggested modes of access to Kroll's information systems, would likely affect the integrity and responsiveness of Kroll's networks and data, compromise the uptime of Kroll's case websites, and would directly lead to increased costs to be borne by debtors' estates.  For these reasons, Kroll has always precluded the scraping of its website, which is customary practice for the vast majority of websites in existence— including Xclaim's own site.[28]  Preventing scraping preserves the ability of the public to access case data without delay (as scraping slows website response times), frustrates efforts of nefarious actors to collect individual data *en masse* for illegal uses (e.g., phishing, identity theft, credit card fraud, etc.), and eliminates the significant cost that would otherwise be borne by the estate to accommodate claims traders' profit margin desires.

Finally, the information that Xclaim seeks to collect inherently includes personally identifiable information.  When data is shared or scraped, the ability to control the data often goes with it.  Kroll often receives inquiries from claimants who are concerned as to who has their information, or deletion requests from claimants who discover that their information is publicly available on our website, either because they did not realize that it would be made publicly available, or because it appears on our website due to a filing in a case that was erroneous or in contravention of a confidentiality order.  While Kroll has been able to work with these claimants or the Court to creatively resolve their concerns as to public display, if their information has

---

[27] Web scraping is a way to extract data from a website.

[28] Indeed, Xclaim's own "Terms of Use" state "Any use of direct or indirect automated searches or data queries with respect to this Site or the Materials is strictly prohibited..."  https://www.x-claim.com/legal/terms-of-use.

already been shared with Xclaim or another third party who has scraped Kroll's website it would

be impossible to secure their information.[29]

## **CONCLUSION**

Since it was first approached by Xclaim, Kroll has consistently believed that any

arrangement with Xclaim would be contrary to statutes, rules, orders, and protocols governing its

appointment as claims agent as well as Kroll's duties as an approved claims agent.  Accordingly,

Kroll has never entered into any agreement or relationship with Xclaim or any other third party

for privileged access to court data, nor does Kroll intend to do so.

Executed:        September 16, 2022
                 New York, New York

                                    By:    */s/ Shira Weiner*                     
                                           Shira Weiner
                                           General Counsel
                                           Kroll Restructuring Administration LLC
                                           55 East 52nd Street, 17th Floor
                                           New York, New York 10055

---

[29] *See* "Web Scrapers and Their Targets Beware. Regulators are Zeroing in on Privacy Implications" (Nov. 18, 2021), at https://www.jdsupra.com/legalnews/web-scrapers-and-their-targets-beware-5025499/ (discussing the intersection of web scraping and privacy laws).

## Exhibit 1

| From: | Weiner, Shira |
|---|---|
| To: | "matt@x-claim.com"; "amanda.hendy@tunehousecapital.com"; "steve@x-claim.com" |
| Cc: | "Shai Waisman"; "Legal" |
| Subject: | RE: Claim Filed in the General Nutrition Corporation bankruptcy case |
| Date: | Friday, August 28, 2020 6:08:00 PM |
| Attachments: | image001.png |
|  | image002.png |

XClaim,

We are in receipt of the below, which is an example of various emails sent to creditors in our clients' cases.

As you are well aware, Prime Clerk has not partnered with you or your firm, and we have not authorized you to access any of our clients' or their creditors' information. You are illegally scraping our website in violation of our Terms of Use. **This email is notice that you must cease and desist from contacting creditors, stealing information from our website, and making these or other false statements that involve Prime Clerk, its clients, or their creditors. If you fail to do so, we will pursue legal action**.

All of our rights are expressly reserved.

Sincerely,

Shira Weiner

**Shira D. Weiner**
General Counsel
sweiner@primeclerk.com
**Prime Clerk**
One Grand Central Place
60 East 42nd Street
Suite 1440
New York, NY 10165

primeclerk.com

*Quality. Partnership. Expertise. Innovation.*
For more information click here: https://www.primeclerk.com/why-choose-us

**From:** no-reply@x-claim.com <no-reply@x-claim.com>
**Sent:** Friday, August 28, 2020 1:07 PM
**To:**
**Subject:** Claim Filed in the General Nutrition Corporation bankruptcy case



CLAIM FILED

Hi ⬚

Our partner Prime Clerk notified us that you filed Proof of Claim ⬚ in the General Nutrition Corporation bankruptcy.

While you're eagerly awaiting updates on the General Nutrition Corporation bankruptcy, we want to ensure that you are aware of all of your options.

**"98% of Creditors are unaware that they can sell their Claim against a Debtor."**

5 Reasons to Sell Your Claim ⟶

The XCLAIM Marketplace connects Creditors with Verified Buyers to offer you a hassle-free solution to selling your claim and getting you paid quickly. We are revolutionizing the bankruptcy claims trading industry by eliminating risk, generating liquidity, and increasing transparency.

**Learn how to sell your Claim**

Regards,
XCLAIM Trade Support

Have a question? **Click here** to contact XCLAIM Trade Support.

## Exhibit 2

| From: | Matthew Sedigh |
|---|---|
| To: | Weiner, Shira |
| Cc: | amanda.hendy@tunehousecapital.com; steve@x-claim.com; Waisman, Shai; Legal |
| Subject: | [EXTERNAL] Re: Claim Filed in the General Nutrition Corporation bankruptcy case |
| Date: | Friday, August 28, 2020 7:15:54 PM |
| Attachments: | image001.png |
| | image002.png |

Shai and Shira,

I want to offer my profound apology for this gross error on our part. This was a completely unintentional mistake that occurred due to an automated email where we failed to catch the error. Since receiving your first email just over an hour ago, we have remedied this and corrected the email marketing to avoid any mention of Prime Clerk and any affiliation whatsoever between XCLAIM and Prime Clerk.

Again, I take full responsibility for this and am truly sorry. It won't happen again.

Can we schedule a call for Monday to clear the air?

-Matt

On Fri, Aug 28, 2020 at 3:09 PM Weiner, Shira <sweiner@primeclerk.com> wrote:

XClaim,

We are in receipt of the below, which is an example of various emails sent to creditors in our clients' cases.

As you are well aware, Prime Clerk has not partnered with you or your firm, and we have not authorized you to access any of our clients' or their creditors' information.  You are illegally scraping our website in violation of our Terms of Use.  **This email is notice that you must cease and desist from contacting creditors, stealing information from our website, and making these or other false statements that involve Prime Clerk, its clients, or their creditors.  If you fail to do so, we will pursue legal action**.

All of our rights are expressly reserved.

Sincerely,
Shira Weiner

**Shira D. Weiner**
General Counsel
sweiner@primeclerk.com
**Prime Clerk**
One Grand Central Place
60 East 42nd Street
Suite 1440
New York, NY 10165

[primeclerk.com](primeclerk.com)

*Quality. Partnership. Expertise. Innovation.*
For more information click here: [https://www.primeclerk.com/why-choose-us](https://www.primeclerk.com/why-choose-us)

---

**From:** [no-reply@x-claim.com](no-reply@x-claim.com) <[no-reply@x-claim.com](no-reply@x-claim.com)>
**Sent:** Friday, August 28, 2020 1:07 PM
**To:**
**Subject:** Claim Filed in the General Nutrition Corporation bankruptcy case



**Exhibit 3**

| From: | Weiner, Shira |
|---|---|
| To: | JANE.M.LEAMY@USDOJ.GOV |
| Cc: | Shai Waisman; Legal; Caroline.Reckler@lw.com; Jeffrey.Mispagel@lw.com; RICHARD.LEVY@lw.com; Kara Hammond Coyle (kcoyle@ycst.com) |
| Subject: | FW: Claim Filed in the General Nutrition Corporation bankruptcy case |
| Date: | Monday, August 31, 2020 10:35:00 AM |
| Attachments: | image001.png |
| | image002.png |

Jane,

It has come to our attention that one or more creditors in the GNC chapter 11 cases have received the below communication from a company named XClaim. Prime Clerk has not partnered with XClaim, and we have not authorized them to access any of our clients' or their creditors' information. We have demanded that they cease and desist from contacting creditors and making these false statements. We have also notified Debtors' counsel (copied) and counsel to the Creditors' Committee in these cases.

I am available if you would like to discuss.

Respectfully,
Shira

**Shira D. Weiner**
General Counsel
sweiner@primeclerk.com
**Prime Clerk**
One Grand Central Place
60 East 42nd Street
Suite 1440
New York, NY 10165

primeclerk.com

*Quality. Partnership. Expertise. Innovation.*
For more information click here: https://www.primeclerk.com/why-choose-us

**From:** no-reply@x-claim.com <no-reply@x-claim.com>
**Sent:** Friday, August 28, 2020 1:07 PM
**To:**
**Subject:** Claim Filed in the General Nutrition Corporation bankruptcy case



**CLAIM FILED**

Hi XXXXX XXXXX,

Our partner Prime Clerk notified us that you filed Proof of Claim XXXX in the General Nutrition Corporation bankruptcy.

While you're eagerly awaiting updates on the General Nutrition Corporation bankruptcy, we want to ensure that you are aware of all of your options.

**"98% of Creditors are unaware that they can sell their Claim against a Debtor."**

5 Reasons to Sell Your Claim ⟶

The XCLAIM Marketplace connects Creditors with Verified Buyers to offer you a hassle-free solution to selling your claim and getting you paid quickly. We are revolutionizing the bankruptcy claims trading industry by eliminating risk, generating liquidity, and increasing transparency.

**Learn how to sell your Claim**

Regards,
XCLAIM Trade Support

Have a question? Click here to contact XCLAIM Trade Support.

**Exhibit 4**

**From:**      Weiner, Shira
**To:**        Matthew Sedigh
**Cc:**        amanda.hendy@tunehousecapital.com
**Subject:**   X-Claim Website
**Date:**      Friday, December 4, 2020 12:20:00 PM
**Attachments:**   image001.png
               image002.png

Matt,

It has come to our attention that the main page of your website contains a photo highlighting one of our clients' cases (currently Frontier Communications Corporation, and reportedly at one point PG&E Corporation).  Consistent with our prior request that your firm and website not draw any connection between X-Claim and Prime Clerk, we ask that you remove this reference and refrain from future use of or reference to any of our clients on your website.

Please confirm receipt and that you will comply with the above.  I am available if you would like to discuss.

Regards,
Shira

**Shira D. Weiner**
General Counsel
sweiner@primeclerk.com
**Prime Clerk**
One Grand Central Place
60 East 42nd Street
Suite 1440
New York, NY 10165

primeclerk.com

*Quality. Partnership. Expertise. Innovation.*
For more information click here: https://www.primeclerk.com/why-choose-us

 

**<u>Exhibit 5</u>**

| From: | Matthew Sedigh |
|---|---|
| To: | Weiner, Shira; Waisman, Shai |
| Subject: | [EXTERNAL] Re: X-Claim Website |
| Date: | Friday, December 4, 2020 3:06:13 PM |
| Attachments: | image001.png |
| | image002.png |

---

Our activity in Prime Clerk cases.....
This won't change regardless of which case we highlight.

| Bankruptcy Case | Bids | | Value |
|---|---|---|---|
| Ascena Retail Group | 1 | $ | 1,128,259 |
| Covia | 60 | $ | 3,106,137 |
| Frontier Communications | 385 | $ | 10,921,844 |
| Hertz | 76 | $ | 16,824,803 |
| Mallinckrodt | 65 | $ | 2,110,220 |
| NorthEast Gas Generation | 12 | $ | 1,036,148 |
| RTW Retailwinds | 117 | $ | 10,705,037 |
| Tailored Brands | 105 | $ | 3,237,208 |
| **8** | **821** | **$** | **49,069,656** |

On Fri, Dec 4, 2020 at 11:27 AM Matthew Sedigh <matt@x-claim.com> wrote:

Hi Shira, good to hear from you. Hope you and your family have been well and enjoyed the Thanksgiving break.

I've received your request and would appreciate a discussion. Please call me at

On Fri, Dec 4, 2020 at 9:20 AM Weiner, Shira <sweiner@primeclerk.com> wrote:

Matt,


It has come to our attention that the main page of your website contains a photo highlighting one of our clients' cases (currently Frontier Communications Corporation, and reportedly at one point PG&E Corporation). Consistent with our prior request that your firm and website not draw any connection between X-Claim and Prime Clerk, we ask that you remove this reference and refrain from future use of or reference to any of our clients on your website.


Please confirm receipt and that you will comply with the above. I am available if you would like to discuss.


Regards,

Shira

**Shira D. Weiner**
General Counsel
sweiner@primeclerk.com

**Prime Clerk**
One Grand Central Place
60 East 42nd Street
Suite 1440
New York, NY 10165

primeclerk.com

*Quality. Partnership. Expertise. Innovation.*
For more information click here: https://www.primeclerk.com/why-choose-us

For Prime Clerk's email disclaimer, please click here: http://primeclerk.com/email-disclaimer/

--
Matt Sedigh
Chief Executive Officer

--
Matt Sedigh
Chief Executive Officer



**Exhibit 6**

| | |
|---|---|
| **From:** | Matthew Sedigh |
| **To:** | Pullo, Christina; Adler, Adam; Steele, Benjamin |
| **Cc:** | Waisman, Shai; Weiner, Shira |
| **Subject:** | [EXTERNAL] XCLAIM <> Prime Clerk |
| **Date:** | Monday, April 26, 2021 1:31:35 PM |
| **Attachments:** | PRIME CLERK Q1 Report.pdf |
| | XCLAIM Monthly Volume.pdf |
| | Prime Clerk - XCLAIM Claims Data Access Agreement.docx |

Friends at Prime Clerk,

As you know, XCLAIM has been manually copying all public claims data from Prime Clerk's website. With that data, along with the data received from our Claims Agent partners, XCLAIM has built a marketplace for trading claims where our inventory is all claims.

In the first six months of trading activity on the XCLAIM Marketplace, we settled more than $15 million of trades. Of that, $3.2 million occurred in Prime Clerk cases. Buyers are buying. Creditors are selling. We have proven that a more efficient market can exist.

We are active in all court districts. After recording more than 300 trades on court dockets across the country, there have been no objections. We have been accepted.

As an example, Hertz claims traded 211 times in March. XCLAIM was responsible for 17 of those, an 8% market share. So far in April there have been 170 trades for Hertz claims. XCLAIM is responsible for 53, a 31% market share. We are growing fast.

There is $550 million of General Unsecured Debt in the Hertz case. We charge buyers a 1% commission, and we pay our Claims Agent partners a 10% processing fee from the commissions we collect. That represents a $550,000 top-line revenue opportunity for Prime Clerk (without considering the market expansion to come from secondary trading).

In February, we raised institutional financing to bring XCLAIM's total funding to $11 million. We are here to stay.

We are revolutionizing the claims trading market. Our proposition is simple: let's be partners.

Attached are supporting analyses of our activity to date, as well as a draft of an agreement for discussion.

Thank you.

--
Matt Sedigh
Chief Executive Officer







PROPRIETARY AND CONFIDENTIAL



**Trade Summary**

| Debtor | Trade Count | | Total Claim Value |
|---|---|---|---|
| Diamond Offshore Company | 22 | $ | 544,095.65 |
| EdgeMarc Energy Holdings, LLC | 1 | $ | 184,085.97 |
| Frontier Communications | 11 | $ | 172,293.72 |
| LATAM Airlines Group S.A. | 2 | $ | 40,868.60 |
| Mallinckrodt plc | 1 | $ | 35,930.00 |
| Moores the Suit People Corp. | 1 | $ | 11,609.00 |
| RTW Retailwinds, Inc. | 3 | $ | 380,798.86 |
| Specialty Retail Shops Holding Corp. | 2 | $ | 301,176.86 |
| The Hertz Corporation | 24 | $ | 1,482,214.87 |
| **TOTAL** | **67** | **$** | **3,153,073.53** |

| | | |
|---|---|---|
| **Average Trade Size** | **$** | **47,060.80** |
| **Max Trade Size** | **$** | **791,556.20** |

PROPRIETARY AND CONFIDENTIAL

XCLAIM.

**Trade Details**

| Date | Debtor | Creditor | Claim # | Claim Value |
|------|--------|----------|---------|-------------|
| 9/17/2020 | Frontier Communications | Sellers Services of Safety Harbor Inc | 1146 | $ 17,862.70 |
| 10/5/2020 | RTW Retailwinds, Inc. | SELECAO NYC, INC. | 271 | $ 138,150.00 |
| 10/13/2020 | Moores the Suit People Corp. | CompCall Ltd | 1131 | $ 11,609.00 |
| 10/15/2020 | Frontier Communications | LPS-Fire, LLC | 868 | $ 19,438.30 |
| 10/27/2020 | The Hertz Corporation | International Auto Body | 1988 | $ 118,645.56 |
| 11/11/2020 | Frontier Communications | Carrier Corporation | 3293 | $ 10,269.20 |
| 11/12/2020 | Frontier Communications | MAGNA CONSTRUCTION LIMITED | 2891 | $ 22,278.00 |
| 11/17/2020 | Frontier Communications | Eagle Rivet Roof | 2830 | $ 1,054.10 |
| 11/20/2020 | Frontier Communications | Kocourek Chevrolet Inc | 111 | $ 1,396.70 |
| 1/14/2021 | Mallinckrodt plc | SIMR, LLC | 705 | $ 35,930.00 |
| 1/22/2021 | Frontier Communications | The Gofer Guys, LLC | 2596 | $ 54,401.92 |
| 1/28/2021 | The Hertz Corporation | LOYALTY COLLISION INC | 203 | $ 9,258.10 |
| 1/28/2021 | Diamond Offshore Company | Nance International Inc | 131 | $ 29,750.97 |
| 2/1/2021 | The Hertz Corporation | NEXT LEVEL AUTO BODY REPAIR & PAINT LLC | 1618 | $ 3,358.00 |
| 2/3/2021 | Diamond Offshore Company | Napa Ltd | 546 | $ 33,701.00 |
| 2/3/2021 | Diamond Offshore Company | Torq/Lite, LLC | 246 | $ 28,666.94 |
| 2/3/2021 | Diamond Offshore Company | Dingbro Ltd | 230 | $ 8,001.64 |
| 2/3/2021 | Diamond Offshore Company | TASMAN OIL TOOLS PTY LTD | 234 | $ 12,101.60 |
| 2/3/2021 | Diamond Offshore Company | Drew Marine | 4327158 | $ 60,758.24 |
| 2/3/2021 | RTW Retailwinds, Inc. | Zensar Technologies Inc. | 386 | $ 80,472.44 |
| 2/4/2021 | Diamond Offshore Company | Torq/Lite, LLC | 244 | $ 25,817.85 |
| 2/5/2021 | Diamond Offshore Company | Hobart UK | 341 | $ 5,334.82 |
| 2/5/2021 | Diamond Offshore Company | Xtend Packaging, Inc. | 79 | $ 1,021.00 |
| 2/9/2021 | Frontier Communications | Microworx Direct, Inc. | 1215 | $ 12,152.90 |
| 2/10/2021 | Diamond Offshore Company | GoExpedi, Inc | 779 | $ 34,520.10 |
| 2/10/2021 | Diamond Offshore Company | Bluewater Rubber & Gasket Co. | 210 | $ 13,774.60 |
| 2/12/2021 | Diamond Offshore Company | Entrion Inc | 188 | $ 10,559.60 |
| 2/12/2021 | Diamond Offshore Company | LDC SALES & CONSULTING AB | 525 | $ 23,005.00 |
| 2/15/2021 | Frontier Communications | Fuller's Automotive Services Inc. | 290 | $ 6,678.60 |
| 2/16/2021 | Diamond Offshore Company | FERGUSON GROUP AUSTRALIA PTY LTD | 516 | $ 8,170.64 |
| 2/17/2021 | The Hertz Corporation | Patricks Auto Body | 11423 | $ 28,980.00 |
| 2/17/2021 | RTW Retailwinds, Inc. | Sandhill Center, LLC | 785 | $ 162,176.42 |
| 2/24/2021 | The Hertz Corporation | Hard Right Solutions LLC | 346 | $ 68,811.50 |
| 2/24/2021 | LATAM Airlines Group S.A. | Meplan GmbH | 682 | $ 14,500.00 |
| 2/24/2021 | Diamond Offshore Company | Polar Rig Specialties, Inc. | 284 | $ 86,484.26 |
| 3/1/2021 | Frontier Communications | Accent Business Services | 2675 | $ 11,538.34 |
| 3/3/2021 | Diamond Offshore Company | American Polymer Products | 34 | $ 27,676.00 |
| 3/3/2021 | The Hertz Corporation | Coastal Automotive Reconditioning, LLC | 1120 | $ 49,122.10 |
| 3/3/2021 | The Hertz Corporation | Coastal Automotive Reconditioning, LLC | 1130 | $ 146,733.88 |
| 3/4/2021 | Diamond Offshore Company | Alliant RigServ, LLC | 301 | $ 23,497.30 |
| 3/4/2021 | The Hertz Corporation | ARLINGTON AUTO CENTER INC. | 4968 | $ 4,551.73 |
| 3/5/2021 | The Hertz Corporation | HGC AUTO COLLISION | 136 | $ 18,283.40 |
| 3/5/2021 | The Hertz Corporation | FAST 5 FIRESTONE 1 LLC | 4761 | $ 13,500.00 |
| 3/8/2021 | Diamond Offshore Company | RADIO HOLLAND USA INC | 717 | $ 23,489.07 |
| 3/10/2021 | The Hertz Corporation | Puget Sound Energy | 2772 | $ 8,520.57 |
| 3/10/2021 | LATAM Airlines Group S.A. | AmCar Freight Inc. Dba AmCar Lamprecht, Inc | 475 | $ 26,368.60 |
| 3/10/2021 | Diamond Offshore Company | Southwest Impreglon Sales, Inc. | 252 | $ 28,125.00 |
| 3/11/2021 | The Hertz Corporation | Rogue Architects LLC | 20 | $ 38,748.81 |
| 3/12/2021 | Specialty Retail Shops Holding Corp. | POPCHIPS INC. | 150 | $ 77,644.80 |
| 3/15/2021 | Diamond Offshore Company | Bauer Compressors Inc. | 237 | $ 18,794.46 |
| 3/18/2021 | Diamond Offshore Company | CUSTOMSPOINT, INC. | 444 | $ 14,000.00 |
| 3/19/2021 | Frontier Communications | Colonial Hardware Corp. | 3455 | $ 15,222.96 |
| 3/19/2021 | The Hertz Corporation | Pine Level Paint & Body | 406 | $ 3,811.20 |
| 3/19/2021 | The Hertz Corporation | GALEANA CHRYSLER-JEEP INC | 6640 | $ 11,084.04 |
| 3/19/2021 | The Hertz Corporation | Corvus Janitorial Systems of Indianapolis | 3035 | $ 15,300.00 |
| 3/19/2021 | Specialty Retail Shops Holding Corp. | Fusion Products Ltd | 156 | $ 223,532.06 |
| 3/19/2021 | The Hertz Corporation | Prestige Nissan of Tiffany Springs | 9776 | $ 24,750.00 |
| 3/22/2021 | The Hertz Corporation | Pennys Towing And Property Services | 2527 | $ 9,899.00 |
| 3/23/2021 | Diamond Offshore Company | Loadmaster Industries | 132 | $ 26,845.56 |
| 3/23/2021 | EdgeMarc Energy Holdings, LLC | NexTier Completion Solutions Inc. | 430 | $ 184,085.97 |
| 3/25/2021 | The Hertz Corporation | Canon Business Process Services | 3720912 | $ 791,556.20 |
| 3/26/2021 | The Hertz Corporation | Herrera, Anthony | 4683 | $ 653.96 |
| 3/30/2021 | The Hertz Corporation | Excel Auto Collision Services Inc | 6603 | $ 409.35 |
| 3/30/2021 | The Hertz Corporation | Excel Auto Collision Services Inc | 6514 | $ 1,155.45 |
| 3/30/2021 | The Hertz Corporation | Edmunds.com | 13415 | $ 24,083.48 |
| 3/31/2021 | The Hertz Corporation | Rate-Highway, Inc | 4168 | $ 65,183.14 |
| 3/31/2021 | The Hertz Corporation | Total Paint and Body LLC | 695 | $ 25,815.40 |

PROPRIETARY AND CONFIDENTIAL

## EXCLUSIVE CLAIMS DATA ACCESS AGREEMENT

This Exclusive Claims Data Access Agreement (this "Agreement"), dated as of _____, 2021 (the "Effective Date"), is made by and between Prime Clerk LLC ("Prime Clerk") and XClaim Inc. ("XCLAIM"). Prime Clerk and XCLAIM may be referred to individually herein as a "Party" or together as the "Parties."

**WHEREAS**, XCLAIM has developed an easily accessible electronic platform (the "Platform") to facilitate the purchase and sale of claims that are filed or scheduled (each, a "Claim") in any bankruptcy proceeding (each, a "Bankruptcy Proceeding") filed in the United States pursuant to title 11 of the United States Code (the "Bankruptcy Code"); and

**WHEREAS**, Prime Clerk is one of approximately seven (7) companies often authorized by the United States bankruptcy courts with jurisdiction over such Bankruptcy Proceedings to serve as claims agent (in such capacity in any such Bankruptcy Proceeding, any company acting in such capacity, including Prime Clerk, a "Claims Agent"), which requires Prime Clerk, among other things, to maintain the Bankruptcy Proceeding's official, public claims register in such Bankruptcy Proceeding (each a "Claims Register" and collectively, the "Claims Registers") to record all Claims filed against, or scheduled by, the debtor(s); and

**WHEREAS**, XCLAIM desires to obtain access to Claims-related data that is maintained by Prime Clerk on Claims Registers, or otherwise publicly available in Bankruptcy Proceedings, (i) on a read-only basis such that XCLAIM shall have no ability to directly modify such Accessible Data (as defined below), and (ii) to allow XCLAIM to transmit to Prime Clerk all necessary information and documentation relating to any Claims that are bought or sold on the Platform (the "Claims Transfer Data") so that Prime Clerk may review the Claims Transfer Data and have an expedient means to update the Claims Registers.

**NOW, THEREFORE**, in consideration of the mutual promises and the other terms and conditions contained herein and for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

1.      **Definitions**.  The defined terms used in this Agreement shall have the meanings set forth herein or as defined in this Section 1.

1.1      **"Accessible Data"** means, for all Bankruptcy Proceedings in which Prime Clerk is the Claims Agent, (a) the publicly-available data contained in all fields in Official Form 410 (Proof of Claim) with respect to all filed Claims; (b) the publicly-available data reflected in the debtors' schedules of liabilities with respect to all scheduled Claims; and (c) to the extent agreed upon by the Parties in writing, certain additional publicly-available data relating to Claims, such as information regarding Claim objection, allowance, amendment, withdrawal, estimation, balloting, satisfaction, expungement and disallowance status, and data reflecting amendments to schedules; provided, however, that Accessible Data does not include any Confidential Information, any information that Prime Clerk may not disclose under applicable Law, or any information that Prime Clerk elects not to publicly disclose.

1.2    **"API"** means one or more private application programming interface(s) created by XCLAIM to interface with the Accessible Data so that the Platform will have current information and documents as reflected in each Claims Register.

1.3    **"Business Day"** means all days excluding Saturdays, Sundays, and holidays recognized by the U.S. federal court system.

1.4    **"Confidential Information"** means the terms of this Agreement and any confidential or proprietary information marked or otherwise identified in writing as confidential or proprietary at the time of disclosure by the disclosing Party, or which the receiving Party reasonably should recognize from the circumstances surrounding such disclosure or the contents of such disclosure to be confidential or proprietary, and including any redacted information, personally identifiable information, source code, software tools, designs, schematics, plans, or any other information relating to any research project, work in process, future development, scientific, engineering, manufacturing, marketing or business plan or financial or personnel matter relating to either Party, its present or future products, services, customers, employees, investors or business.

1.5    "**Intellectual Property Rights**" means all past, present, and future rights of the following types, whether registered or unregistered, which may exist or be created under the Laws of any jurisdiction in the world: (a) rights associated with works of authorship, including copyrights, design rights, and moral rights ("Copyrights"); (b) trademark, trade name, service name, trade dress and service mark rights and similar means of identification and similar rights, including all goodwill associated with the foregoing (collectively, "Trademarks"); (c) trade secret rights and other rights in know-how and confidential or proprietary information (including any techniques, specifications, designs, processes, practical knowledge and skills, or other similar information) (collectively, "Know-How"); (d) United States and foreign patents, including utility models, industrial designs and design patents, and applications therefor (and any patents that issue as a result of those patent applications), and any renewals, reissues, reexaminations, extensions, continuations, continuations-in-part, divisions and substitutions relating to any of such patents and patent applications, and any counterparts worldwide claiming priority therefrom, and all rights in and to any of the foregoing (collectively, "Patents"); (e) rights in data, including technical data, clinical data, user data, algorithm training data, feasibility study results, data from research and development, including user research, safety data rights in databases and data collections (including knowledge databases, safety databases, user lists and user databases) (collectively, "Data"); (f) all other intellectual property rights or proprietary rights; and (g) all past, present and future claims and causes of action arising out of or related to infringement or misappropriation of any of the foregoing.

1.6    "**Law**" means all applicable laws, statutes, ordinances, codes, rules, regulations, orders, directions, or decrees of any court or other governmental authority, including the Executive Office of the United States Trustee and any Regional Office of the United States Trustee.

1.7    "**Losses**" means any and all losses, claims, damages, judgments, liabilities, expenses, settlements, interest, awards, penalties, fines, and costs, whether direct or indirect (including, without limitation, reasonable and documented out-of-pocket counsel fees and expenses), fees and costs of enforcing any right to indemnification hereunder, and the cost of

pursuing any insurance providers. Without limiting the generality of the foregoing, Losses include any liabilities resulting from claims by any third-parties against any Indemnified Party.

1.8    "**Release Date**" means the date upon which the Platform goes live and is operational for the trading of Claims in cases in which Prime Clerk is the court-appointed Claims Agent.

1.9    **"Prime Clerk Software"** means Prime Clerk-developed custom software and all operating manuals and other documentation and materials supplied to XCLAIM or Prime Clerk's clients by Prime Clerk and all copies thereof.

1.10    "**Technical Data**" means any data, related interface access points, and other technical information required by XCLAIM to create and use the API for its intended purposes.

1.11    **"XCLAIM Improvements"** means all improvements, modifications and enhancements to the Technical Data created by or on behalf of XCLAIM.

2.    **Data Access; Ownership; Claims Transfer Data**.

2.1    **Access**.  Prime Clerk shall provide XCLAIM direct access to all Accessible Data through data files as specified in Exhibit A (a "Data File"); provided, however, that (a) Prime Clerk may suspend access to Accessible Data (and delivery of Data Files) in order to accommodate changes to the Prime Clerk Software, and (b) XCLAIM must immediately delete any data provided by Prime Clerk to XCLAIM that is not Accessible Data when provided or that subsequently no longer constitutes Accessible Data (e.g., data that is no longer publicly available on Claim Registers).  To the extent agreed upon by the Parties in writing as provided in Section 2.5 hereof, Prime Clerk may also allow XCLAIM to transmit Claims Transfer Data to Prime Clerk for its review and approval of any changes to the Claims Registers to reflect any Claim transfers facilitated through the Platform.  Prime Clerk agrees not to provide any Accessible Data by programmatic electronic or digital means, such as by Data Files or API, to any other party that operates a claims-trading platform similar to the Platform unless required by Law; provided that, for the avoidance of doubt, Prime Clerk may directly provide Accessible Data to any party or parties seeking to purchase or sell Claims.  XCLAIM may use Accessible Data solely to facilitate the purchase and sale of Claims on the Platform and for no other purpose, including providing mailing services to customers.

2.2    **Initial Delivery**.  Prime Clerk shall promptly, but in no more than thirty (30) Business Days following the Effective Date, deliver to XCLAIM (a) a list of all pending Bankruptcy Proceedings in which Prime Clerk serves as a Claims Agent and (b) a Data File including all Accessible Data as of the date of delivery (together, (a) and (b), the "Initial Delivery").

2.3    **Subsequent Deliveries**.  Following the Initial Delivery, Prime Clerk shall provide XCLAIM with Data Files for all Accessible Data as set forth in Exhibit A.

2.4    **Ownership**.  As between the Parties, Prime Clerk shall continue to own all rights in and to Prime Clerk's Technical Data and all changes to Prime Clerk's Technical Data created or developed by, or on behalf of, Prime Clerk.  As between the Parties, XCLAIM shall own all

right, title, and interest in and to (i) the Platform, XCLAIM's Technical Data, and the API, and (ii) any XCLAIM Improvements that XCLAIM creates or develops as a result of the access granted by Prime Clerk herein to facilitate XCLAIM's ability to access the Accessible Data, or to provide Claims Transfer Data to Prime Clerk, excluding any portion thereof created or developed in Prime Clerk Software.  To the extent that the Parties agree, in writing and in advance, to collectively create or develop software, the Parties shall have joint ownership of such software.  Notwithstanding the foregoing, all Intellectual Property Rights to the Prime Clerk Software remain the property of Prime Clerk.  XCLAIM will not sell, transfer, publish, disclose, display, or otherwise make available to others the Prime Clerk Software or any copies thereof, except as provided in this Agreement.  All Prime Clerk Software is subject to the confidentiality provisions of this Agreement.  XCLAIM shall not, and shall not permit any third-party to, reverse engineer, decompile, or otherwise derive the source code of the Prime Clerk Software.

2.5     **Claims Transfer Data**.  Following the Release Date, to the extent agreed upon by the Parties in writing, Prime Clerk may receive and review Claims Transfer Data provided by XCLAIM.  For the avoidance of doubt, nothing in this Agreement requires Prime Clerk to receive or use Claims Transfer Data to update any Claims Register.

3.     **Security; Errors; Referral**.

3.1     **Security**.  XCLAIM shall permit its employees to have access to and use of the Accessible Data solely to the extent necessary to perform the functions permitted pursuant to this Agreement.  Passwords granting access to the Platform will require a minimum of eight (8) characters, one (1) capital letter, one (1) number and one (1) special character.  XCLAIM will require password changes at least every 180 days and will not allow for the reuse of passwords.  XCLAIM will make further advances in these security protocols over time to meet or exceed industry standards for maintaining security of financial information.

3.2     **Errors**.  For the avoidance of doubt, XCLAIM shall be responsible for any errors or omissions contained in Claims Transfer Data transmitted to Prime Clerk, and in any resulting updates to the Claims Registers made by Prime Clerk using such Claims Transfer Data.

3.3     **Referral to XCLAIM**.  To the extent agreed upon by the Parties in writing, Prime Clerk may place a hyperlink on certain of Prime Clerk's case websites or its case directory which will navigate persons interested in buying or selling Claims listed on the Claims Registers to the Platform.  Prime Clerk also agrees that it will not allow any other person or entity offering a service that competes with XCLAIM's services contemplated in this Agreement to place a similar link or device on Prime Clerk's case websites or otherwise promote any other operator of a claims-trading platform similar to the Platform unless required by Law.  Notwithstanding the foregoing, nothing herein shall prohibit Prime Clerk from responding to questions from interested parties where such response includes a discussion of XCLAIM's competitors, if any.

4.     **Payment**.

4.1     **Processing Fee**.  XCLAIM shall pay Prime Clerk a processing fee (the "Fee") equal to 10.0% of the commissions collected by XCLAIM related to any transfers of Claims facilitated by the Platform in any Bankruptcy Proceedings in which Prime Clerk serves as the Claims Agent

and has provided Accessible Data to XCLAIM as set forth in Section 2 hereof and Exhibit A hereto. In the event that XCLAIM agrees to pay any other Claims Agent for Bankruptcy Proceedings a Fee greater than 10.0%, XCLAIM will offer such higher Fee to Prime Clerk within ten (10) Business Days after the later of the execution date or the effective date of such agreement, and Prime Clerk shall have the right to accept or reject such offer within fifteen (15) Business Days of receipt of such offer (the "Most Favored Nation Clause"). If Prime Clerk accepts such offer, the Parties shall enter into an amendment to this Agreement and XCLAIM will pay such new Fee with respect to all transfers of Claims facilitated by the Platform made on and after the date Prime Clerk accepted such offer.

4.2     **Timing**. Within thirty (30) calendar days after the end of each calendar quarter, XCLAIM shall deliver to Prime Clerk a written report (the "Fee Report") detailing commissions actually collected during such calendar quarter by XCLAIM on account of Claim Transfers. If Prime Clerk does not object to the amount of the Fee contained in the Fee Report within ten (10) Business Days after receipt of the Fee Report, XCLAIM shall remit the Fee to Prime Clerk for such quarter within five (5) Business Days thereafter by check or wire transfer in U.S. Dollars and in accordance with written instructions provided by Prime Clerk. Prime Clerk's failure to object during such ten (10) Business Day period shall not constitute a waiver of Prime Clerk's right to object to such payment amount at any later date or preclude Prime Clerk from seeking additional fees related to such Claim Transfers.

4.3     **Audits**. XCLAIM shall maintain accurate and complete records, in a manner sufficient to permit audits in accordance with this Section 4.3. Upon a reasonable prior request from Prime Clerk, XCLAIM shall provide Prime Clerk and its representatives with access to such financial records and supporting documentation as may be reasonably requested by Prime Clerk solely to the extent necessary to determine the accuracy of any Fee Report. Prime Clerk shall be permitted to access XCLAIM's business premises to the extent necessary to perform such audit, as long as Prime Clerk conducts the audit at its expense and during business hours and with reasonable written advance notice. Unless required by Law or requested by a regulatory body, Prime Clerk shall not perform more than one audit per calendar year. If Prime Clerk's audit reflects that XCLAIM has underpaid or overpaid any Fee owing to Prime Clerk, then Prime Clerk shall inform XCLAIM as to Prime Clerk's calculations and methodology regarding its determination of the correct Fee. XCLAIM will have thirty (30) calendar days to respond to Prime Clerk's audit determinations (the "Audit Response Deadline"). To the extent XCLAIM agrees with any portion of the Fee discrepancy reported by Prime Clerk, XCLAIM shall promptly pay any agreed underpayment amount to Prime Clerk, no later than the Audit Response Deadline, and Prime Clerk shall pay XCLAIM any agreed overpayment by XCLAIM within seven (7) Business Days following XCLAIM's delivery of its audit response to Prime Clerk. If XCLAIM disputes any part of an underpayment claimed by Prime Clerk, XCLAIM shall inform Prime Clerk as to XCLAIM's calculations and methodology regarding its determination of the correct Fee. The Parties shall thereafter meet and confer in an effort to resolve any remaining Fee dispute. If such dispute is not resolved within ten (10) Business Days, or such longer period as agreed by the Parties, the dispute shall be submitted by the Parties to binding arbitration regarding the final Fee determination, in accordance with Section 10.7 hereof. In the event of material underpayment by XCLAIM, XCLAIM shall reimburse Prime Clerk for all reasonable documented costs and expenses incurred in connection with the audit (including, without limitation, payment in full of the audit) no later than thirty (30) calendar days after receipt of an invoice from Prime Clerk.

5.      **Representations and Warranties**.

5.1      **Joint Representations and Warranties**.  Each Party represents and warrants as follows:

5.1.1      **Authority**.  Such Party has all requisite power and authority to execute and deliver this Agreement and any and all instruments necessary or appropriate in order to perform its obligations under this Agreement.  This Agreement has been duly authorized, executed, and delivered by all necessary action on the part of such Party and constitutes a valid and legally binding obligation of such Party.

5.1.2      **Compliance with Laws**. The execution, delivery, and performance of this Agreement does not and will not conflict with or result in any violation or breach of Law.

5.1.3      **Non-Contravention**. The execution, delivery, and performance of this Agreement does not and will not violate any other agreement to which such Party is a party.

5.1.4      **Requisite Approvals**.  Notwithstanding anything in this Agreement, the Parties acknowledge that this Agreement has not been reviewed or approved by any bankruptcy court, the Executive Office of United States Trustee, or any Regional Office of the United States Trustee.  Should any such entities suggest that aspects of this Agreement be changed or suspended as to any Bankruptcy Proceeding(s), the Parties shall confer in a good faith effort to reach a consensual resolution regarding proposed changes to this Agreement as to any affected Bankruptcy Proceeding(s).  If the Parties cannot agree on changes to or suspension of this Agreement as to any affected Bankruptcy Proceeding(s), and either Party's proposed changes materially impact the other Party's "benefit of the bargain" pursuant to this Agreement in its entirety, such impacted Party may terminate this Agreement on thirty (30) days' notice with no liability as such Party's sole remedy, provided that Fees accruing based on transfers of Claims through the effective date of termination (whether XCLAIM receives its commission on such transfers of Claims before or after such effective date) shall be remitted.  The Parties agree that no prior notice or approval requests regarding this Agreement are necessary to the Parties' knowledge.  For the sake of clarity, as an example, if the Executive Office of the United States Trustee demands that Prime Clerk stop providing some or all of the services set forth under this Agreement either entirely or until making certain revisions to the Parties' activities, Prime Clerk may request that XCLAIM participate in such revisions and Prime Clerk may suspend or modify its activity under this Agreement until Prime Clerk and XCLAIM can take reasonable steps to satisfy the concerns of the Executive Office of the United States Trustee; and, on the other hand, XCLAIM may then terminate this agreement on thirty (30) days' notice if the Parties do not satisfy such concerns and restart the activities hereunder.

5.2      **XCLAIM's Representations and Warranties**.  XCLAIM represents and warrants to Prime Clerk as follows:

5.2.1      **Title**.  XCLAIM exclusively owns all right, title, and interest in and to the Platform and the API free and clear of any encumbrances, security interests, notes, loans, instruments, liens, judgments, orders, decrees, commitments, liabilities, licenses,

agreements or other binding arrangements or obligations between XCLAIM and any other person or entity that conflict with the rights granted by XCLAIM under this Agreement.

5.2.2  **No Infringement**.  XCLAIM's Platform and API, and Prime Clerk's delivery of the Accessible Data and Technical Data for use in the Platform, does not infringe, misappropriate or violate any Intellectual Property Right of any person or entity.

5.3  **Prime Clerk's Representations and Warranties**.  Prime Clerk represents and warrants to XCLAIM as follows:

5.3.1  **No Encumbrances**.  The execution, delivery and performance of this Agreement does not and will not result in the creation of any lien, security interest, or other encumbrance in or upon any of the Claims Registers or Accessible Data.

5.3.2  **No Infringement**.  Prime Clerk's transfer of Data Files, Accessible Data, and Prime Clerk's Technical Data (excluding any resulting XCLAIM Improvements) in accordance with this Agreement will not, infringe, misappropriate, or violate any Intellectual Property Right of any person or entity.

5.3.3  **Accuracy of Accessible Data**.  To Prime Clerk's knowledge, the Accessible Data accurately reflects the respective Claims Registers as of the time such Accessible Data is transferred to XCLAIM.

6.    **Indemnification**.

6.1    To the fullest extent permitted by applicable law, XCLAIM shall indemnify and hold harmless Prime Clerk and its members, shareholders, directors, officers, employees, representatives, affiliates, consultants, subcontractors and agents (collectively, the "Prime Clerk Indemnified Parties") from any against and Losses resulting from, arising out of, or related to the trading of Claims through the Platform, excluding Losses resulting from Prime Clerk's gross negligence or willful misconduct.

6.2    To the fullest extent permitted by applicable law, Prime Clerk shall indemnify and hold harmless XCLAIM and its members, shareholders, directors, officers, employees, representatives, affiliates, consultants, subcontractors and agents (collectively, the "XCLAIM Indemnified Parties") from and against any Losses resulting from, arising out of, or related to any errors in Accessible Data provided by Prime Clerk to XCLAIM, excluding Losses resulting from XCLAIM's gross negligence or willful misconduct.

6.3    Prime Clerk and XCLAIM shall notify each other in writing promptly upon the assertion, threat, or commencement of any claim, action, investigation or proceeding that either party becomes aware of with respect to the services provided hereunder.

6.4    The Parties' indemnification obligations hereunder shall survive the termination of this Agreement.

7.    **Limitation of Liability**.

7.1    Except as expressly provided herein, each Party's liability to the other Party for any Losses, unless due to such Party's gross negligence or willful misconduct, shall be limited to the total amount paid by XCLAIM to Prime Clerk for the portion of the particular work that gave rise to the alleged Loss.  In no event shall either Party be liable to the other Party for any indirect, special, or consequential damages (such as loss of anticipated profits or other economic loss) in connection with or arising out of the services provided hereunder.  Notwithstanding the foregoing, the Parties intend there to be no limitation with respect to (a) any Losses arising from or related to a breach by either Party of its confidentiality obligations hereunder or fulfillment of related indemnification obligations hereunder, or (b) Prime Clerk's right to any unpaid Fee, whether XCLAIM's failure to pay such fee relates to simple underpayment, failure of XCLAIM to honor the Most Favored Nation Clause, or otherwise.

8.    **Confidentiality**.

8.1    **Nondisclosure; Nonuse**.  All Confidential Information exchanged between the Parties pursuant to this Agreement shall not be distributed, disclosed, or disseminated by the receiving party to anyone except its own employees, agents, affiliates, owners, or subcontractors who have a reasonable need to know such Confidential Information and who have been advised of the confidential nature and required to observe the terms and conditions hereof; nor shall Confidential Information be used by the receiving party for its own purpose, except for the purposes of exercising its rights or fulfilling its obligations under this Agreement.  The restriction on disclosure will not apply to Confidential Information that is required to be disclosed by a court, government agency, or regulatory requirement, provided that the recipient shall first notify the disclosing party of such disclosure requirement or order and use reasonable efforts to obtain confidential treatment or a protective order.

8.2    **Exclusions**.  The obligations of Section 8.1 shall not apply to any information that: (a) is already in the public domain or becomes available to the public through no breach of this Agreement or other confidentiality obligation by the receiving party; (b) was in the receiving party's possession prior to receipt from the disclosing party as proven by the receiving party's written records; or (c) is received independently on a non-confidential basis from a third party free to disclose such information to the receiving party.  The obligations of Section 8.1 shall also not apply to any information that the receiving party discloses under an obligation of confidentiality to persons or entities who are considering making an investment in or lending funds to the receiving party, provided that such disclosures are made subject to the confidentiality terms set forth herein and the disclosing party accepts all responsibility and liability for any breach made by such recipient.

9.    **Term; Termination**.

9.1    **Term**.  This Agreement shall be effective on the Effective Date and shall continue in full force and effect for thirty (30) months after the Effective Date (the "Initial Term"), which term shall be automatically extended for an additional thirty (30) month period after the Initial Term expires unless either Party provides at least thirty (30) days' prior written notice of non-renewal.

9.2     **Termination for Breach**.  Either Party may terminate this Agreement for cause by notice in writing if the other Party shall at any time be in material breach of this Agreement and shall fail to remedy such breach (if capable of remedy) within thirty (30) calendar days from receipt of notice in writing from the first Party specifying such breach.

9.3     **No Waiver of Termination**.  No failure or delay on the part of either Party in exercising its right of termination hereunder for any one or more causes shall be construed to prejudice its rights of termination for such cause or any other or subsequent cause.

9.4     **Effect of Termination**.  The termination of this Agreement shall not release either Party from any liability which, upon such termination, has already accrued to the other Party.  If XCLAIM terminates this Agreement for cause, XCLAIM shall have no further obligation to pay the Fee specified in Section 4 with respect to Claim Transfers consummated after the date of termination, but will pay the Fees specified in Section 4 with respect to any Claim Transfers consummated prior to the date of termination.  Upon any termination of the Agreement, each Party shall return or destroy any Confidential Information of the other Party then in its possession, except as reasonably necessary for XCLAIM to continue to exercise its rights under this Agreement, in which case XCLAIM shall: (a) inform Prime Clerk of the exact Confidential Information retained and the reason for such retention; (b) return or destroy any such retained Confidential Information as soon as possible; and (c) update Prime Clerk upon request (such requests not to occur more often than weekly) as to the status of the continued need to retain such Confidential Information.  Within thirty (30) days of any termination, an officer of each Party shall certify in writing that all Confidential Information within such Parties' possession or control has been returned or destroyed.  In addition to the foregoing, the following Sections shall survive any termination or expiration of this Agreement: 1, 2.4, 4, 5, 6, 7, 8, 9, and 10.

10.     **Miscellaneous**.

10.1     **Waiver**.  No failure or delay by any Party hereto in exercising any right, power, or privilege hereunder shall operate as a waiver thereof, nor shall any single or partial waiver thereof preclude any other or further exercise thereof or the exercise of any other right, power, or privilege.

10.2     **Amendment**.  This Agreement may be modified only by a written document signed by duly authorized officers of each of the Parties.

10.3     **Notices**.  All notices and other communications required or permitted hereunder shall be in writing and shall be personally delivered by hand, or delivered by first-class, registered or certified mail, postage prepaid, by messenger, or by overnight delivery at the addresses first set forth above or at such other address as each Party shall have furnished to the other in writing.  Any notice or other communications so provided shall be deemed to be given when actually received by the addressees.

10.4     **Relationship of Parties**.  Nothing herein contained shall be deemed to create an agency, joint venture, or partnership relationship between the Parties.  It is understood and agreed that neither Party is, by reason of this Agreement or anything herein contained, constituted, or appointed the agent or representative of the other Party for any purpose whatsoever.

10.5    **Assignment**.  Neither Party may assign this Agreement nor any of its rights or obligations hereunder without the prior written consent of the other Party, such consent not to be unreasonably conditioned, delayed, or withheld.  Notwithstanding the foregoing, either Party may assign this Agreement and its rights and obligations hereunder, without the other Party's consent, to an affiliate of the assigning party or to a successor in interest upon any merger, reorganization, acquisition, change of control, or sale of all or substantially all of the assets of the assigning Party; provided, however, that Prime Clerk may terminate this Agreement at any time within eighteen (18) months of such assignment if XCLAIM assigns this Agreement to (a) another Claims Agent, or (b) to an assignee that owns or controls, or is under common ownership or control with, another Claims Agent.  Any purported assignment not in compliance with this Section 10.5 shall be deemed null and void *ab initio*.  This Agreement is binding upon and inures to the benefit of the Parties and their respective permitted successors and assigns.

10.6    **Governing Law**.  This Agreement and the Parties' performance hereunder shall be governed by New York law, excluding choice-of-law rules.  Any proceeding arising out of or based upon this Agreement shall be submitted to binding arbitration pursuant to Section 10.7 hereof.  EACH PARTY HERETO IRREVOCABLY WAIVES THE RIGHT TO TRIAL BY JURY IN ANY PROCEEDING BROUGHT BY OR ON BEHALF OF EITHER PARTY RELATED TO OR ARISING OUT OF THIS AGREEMENT OR THE PERFORMANCE OF ANY OBLIGATIONS HEREUNDER.

10.7    **Arbitration**.  Any dispute, claim, or controversy arising out of or relating to this Agreement or the breach, termination, enforcement, interpretation, or validity thereof, including the determination of the scope or applicability of this agreement to arbitrate, shall be determined exclusively by arbitration in Los Angeles, California, before a single arbitrator.  The arbitration shall be administered by JAMS pursuant to its Comprehensive Arbitration Rules and Procedures.  Judgment on the award may be entered in any court having jurisdiction.  This clause shall not preclude parties from seeking provisional remedies in aid of arbitration from a court of appropriate jurisdiction.

10.8    **Severability**.  Whenever possible, each provision of the Agreement will be interpreted in such manner as to be effective and valid under applicable Law, but if any provision of the Agreement is held to be prohibited by or invalid under applicable Law, such provision will be ineffective only to the extent of such prohibition or invalidity, without invalidating the remainder of the Agreement.

10.9    **Headings; Construction**.  The headings to the clauses, sub-clauses, and parts of this Agreement are inserted for convenience of reference only and are not intended to be part of or to affect the meaning or interpretation of this Agreement.  The terms "this Agreement," "hereof," "hereunder" and any similar expressions refer to this Agreement and not to any particular Section or other portion hereof.  The Parties agree that any rule of construction to the effect that ambiguities are to be resolved against the drafting Party will not be applied in the construction or interpretation of this Agreement.  As used in this Agreement, the words "include" and "including," and variations thereof, will be deemed to be followed by the words "without limitation."

10.10    **Counterparts**.  This Agreement may be executed in multiple counterparts, each of which shall be deemed an original and all of which together shall constitute one instrument.  This

Agreement may be executed by facsimile or .pdf signature by either Party and such signature will be deemed binding for all purposes hereof without delivery of an original signature being thereafter required.

    10.11  **Entire Agreement**.    This Agreement, including all exhibits attached hereto, constitutes the entire agreement between the Parties with respect to the subject matter hereof, and supersedes any prior agreements, or understandings of the Parties in either written or oral form.

    **IN WITNESS WHEREOF,** the Parties have executed this Agreement as of the Effective Date.

**Prime Clerk**                                        **XClaim Inc.**

By:  _____        By:  _____

                                                        Matthew D. Sedigh
                                                       President and CEO

Date:  _____        Date:  _____

## EXHIBIT A

## TECHNOLOGY AND DATA EXCHANGE

1. **Accessible Data Sent Electronically by Prime Clerk to XCLAIM**.

   1.1 **SFTP File Transfers**.

       1.1.1    Prime Clerk to place a JavaScript Object Notation (JSON) or other mutually agreed format on a Prime Clerk-owned Secure File Transfer Protocol (SFTP) server (the "SFTP Server").  Prime Clerk to provide XCLAIM personnel named credentials to access the SFTP Server for up to five (5) XCLAIM employees and one (1) service account.

       1.1.2    Prime Clerk to include data elements in each Data File from all Accessible Data, in fields and format to be mutually agreed by the Parties within thirty (30) days after the Effective Date of the Agreement.  Within such thirty (30) day period, the Parties will use their best efforts to spend three (3) working days onsite at XCLAIM or Prime Clerk, as mutually agreed upon.

       1.1.3    During the Term of the Agreement, except as may be otherwise agreed by the Parties in writing, Prime Clerk agrees to use commercially reasonable efforts to post a date-stamped Data File to the SFTP Server every one (1) hour with all Accessible Data as a cumulative bundle.

2. **Claim Transfer Data Sent Electronically by XCLAIM to Prime Clerk.**

   The Parties recognize that Prime Clerk has no duty hereunder, nor will any such duty arise hereunder, unless and until, among other things, Prime Clerk determines, in its sole discretion, that updating the relevant Claims Register is appropriate, is authorized by the respective bankruptcy court, and satisfies Prime Clerk's business judgment; this paragraph gives rise to absolutely no duties hereunder, but rather operates as a placeholder identifying the future goals of XCLAIM, which goals Prime Clerk has not agreed to advance at this point or committed to advance at any point in the future.

**Exhibit 7**

| | |
|---|---|
| **From:** | Matthew Sedigh |
| **To:** | Pullo, Christina |
| **Cc:** | Adler, Adam; Steele, Benjamin; Waisman, Shai; Weiner, Shira |
| **Subject:** | [EXTERNAL] XCLAIM Update |
| **Date:** | Wednesday, July 7, 2021 3:40:55 PM |

Christina,

It's been a few months since we last connected - I hope all is well.

I wanted to update you on our efforts to modernize the claims trading market with a digital solution for creditors, traders, claims agents, and the courts.

In Q2 XCLAIM settled $21,712,040 of traded claims, a 242% increase from our Q1 volume. As you know BK activity has slowed significantly over the last several months. During this time XCLAIM was still growing, and fast.

We now have 42 distressed debt investors signed up to trade claims. The market is embracing our innovative approach to solving for the inefficiencies of the marketplace.

In Q2, those investors placed more than $7b of bids on claims across 33 cases. Our top 5 most active cases have been:

       Hertz (Prime Clerk)
       LatAm (Prime Clerk)
       Francesca's (Stretto)
       Century21 (Stretto)
       Intelsat (Stretto)

The XCLAIM leadership team will be in NY from August 9-20 to meet with our buy-side clients. I'd like to also arrange a time to meet with you and your team to share more about our plans for the future and why we see a relationship between XCLAIM and Prime Clerk as being mutually beneficial. Can you find an hour for us?

--
Matt Sedigh
Chief Executive Officer



**Exhibit 8**



2261 Market Street #4385
San Francisco, CA 94114
www.x-claim.com

July 25, 2022

***By Email***

Mr. Adam Adler
Managing Director, Restructuring Administration
Kroll, LLC
55 East 52nd Street 17th Floor
New York, NY 10055

Re: *In re LSC Communications, Inc.* Case No. 20-10950 (SHL)

Dear Mr. Adler,

     Pursuant to 11 U.S.C. § 107(a), XClaim Inc. ("Xclaim") respectfully requests a true and correct copy of the following public record delivered at your earliest convenience to Xclaim's Public Data Processing Team at publicdatarequests@x-claim.com, current within one business day of the delivery date:

1. Official claims register for the above captioned chapter 11 case, including but not limited to all publicly available data associated with each creditor in .csv or comparable electronic format and copies of all proofs of claim identified to each creditor listed in the claims register.

     Xclaim has previously contacted the Office of the Clerk of the United States Bankruptcy Court for the Southern District of New York to inquire about obtaining a copy of such record, but was informed that the Court does not have access to the claims register until a bankruptcy case is closed. The representative in the Clerk's Office provided your name and instructed us to contact you directly to receive a copy of the above record, which is unavailable for download on your public-facing website.

     We understand that the fee for reproducing and transmitting a copy of an electronic record stored outside the court's electronic case management system is $31.00 per-record pursuant to section 1(b) of the Bankruptcy Court Miscellaneous Fee Schedule as referenced in 28 U.S.C. §§ 1930(b) and 1914(b). Please bill the cost of this service to the credit card provided below:

                       Andrew Glantz

                       /s/ *Andrew Glantz*
                       Andrew Glantz
                       Director of Business Development and Legal
                       Innovation

Cc:     Vito Genna, Clerk of Court, United States Bankruptcy Court for the Southern District of New York

**Exhibit 9**

Service Level Agreement - Delaware Bankruptcy Court                    Version 2019-1.2

- If the Claims Agent utilizes the services of a third-party for physical or virtual LAN or cloud servers containing DEB's data, Claims Agent must specify the third-party's backups schedule per the approved retention policy, the recovery of backed up computing equipment, associated OS, software, data and databases that will be included within business continuity plans;
- Conduct retrieve and restore of archived backup files, as needed to return business operations to a normal state in the event of a breach, force majeure, or exercised business continuity;
- Manage enterprise backup licenses, ensuring the patching, scanning, remediation, licensure, support services, and vendor upgrades;
- If the Claims Agent utilizes the services of a third-party for physical or virtual LAN or cloud servers containing DEB's data, Claims Agent must manage enterprise backup licenses, ensuring the patching, scanning, remediation, licensure, support services, and vendor upgrades on any third-party server containing DEB's data.

# 4. Security

As an agent for DEB, Claims Agent is subject to the same security policies enacted by the Administrative Office (AO) of the United States Courts, the Third Circuit and DEB, incorporated herein and with respect to DEB's data. Claims Agent must implement and enforce the following security policies and standards:

**System / Software Inventory and Data Identification:**

- Hosts containing DEB's data must be identified and documented;
- All virtual servers that contain DEB's data must reside in a cloud environment that is compliant with an accepted security standard and program such as Cloud Security Alliance, International Organization for Standardization, FedRAMP, etc. DEB may request that the Claims Agent provide proof of certified compliance.

**Privileged Account Access:**

- Administrative privileges on physical or virtual hosts containing DEB data are assigned only to authorized persons designated by Claims Agent;
- Privileged staff access to DEB data is logged and periodically reviewed by designated Claims Agent personnel;
- Privileged access of DEB data is only used by authorized staff for those tasks that specifically require it;
- Claims Agents use individual administrative accounts when completing administrative tasks pertaining to DEB data rather than shared accounts.

**Password Security:**

- All systems (whether physical or virtual) containing DEB data have changed default passwords. Changed passwords should be comprehensive and contain a minimum of 8 characters, one capital letter, one number and one special character;