**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| In re: | ) FOR PUBLICATION |
|  | ) |
| MATTER OF CERTAIN CLAIMS AND NOTICING AGENTS' RECEIPT OF FEES IN CONNECTION WITH UNAUTHORIZED ARRANGEMENTS WITH XCLAIM INC. | ) Misc. Pro. No. 22-00401 (MG) |

## MEMORANDUM OPINION AND ORDER STRIKING THE XCLAIM SUBMISSION AND SANCTIONING THE XCLAIM ACCOUNTHOLDERS

*A P P E A R A N C E S :*

HOGAN LOVELLS US LLP
*Attorneys for Xclaim, Inc.*
390 Madison Avenue
New York, NY 10017
By:      John D. Beck, Esq.
         and
1735 Market St.
Philadelphia, PA 19103
By:      Kevin J. Carey, Esq. (*pro hac vice*)

OFFICE OF THE UNITED STATES TRUSTEE
U.S. Federal Office Building
201 Varick Street, Room 1006
New York, NY 10014
By:      Annie Wells, Esq.
         Andrea Schwartz, Esq.

**MARTIN GLENN**
**CHIEF UNITED STATES BANKRUPTCY JUDGE**

Under 28 U.S.C. § 156(c),[1] the Clerk of Court of a United States Bankruptcy Court may

utilize the services of a claims and noticing agent ("claims agent") to assist the Clerk with certain

---

[1]      Section 156(c) of Title 28 allows a bankruptcy court to "utilize facilities or services . . . off the court's premises, which pertain to the provision of notices, dockets, calendars, and other administrative information to

administrative tasks.  Claims agents are often utilized in large cases to assist with noticing and

the processing of creditor claims, and the Clerk of Court of this Bankruptcy Court ("Clerk" or

"Clerk of Court") has over the years preapproved ten private entities any one of which can be

retained to act as the Clerk's agent in a bankruptcy case in the Southern District of New York.[2]

For the past few years, half of the preapproved claims agents contracted with a for-profit

claims-trading website to synchronize creditor claims data to the website where such claims were

posted for sale.  In *In re Madison Square Boys & Girls Club, Inc.*, 642 B.R. 487 (Bankr.

S.D.N.Y. 2022) ("*Madison Square Decision*"), Judge Lane of this Court ruled that these

synchronization arrangements violated 28 U.S.C. § 156(c) and related local guidelines.  Because

the *Madison Square Decision* involved the retention of a single claims agent, the Court

commenced this miscellaneous proceeding to ascertain which other claims agents had, or still

have, similar arrangements and to determine what sanctions, if any, should be levied on such

claims agents.

Xclaim, Inc. ("Xclaim") – the entity that operates the claims-trading website – is not a

party to this proceeding.  Without seeking leave to intervene, and in violation of its limited

electronic-filing credentials, Xclaim filed a sixty-eight-page submission ("Xclaim Submission")[3]

"seeking no relief," but rather, according to Xclaim, to "correct and supplement the record."  The

---

parties in [bankruptcy cases], where the costs of such facilities or services are paid for out of the assets of the estate
and are not charged to the United States."

[2]     The list of the ten claims agents is available at https://www.nysb.uscourts.gov/claims-agents.  The webpage
instructs private entities wishing to become a preapproved claims agent in the Southern District of New York to
submit a letter to the Clerk of Court to initiate the application process.

[3]     The Xclaim Submission was filed on September 22, 2022 [ECF Doc. # 16], but for reasons explained
herein, the Clerk has blocked public access to the document.  "ECF Doc. # _" refers to documents filed on the
docket of this miscellaneous proceeding.  Documents filed on the electronic docket of a different case will include
the case number.

Xclaim Submission displayed the direct contact information of, among others, five federal judges, the Director of the Administrative Office of the U.S. Courts, the Director of the Executive Office for United States Trustees, United States Trustee for Regions 3 and 9, the Bankruptcy Clerks of this Court and the Delaware Bankruptcy Court, and dozens of other civil servants.

A federal court docket is not a vehicle for nonparties to blithely file documents to rebut what it perceives as negative information that comes to light in a proceeding. For the reasons explained below, the Xclaim Submission is stricken as an improper filing, and the Xclaim Accountholders (defined below) are sanctioned as set forth herein.

## I. BACKGROUND

### A. Xclaim's Limited Electronic-Filing Credentials

Attorneys who are admitted to practice in this Court may apply for an account with this Court's Electronic Case Filing ("ECF") system to file pleadings and other documents electronically. Under certain circumstances, non-attorneys are permitted to apply for limited-access ECF accounts to file a subset of documents electronically. *See* United States Bankruptcy Court Southern District of New York, Procedures for the Filing, Signing and Verification of Documents By Electronic Means ("SDNY E-Filing Procedures") § I.A.2 ("This Court has authorized the limited use of the System by non-attorneys who obtain a limited-access account.").[4] For example, institutional lenders are sometimes given limited-access ECF accounts to electronically file proofs of claim because such lenders frequently appear as creditors in consumer bankruptcy cases.

---

[4] The SDNY E-Filing Procedures are available at https://www.nysb.uscourts.gov/sites/default/files/5005-2-procedures.pdf.

In 2020, Xclaim representatives approached the Clerk of Court about obtaining electronic-filing credentials. The Clerk tentatively agreed to give Xclaim limited electronic-filing rights. Given the nature of Xclaim's business as a claims-trading website, the Clerk made clear that he was providing access to Xclaim for the limited purpose of filing notices of claim transfers on the docket.[5] In August 2020, one Xclaim representative was granted limited ECF access and executed a Limited User E-Filing Access agreement ("Limited E-Filing Agreement"). Consistent with the restrictions outlined by the Clerk, the agreement provided the Xclaim representative with "limited access to the ECF System for the purpose of filing electronically certain claims-related documents and/or affidavits of service." (Limited E-Filing Agreement ¶ 1.) By signing the Limited E-Filing Agreement, the Xclaim representative acknowledged that the "**Clerk's office has the right to terminate my e-filing access at any time in the event of any misuse of the account, or for any other reason**." (*Id.* ¶ 8 (emphasis in original).) In February 2021, two other Xclaim representatives – Matthew Sedigh (Xclaim's CEO) and Ryan Vollenhals (together with Mr. Sedigh, the "Xclaim Accountholders") – each signed a Limited E-Filing Agreement and were granted the same limited electronic-filing rights.

B.     **The Synchronization Agreements and the *Madison Square Decision***

In 2019 and 2020, Xclaim entered into agreements (each, a "Synchronization Agreement") with five of the ten claims agents preapproved to be retained in this Court. (*See, e.g.*, Exclusive Access Agreement, dated Oct. 3, 2019, between Xclaim and Epiq Corporate Restructuring LLC (attached as Exhibit B to Epiq's Notice & Response to August 25, 2022, Order [ECF Doc. # 12]); Exclusive Claims Data Access Agreement, dated Nov. 23, 2020

---

[5]     Rule 3001(e)(2) of the Federal Rules of Bankruptcy Procedure requires the transferee to file evidence of a transfer when "a claim other than one based on a publicly traded note, bond, or debenture has been transferred other than for security after the proof of claim has been filed."

(attached as Exhibit A to Notice of Stretto, Inc. [ECF Doc. # 13]).  As set forth in greater detail

in the *Madison Square Decision*, the purpose of the Synchronization Agreement was to "allow

Xclaim to synchronize the claims registers that [the claims agent] administers as the Clerk's

claims agent with the claims available for sale on the Xclaim platform."  642 B.R. at 489.[6]  In

return for providing ongoing synchronization and corresponding services, Xclaim paid the claims

agent 10% of the commissions Xclaim received from users of its website.  *Id*. at 489.

The propriety of the Synchronization Agreements was resolved by Judge Lane in the

*Madison Square Decision*.  Among other things, the Court recognized that a claims agent's

authority to act under 28 U.S.C. § 156(c) is derivative of the Clerk's authority, and therefore, the

claims agent may not engage in activities that the Clerk may not engage in.  *Madison Square

Decision*, 642 B.R. at 493; *accord In re LATAM Airlines Grp. S.A.*, Case No. 20-11254 (JLG),

2022 WL 4229500, at *9 (Bankr. S.D.N.Y. Sept. 13, 2022).[7]  If the Clerk provided comparable

synchronization services to, and received fees from Xclaim, the Clerk would violate Canon 2 of

the Code of Conduct for Judicial Employees which prohibits the Clerk from (i) lending the

prestige of the office to advance or to appear to advance the private interests of others, and (ii)

using the office for private gain.  *Madison Square Decision*, 642 B.R. at 493-94.  Judge Lane

also rejected the claims agent's representation in the Synchronization Agreement that it owned

---

[6]      All of the original Synchronization Agreements provided Xclaim with digital access to the claims data on
an *exclusive* basis, but the agreement at issue in the *Madison Square Decision* was amended five days before the
case filing to remove the exclusivity requirement.  642 B.R. at 488-89.  The Court explained that, "[w]hile the
exclusivity provision made the agreement even more problematic, the Court concludes that the [Synchronization
Agreement] is improper even without the exclusivity provision."  *Id.* at 489 n.5.

[7]      This Court's local protocol for the retention of claims agents under section 156(c) provides that the
retention "should be limited in scope to those duties that would be performed by a Clerk of Court" and "should
exclude those duties that would *not* be performed by a Clerk of Court . . . ."  Protocol for the Employment of Claims
and Noticing Agents Under 28 U.S.C. § 156(c) at 1,
https://www.nysb.uscourts.gov/sites/default/files/pdf/newClaimsAgentsProtocol.pdf (emphasis in original).

the creditor claims data. Such data belongs to the U.S. Courts as the Clerk is the official custodian of court records under 28 U.S.C. § 156(e). The Clerk remains responsible for the data even when a claims agent is retained to assist the Clerk with administrative tasks, and the data remains in the legal custody of the Judiciary even after the case is closed and the claims are delivered to the Federal Records Center of the National Archives and Records Administration. *Id*. at 494-95. But for the claims agent's ability to administer the claims register as the Clerk's agent under 28 U.S.C. § 156(c), it would not be able to provide the synchronization services. *Id* at 495. Thus, the claims agent could not be retained in the case to the extent the terms of the Synchronization Agreement applied to the claims register in the case. *Id*. at 497.[8]

As of the date that Xclaim filed the Xclaim Submission (September 22, 2022), all of the claims agents that were parties to a Synchronization Agreement had terminated such contracts with Xclaim. (*See* Transcript of Oct. 26, 2022 ("Hr'g Tr.") at 16:6-9 ("THE COURT: . . . So you agree that at the time they made the filing in this proceeding they no longer had contracts with any of the claims agents? MR. CAREY: That's correct.") [ECF Doc. # 33].)

## C.    This Proceeding and Kroll's Submission

Until earlier this year when the United States Trustee's office delivered a copy of a Synchronization Agreement to the Clerk, the Court was unaware of the arrangements. The existence of the Synchronization Agreements was not previously disclosed to the Court in

---

[8]    The claims agent whose retention was at issue in the *Madison Square Decision* did not appeal the decision, but Xclaim did. *See Xclaim Inc. v. Madison Square Boys & Girls Club, Inc.*, Case No. 22-cv-07575-KPF (S.D.N.Y.). Xclaim's standing to appeal the *Madison Square Decision* is disputed. (*See* Transcript of Sept. 12, 2022 hearing in Madison Square case at 7:23-8:4 ("MS. SCHWARTZ: Andrea Schwartz with the U.S. Trustee. I do have a question about what you just said because the U.S. Trustee really does have a question as to whether or not Xclaim has standing . . . . THE COURT: But that's an issue for the . . . the District Court to address.") *see also id*. at 8:25-9:5 ("MS. SCHWARTZ: So . . . the U.S. Trustee's rights with respect to making any arguments or objections to the standing of Xclaim in this proceeding are all preserved [to be raised with the District Court?] THE COURT: Correct.") [ECF Case No. 22-10910 Doc. # 202].)

claims-agent retention applications or otherwise.  Since the *Madison Square Decision* involved a single claims agent, the Court commenced this miscellaneous proceeding to ascertain which, if any, of the other nine preapproved claims agents had similar arrangements with Xclaim or any other entity.  (*See* Order, dated Aug. 25, 2022 ("Commencement Order") [ECF Doc. # 1].)  The Commencement Order required the ten claims agents to make certain disclosures including any business arrangements with Xclaim or similar entity and any fees received from those entities on account of such arrangements.  (*Id*. at 2-3.)  The order previewed that the disclosures and further proceedings might lead to suspension from the Clerk's list of preapproved claims agents and/or disgorgement of fees received.  (*Id*. at 2.)  Notably, the Commencement Order did not contemplate participation by Xclaim, did not seek disclosure from Xclaim, and did not preview any possible sanction against Xclaim.  Xclaim did not seek to intervene.

Kroll Restructuring Administration LLC f/k/a Prime Clerk LLC ("Kroll") is among the Clerk's preapproved claims agents and timely filed its disclosure on September 16, 2022 ("Kroll Submission") [ECF Doc. # 11].  The Kroll Submission was divided into three sections.  In the "Response to Order" section, Kroll answered the disclosures required by the Commencement Order and represented, *inter alia*, that it never had any business arrangement with Xclaim and did not have any other arrangement with any third party requiring it to perform a task that the Clerk could not perform.  (Kroll Submission at 1-2.)

Next, in the "Additional Statement" section, Kroll described the various interactions it has had with Xclaim since early 2020, including (i) Xclaim's multiple efforts to enter into a Synchronization Agreement with Kroll including by describing the substantial fees that Kroll

was foregoing by not engaging with Xclaim,[9] (ii) an August 2020 incident in which Xclaim

solicited a creditor in the General Nutrition Corporation chapter 11 case to consider selling its

claim and represented that Kroll and Xclaim were partners and that Kroll had notified Xclaim

that the creditor had filed a proof of claim, (iii) Xclaim's continuing to display trademarked

logos on its website of Kroll's clients without permission, and (iv) days after Judge Lane's bench

decision in the Madison Square case,[10] Xclaim sending Kroll a request for claims data in the

LSC Communications, Inc. chapter 11 case "in .csv or comparable electronic format."[11]  (Kroll

Submission at 3-7.)

---

[9]     For example, on April 26, 2021, Xclaim CEO Mr. Sedigh emailed various Kroll representatives the
following about the Hertz chapter 11 case in which Kroll was serving as claims agent:

> As you know, XCLAIM has been manually copying all public claims data from Prime Clerk's
> website.  With that data, along with the data received from our Claims Agent partners, XCLAIM
> has built a marketplace for trading claims where our inventory is all claims.
>
> . . .
>
> There is $550 million of General Unsecured Debt in the Hertz case.  We charge buyers a 1%
> commission, and we pay our Claims Agent partners a 10% processing fee from the commissions we
> collect.   That represents a $550,000 top-line revenue opportunity for Prime Clerk (without
> considering the market expansion to come from secondary trading).  . . . .

(Kroll Submission, Ex. 6.)

[10]     Judge Lane initially ruled from the bench on July 20, 2022 (*see* ECF Case No. 22-10910 Doc. # 82
(Transcript of July 20, 2022 hearing in Madison Square case)), previewed that he may issue a written opinion further
explaining his rationale (*id.* at 49:1-6), and issued the *Madison Square Decision* on August 18, 2022.

[11]     In the *Madison Square Decision*, Judge Lane explained that Xclaim has the same access to claims data as
the rest of the public and is not entitled to receive the data in a specialized format to suit its private interests:

> Xclaim's complaint isn't about access; it has the same access to information about filed claims as
> any member of the public.  Xclaim's real complaint is not being able to obtain this information in
> its preferred electronic format, a format that is best for its online claims trading business. . . .  The
> claims data that Epiq generates in the ordinary course of business as a claims agent does not satisfy
> Xclaim's needs; it wants Epiq to take the additional step of processing the data into Xclaim's
> preferred electronic format, and Xclaim is willing to pay for that service.  But the Clerk of Court
> could not receive a fee to process this claims data simply to further Xclaim's private interest.  *See*
> Code of Conduct, Canon 2 (the Clerk should avoid the appearance of impropriety in all activities
> and should not lend the prestige of the office to advance the private interests of others).  And as the
> Clerk's agent, neither can Epiq.

Last, in the "Rationale" section, Kroll stated its views on why entering into a

Synchronization Agreement would be improper.  Specifically, Kroll stated, among other things,

that (i) the creditor claims data was not Kroll's property to sell, (ii) the Synchronization

Agreement ran afoul of a provision in the claims-agent agreement entered into with the Delaware

Bankruptcy Court, (iii) receiving payments under the Synchronization Agreement would create a

perceived, if not actual, conflict of interest, (iv) Kroll would incur significant expense to provide

claims data in Xclaim's desired format and those additional costs would be borne by the

bankruptcy estates, and (v) synchronization with Xclaim's website would result in unnecessary

republication of creditors' personally identifiable information.  (*Id*. at 7-11.)

### D.    The Xclaim Submission

Despite not being a party to this proceeding, Xclaim electronically filed the Xclaim

Submission on September 22, 2022.  The Xclaim Submission was signed by Mr. Sedigh and

filed using Mr. Vollenhals' limited access ECF credentials.[12]  Mr. Sedigh acknowledged that

"the Court did not request our participation" in the proceeding but that he "fe[lt] compelled to

correct and supplement the record" to rebut certain statements in the Kroll Submission.  (Xclaim

Submission at 1.)  Other than supplementing the record, Xclaim sought no relief in the

proceeding.  (*Id*. at 5 ("I write this letter to your Honor seeking no relief.").)

---

642 B.R. at 495-96; *see also* BANKRUPTCY CLERKS' MANUAL, Topic 12, Subtopic 9 ("**Request for Customized Reports**: Courts often receive requests for access to data compiled by the court or requests that the court use its automation capabilities to compile customized data for an entity.  Court Services Office has determined that any internal work product of the clerk's office, other than dockets for bankruptcy cases and adversary proceedings, are not 'public records' within the meaning of 11 U.S.C. § 107(a), and thus customized reports should not be created for the public.").

[12]    Although Mr. Vollenhals did not physically sign the Xclaim Submission, he acknowledged in the Limited E-Filing Agreement that the "use of my account constitutes my signature on the document being submitted." (Limited E-Filing Agreement ¶ 2.)  Therefore, the document is deemed signed by both Xclaim Accountholders.

The substance of the Xclaim Submission discussed various communications Xclaim had with the Bankruptcy Clerks in the Southern District of New York (as set forth *supra* in § A) and Delaware to introduce Xclaim's website and obtain limited-access ECF credentials.  It also described a meeting with a representative of the United States Trustee's office to introduce the Xclaim website.  Next, it implied that Kroll's positions in this proceeding were disingenuous because Kroll was still considering whether or not to engage with Xclaim into 2022.  Lastly, Xclaim argued that its website serves the best interest of creditors.

The substance notwithstanding, the Xclaim Submission annexed several exhibits which displayed the direct email addresses of:

- five federal judges;
- the Director of the Administrative Office of the U.S. Courts ("AO") as well as two other AO employees;
- the Clerks of Court for the United States Bankruptcy Court for the Southern District of New York and the District of Delaware as well as ten other court employees; and
- the Director of the Executive Office for United States Trustees ("EOUST"), the United States Trustee for Regions 3 and 9 as well as twenty-nine other Department of Justice attorneys.

Due to the potential risk of threats, harassment, and targeted phishing attacks against judges, court personnel, and senior Government officials, the Clerk blocked public access to the Xclaim Submission.

### E.    The Order to Show Cause and Related Briefing

On September 23, 2022, the Court entered an order to show cause why the Xclaim Accountholders should not be sanctioned ("Order to Show Cause") [ECF Doc. # 17].  The order

10

stated that, under the Limited E-Filing Agreements, the Xclaim Accountholders could only electronically file "claims-related documents and/or affidavits of service" and that the Clerk may terminate the Xclaim Accountholders' e-filing access "at any time in the event of any misuse of the account, or for any other reason." (Order to Show Cause at 1.) The order further recognized that Xclaim is not a party to the proceeding, (*id*. ("WHEREAS, Xclaim is not an Approved Claims Agent, but nonetheless, publicly filed [the Xclaim Submission] on September 22, 2022.")), and that its submission included personally identifiable information ("PII") of multiple federal judges, senior Government officers, and court personnel. (*Id*. at 2.)

The Order to Show Cause required the Xclaim Accountholders to submit a written response why they should not be sanctioned, and Xclaim submitted a letter brief through counsel on October 6, 2022 ("Xclaim OSC Brief") [ECF Doc. # 25]. Xclaim made various arguments on why sanctions are unwarranted (many of which are addressed later in this memorandum decision), but they can be boiled down to two central points: (1) Xclaim was able to locate most of the PII of the Judges and Government officials on other parts of the internet (Xclaim OSC Brief at 1-2, 4-5), and (2) the Order to Show Cause failed to cite authority under which the Court could issue sanctions. (*Id*. at 2, 5-9.) Xclaim also asserted that sanctions would be inappropriate because it relied on the advice of its former counsel, Latham & Watkins LLP ("Latham"), when it prepared and filed the Xclaim Submission. (*Id*. at 10.)

The Order to Show Cause permitted the U.S. Trustee ("UST") to also submit a written response, and the UST filed a statement and reservation of rights on October 13, 2022 ("UST OSC Brief") [ECF Doc. # 27]. The UST noted that "Xclaim was not a party or subject to the [Commencement Order]" but "independently decided to file the Xclaim Submission." (UST OSC Brief at 4.) The UST asserted that the Court has ample authority to issue sanctions

including under its inherent powers and also pointed to the Limited E-Filing Agreements which the Xclaim Accountholders appear to have plainly violated.  (*Id*. at 5-6.)  The UST suggested that an appropriate sanction could be to terminate the Xclaim Accountholders' e-filing privileges.  (*Id*.)

A hearing on the Order to Show Cause was held on October 26, 2022.  At the hearing, Xclaim's counsel acknowledged that Xclaim is relying on an advice-of-counsel defense.  Consequently, the Court instructed Xclaim's counsel to submit the attorney-client communications that form the basis of Xclaim's advice-of-counsel defense.  (Hr'g Tr. at 14:19-23.)  Xclaim submitted certain email exchanges between Xclaim representatives and Latham attorney Kimberly Posin, Esq. (the "Xclaim-Posin Communications") to chambers and filed a motion seeking to file redacted versions of the attorney-client communications on October 27, 2022 ("Motion to Seal") [ECF Doc. # 31].[13]

## II.   <u>LEGAL STANDARD</u>

### A.   **Right to be Heard**

Section 1109(b) of the Bankruptcy Code states that "[a] party in interest, including the debtor, the trustee, a creditors' committee, an equity security holders' committee, a creditor, an equity security holder, or any indenture trustee, may raise and may appear and be heard on any issue in a" chapter 11 bankruptcy case.[14]  Beyond the parties enumerated in the statute, a "party in interest" is not further defined.  *Savage & Assocs., P.C. v. K & L Gates LLP (In re Teligent, Inc.)*, 640 F.3d 53, 60 (2d Cir. 2011).  However, "[t]he general theory behind the section is that

---

[13]      As explained *infra*, Xclaim's advice-of-counsel defense lacks merit.  As such, the Motion to Seal is denied as moot, and the Xclaim-Posin Communications need not be docketed.

[14]      Section 1109 applies to this miscellaneous proceeding because the Court is examining the activities of claims agents in chapter 11 cases where they were approved by the Court to serve as the Clerk of Court's agent under 28 U.S.C. § 156(c).

anyone holding a direct financial stake in the outcome of the case should have an opportunity to

participate in the adjudication of any issues that may ultimately shape the disposition of his or

her interest." *Id.* (quoting ALAN RESNICK & HENRY J. SOMMER, 7 COLLIER ON BANKRUPTCY ¶

1109.1 (16th ed. 2011)) (internal quotation marks and alteration omitted).  The Second Circuit

has also described a "party in interest" as the party that "has the legal right which is sought to be

enforced or is the party entitled to bring suit." *Krys v. Official Comm. of Unsecured Creditors of

Refco Inc. (In re Refco Inc.)*, 505 F.3d 109, 117 (2d Cir. 2007) (quoting *Roslyn Sav. Bank v.

Comcoach Corp. (In re Comcoach Corp.)*, 698 F.2d 571, 573 (2d Cir. 1983)).  Although section

1109(b) should be construed "broadly," *In re Ionosphere Clubs, Inc.*, 101 B.R. 844, 849 (Bankr.

S.D.N.Y. 1989), an indirect interest is insufficient to confer party-in-interest status.  *See, e.g.*,

*Teligent*, 640 F.3d at 61 (former law firm of debtor's ex-CEO lacked standing to object to a

settlement negotiated by successor counsel under which ex-CEO agreed to pursue legal

malpractice claims against former law firm); *Refco*, 505 F.3d at 117-19 (investors of an

adversary proceeding defendant lacked standing to object to settlement of adversary proceeding);

*Brandt v. Hongkong & Shanghai Banking Corp. Ltd. (In re China Fishery Grp. Ltd. (Cayman))*,

Adv. Pro. No. 18-01575-JLG, 2018 WL 6824074, at *4 (Bankr. S.D.N.Y. Dec. 27, 2018)

(indirect shareholders of the debtor lacked standing to intervene in chapter 11 trustee's action

against former lenders); *In re Innkeepers USA Tr.*, 448 B.R. 131, 143 (Bankr. S.D.N.Y. 2011)

(an investor in a creditor lacked standing to object to motion to approve bidding procedures for a

sale).[15]

---

[15]    In addition to the "party in interest" requirement under section 1109(b), a party must satisfy Article III's
constitutional requirements as well as the federal court prudential standing requirements to have standing in a
bankruptcy court.  *Scott v. Residential Capital, LLC (In re Residential Capital, LLC)*, No. 14 Civ. 761 (ER), 2015
WL 629416, at *3 (S.D.N.Y. Feb. 13, 2015); *accord In re Old Carco LLC*, 500 B.R. 683, 690 (Bankr. S.D.N.Y.
2013).  The Court need not address these requirements, as set forth below, Xclaim is not a "party in

### B.      The Court's Inherent Power

"A court has the inherent power to supervise and control its own proceedings and to sanction counsel or a litigant for bad-faith conduct." *Sussman v. Bank of Isr.*, 56 F.3d 450, 459 (2d Cir.), *cert. denied sub nom. Bank of Isr. v. Lewin*, 516 U.S. 916 (1995); *In re Bambi*, 492 B.R. 183, 190 (Bankr. S.D.N.Y. 2013).   In that vein, courts have the "inherent power to control their dockets" and "strike material from the docket . . . reflecting procedural impropriety or lack of compliance with court rules or orders." *Jones v. Metro. Life Ins. Co.*, No. C–08–03971–JW (DMR), 2010 WL 4055928, at * 6 (N.D. Cal. Oct. 15, 2010) (citing authorities); *accord Harris Corp. v. Fed. Express Corp.*, Case No. 6:07–cv–1819–Orl–28KRS, 2010 WL 11474444, at *1 (M.D. Fla. Mar. 3, 2010) ("The Court may, among other things, strike a non-compliant motion or other filing.").   A court may strike an unauthorized filing of a nonparty. *See, e.g.*, *Hines v. Save-A-Lot/Supervalu, Inc.*, No. 06 C 490, 2007 WL 1317132, at *2-3 (N.D. Ill. May 3, 2007) (striking documents filed by a nonparty under a local rule preventing the clerk of court from accepting nonparty filings except for a motion to intervene).

Filing electronically is a privilege, not a right. *Wall v. Ctrs. for Disease Control & Prevention*, Case No. 6:21-cv-975-PGB-DCI, 2021 WL 3008588, at *3 (M.D. Fla. June 29, 2021); *Huminski v. Conn.*, No. 3:14–cv–1390 (MPS), 2015 WL 1825966, at *3 (D. Conn. Apr. 22, 2015).   A court may revoke the electronic filing privileges of a person who violates their e-filing agreement with the court. *See, e.g.*, *In re Harmon*, No. 1074390 AST, 2010 WL 3788052, at *4 (Bankr. E.D.N.Y. 2010) (revoking electronic filing privileges of an attorney for, *inter alia*, "violat[ing] the terms of his ECF Application"); *see also* SDNY E-Filing Procedures § I.B.6

---

interest" under section 1109(b). *See Teligent*, 640 F.3d at 60 n.3 ("Because we agree that K & L Gates was not a 'party in interest,' we do not reach the constitutional or prudential questions.").

("The Clerk of Court retains the discretion to cancel the password of a System Account Holder

with respect to . . . any individual who misuses the System . . . .").

### C.      Protection of Information Which Could Cause Unlawful Injury

The presumption favoring public access to bankruptcy court records is codified in 11

U.S.C. § 107(a).  *Video Software Dealers Ass'n v. Orion Pictures Corp. (In re Orion Pictures*

*Corp.)*, 21 F.3d 24, 26 (2d Cir. 1994).  The right of public access is "rooted in the public's First

Amendment right to know about the administration of justice."  *Id*.  Public access is subject to

statutory exceptions set forth in section 107(b) and (c).  As relevant here, section 107(c) states:

> (c)  (1) The bankruptcy court, for cause, may protect an individual, with respect to
> the following types of information to the extent the court finds that disclosure
> of such information would create undue risk of identity theft or other unlawful
> injury to the individual or the individual's property:
>
>> (A) Any means of identification (as defined in section 1028(d) of title
>> 18)[16] contained in a paper filed, or to be filed, in a case under this title.
>
>> (B) Other information contained in a paper described in subparagraph (A).

---

[16]      "Means of identification" under section 1028(d) is defined as:

> [A]ny name or number that may be used, alone or in conjunction with any other information, to
> identify a specific individual, including any –
>
>> (A)  name, social security number, date of birth, official State or government issued driver's
>> license or identification number, alien registration number, government passport number,
>> employer or taxpayer identification number;
>
>> (B)  unique biometric data, such as fingerprints, voice print, retina or iris image, or other unique
>> physical representation;
>
>> (C)  unique electronic identification number, address, or routing code; or
>
>> (D)  telecommunication identification information or access device (as defined in section
>> 1029(e)).

18 U.S.C. § 1028(d)(7).

11 U.S.C. § 107(c).  The Court may protect information under section 107(c) *sua sponte* but, as a practical matter, a conscientious attorney, *before* publicly filing information which could subject an individual to injury, will seek court approval to file such information under seal or in a redacted format.  2 COLLIER ON BANKRUPTCY ¶ 107.04 (16th ed. 2022) (noting that "most orders under [section 107(c)] will be initiated" by a request to the court); Bankr. S.D.N.Y. R. 9018-1 (outlining procedure for filing motion to seal).[17]  This Court recently granted in part an application under section 107(c) in the Celsius Network chapter 11 case to redact individual creditors' physical and email addresses in court filings because "[s]uch information, in combination with their names, could make individual account holders more vulnerable to identity theft and render account holders' crypto assets more susceptible to criminal theft."  *In re Celsius Network LLC*, 644 B.R. 276, 294 (Bankr. S.D.N.Y. 2022); *accord In re Endo Int'l plc*, Case No. 22-22549 (JLG), 2022 WL 16640880, at *10-11 (Bankr. S.D.N.Y. Nov. 2, 2022) (authorizing debtors to file documents redacting physical and email addresses of claimants due to potential identity theft and harassment).  Other courts in this Circuit have routinely protected PII including email addresses of individuals for privacy and security concerns.  *See Burgess v. Town of Wallingford*, No. 3:11–CV–1129 (CSH), 2012 WL 4344194, at *11 (D. Conn. Sept. 21, 2012) ("The Internet has revolutionized the scope and manner in which information is available for public access and has also, unfortunately, provided criminals with a new medium through which to commit crimes. . . .  By gathering such individual pieces of information as a home address, e-mail address, phone number, and the like, a criminal may obtain enough personal information to exploit an individual.") (quoting *Sec. Indus. & Fin. Mkts. Ass'n v. Garfield*, 469 F. Supp. 2d 25,

---

[17]    The same procedure is used by attorneys to protect sensitive commercial information or defamatory matter under section 107(b) of the Bankruptcy Code.

36 (D. Conn. 2007)) (internal quotation marks and alterations omitted); *see also In re Google Dig. Advert. Antitrust Litig.*, 21-md-3010 (PKC), 2021 WL 4848758, at *5 (S.D.N.Y. Oct. 15, 2021) (approving redaction of names, job titles, and e-mail addresses of Google employees because "[t]he privacy interests of these Google employees outweighs the strong presumption of public access"); *Kewazinga v. Microsoft Corp.*, 1:18-cv-4500-GHW, 2021 WL 1222122, at *5 (S.D.N.Y. Mar. 31, 2021) ("Microsoft seeks to redact the personally identifiable information (e-mail addresses) of its employees. . . . Because of the significant privacy interests of non-parties, and the lack of relevance of this information to any issue in this litigation, the request to redact the e-mail addresses of Microsoft's employees is granted."); *Saint-Jean v. Emigrant Mortg. Co.*, 11-CV-2122 (SJ), 2016 WL 11430775, at *8 (E.D.N.Y. May 24, 2016) (redacting PII including email addresses of nonparty individuals based on "the significant privacy interest of non-parties").

### III.    DISCUSSION

There are two issues before the Court: (i) whether the Xclaim Submission, or any portion of it, should be stricken or redacted, and (ii) whether the Xclaim Accountholders should be sanctioned.

### A.    The Xclaim Submission is Stricken as an Improper Filing by a Nonparty

### 1.    Xclaim is Neither a Party nor a "Party in Interest"

A threshold issue to consider is whether Xclaim may appear and be heard in this proceeding.  Initially, Xclaim is not a party to this miscellaneous proceeding.  The Commencement Order plainly stated that the purpose of the proceeding was to seek certain disclosures *from claims agents* and to determine what, if any, sanctions should be levied *on claims agents* based on those disclosures.  (*See generally* Commencement Order; *see also* Order

17

to Show Cause at 1 ("WHEREAS, Xclaim is not an Approved Claims Agent, but nonetheless, publicly filed" the Xclaim Submission.).)  Xclaim acknowledged as much in its submission. (Xclaim Submission at 1 ("the Court did not request our participation").)  Absent an order permitting intervention, an entity that is not a party may generally not participate in an action. *See Eisenbise v. Crown Equip. Corp., Inc.*, Case No.: 15-CV-972-AJB-WVG, 2015 WL 13828753, at *3 (S.D. Cal. Dec. 7, 2015) ("It is reversible error for a court to permit nonparties to participate in an action absent a formal motion for intervention and the requisite findings on such motion.").

Xclaim is also not a "party in interest" within the meaning of 11 U.S.C. § 1109(b) that "may appear and be heard on any issue" in a chapter 11 case.  Xclaim does not have a "direct financial stake" in the outcome of this proceeding.  *Teligent*, 640 F.3d at 60.  The Commencement Order previewed that certain claims agents could be suspended from this Court's list of preapproved claims agents and/or be forced to disgorge fees.  (Commencement Order at 2.)  None of the possible outcomes of this proceeding will have a direct financial impact on Xclaim.  *See Teligent*, 640 F.3d at 61 ("Further, [the entity seeking to participate] had no stake in the outcome of the 9019 Motion [because] the Settlement did not require K & L to pay any money to the Teligent estate or to Mandl.") (quoting *Savage & Assocs., P.C. v. Mandl (In re Teligent, Inc.)*, 417 B.R. 197, 210 (Bankr. S.D.N.Y. 2009)).  Further, any interest as a counterparty to the Synchronization Agreements has been nullified because each claims agent party to such agreement terminated its contract by the time Xclaim filed the Xclaim Submission. (Hr'g Tr. at 16:6-9.)  Even if the claims agents had not terminated those contracts, Xclaim's interest – as a contract counterparty to parties in interest – would be an indirect interest insufficient to confer "party in interest" status on Xclaim.  *See Refco*, 505 F.3d at 117-119

18

(investor of a party was not itself a "party in interest"); *Innkeepers*, 448 B.R. at 143 (same); *see also China Fishery Grp.*, 2018 WL 6824074, at *4 (indirect shareholder of the debtor was not a "party in interest").

In addition, Xclaim does not possess any "legal right which is sought to be enforced" in the miscellaneous proceeding. *Refco*, 505 F.3d at 117 (citation omitted). This proceeding is examining the circumstances surrounding the retention of claims agents. As outlined in the *Madison Square Decision*, the retention of claims agents is governed by 28 U.S.C. § 156(c), Bankr. S.D.N.Y. R. 5075-1, and this Court's Protocol for the Employment of Claims and Noticing Agents Under 28 U.S.C. § 156(c). 642 B.R. at 490-91. Xclaim has no legal right it could enforce under the applicable statute or related local guidelines.

Lastly, Xclaim alludes to "reputational" harm "as a result of these proceedings." (Xclaim OSC Brief at 8.) However, alleged harm to reputation is not sufficient to confer "party in interest" status under 11 U.S.C. § 1109(b). *See Teligent*, 640 F.3d at 60 (requiring a "direct financial stake"); *see also In re Athos Steel & Aluminum, Inc.*, 69 B.R. 515, 520 (Bankr. E.D. Pa. 1987) ("I have doubts whether an, at best, indirect injury to reputation suffices to confer party in interest status in a bankruptcy proceeding . . . .") (*dicta*). To the extent Xclaim is asserting that the existence of this proceeding or the findings or rulings of this Court confer it with standing, Xclaim is mistaken. Alleged "harm from court findings" is not a basis for standing. *Floyd v. City of New York*, 302 F.R.D. 69, 120-21 (S.D.N.Y.) ("[A]llowing non-party trial participants to claim harm from court findings raises serious concerns. If injury to reputation is the guiding precept, there is no principled basis for distinguishing between a chastised attorney and any other participant in the judicial process who becomes the target of the presiding judge's opprobrium. . . . [U]nder such a regime, lawyers, witnesses, victorious parties, victims,

bystanders – all who might be subject to critical comments by a district judge – could appeal their slight if they could show it might lead to a tangible consequence.") (quoting *Bolte v. Home Ins. Co.*, 744 F.2d 572, 573 (7th Cir. 1984) (Posner, J.)) (internal quotation marks, citation, and certain alterations omitted), *aff'd*, 770 F.3d 1051 (2d Cir. 2014).[18]

### 2.    Improper Purpose

Xclaim admits that it "seek[s] no relief," (Xclaim Submission at 5), other than to "correct and supplement the record." (*Id*. at 1.) The submission itself discusses meetings Xclaim had with a few public officials to describe Xclaim's website and obtain limited electronic-filing privileges. Xclaim concludes its submission by lauding its website and attaching over sixty pages of exhibits.

The Xclaim Submission has nothing to say about the merits of the proceeding, *i.e.*, whether claims agents that were party to Synchronization Agreements should be sanctioned for violating 28 U.S.C. § 156(c) and related guidelines. Rather, it is plain that the submission is nothing more than a self-serving document designed to counter what Xclaim perceived as negative information that came to light in the Kroll Submission.

Simply stated, a federal court docket is for parties to file pleadings and other documents relevant to the merits of the case; it is not a forum for a nonparty corporation to file a letter

---

[18]    At the first-day hearing in the Madison Square case, Judge Lane asked for a letter brief on the propriety of the Synchronization Agreement from Epiq (the claims agent seeking to be retained in the case) or the debtor. (*See* Transcript of July 1, 2022 hearing in the Madison Square case at 53:17-21 ("So given all that, what I was going to ask and would very much appreciate if somebody could submit a letter brief on the issues and I would think that would come from Epiq. Perhaps it would come from the Debtor, but I think more likely from Epiq . . . .") [ECF Case No. 22-10910 Doc. #84].) Epiq did indeed file a letter brief which attached a letter from Xclaim's CEO Mr. Sedigh as an exhibit. [ECF Case No. 22-10910 Doc. # 55]. Although the *Madison Square Decision* addressed the few arguments made in Mr. Sedigh's letter, *see* 642 B.R. at 495-96 ("the Clerk of Court could not receive a fee to process this claims data simply to further Xclaim's private interest"); *id*. at 496 n.14 (explaining that Epiq's and Xclaim's policy arguments about the benefits of Xclaim's website "cannot overcome a clear statutory directive") (quoting *BP P.L.C. v. Mayor & City Council of Baltimore*, 141 S. Ct. 1532, 1542 (2021)), it did not address whether Xclaim had standing to appear in the case.

designed to improve its public image while seeking no actual relief. *Cf. Trump v. Clinton*, Case

No. 22-14102-cv, 2022 WL 16848187, at *8 (S.D. Fla. Nov. 10, 2022) (stating that the "judicial

system [may not be used] to pursue a political agenda").  Xclaim's counsel did not disagree.

(Hr'g Tr. at 16:17-22 ("THE COURT:  Do you believe that a non-party corporation that is

seeking no relief . . . should be permitted to use court filings to rebut what it perceives as

negative information that comes to lights in the case?  MR. CAREY:  Stated generally, no."); *see*

*also id.* at 16:10-14 ("THE COURT:  Can you provide an example of a case in which a non-party

without seeking leave to intervene was permitted to 'correct and supplement the record' . . .  MR.

CAREY:  . . . no I cannot . . . .").)

### 3.    Procedural Defects

As stated, the Court has the inherent power to strike material from the docket "reflecting

procedural impropriety or lack of compliance with court rules or orders."  *Jones v. Metro. Life*

*Ins. Co.*, 2010 WL 4055928, at * 6.  The Xclaim Submission was procedurally defective as the

Court never authorized Xclaim – a nonparty – to file it.  *See Hines*, 2007 WL 1317132, at *2-3;

*accord Lederhouse v. Landau Arnold Laufer LLP*, 15 Civ. 8668 (AT) (SDA), 2018 WL

1635030, at *1 n.1 (S.D.N.Y. Apr. 4, 2018) (striking unauthorized sur-replies filed by plaintiff

and defendant).

The Xclaim Submission was also improperly filed because it plainly violated the Limited

E-Filing Agreements which prohibited the Xclaim Accountholders from electronically filing

anything other than "claims-related documents and/or affidavits of service."  (Limited E-Filing

Agreement ¶ 1.)  The Xclaim Submission is neither.  This point is not disputed.  (Hr'g Tr. at

15:3-7 ("THE COURT:  . . .  Do you dispute that [the Xclaim Accountholders] violated the plain

language of their e-filing agreements in making its filing in this miscellaneous proceeding?  MR.

CAREY:  We do not dispute that.").)

Moreover, at least initially, the Xclaim Submission appeared to have been filed *pro se* as

the submission was neither signed by an attorney nor filed using an attorney's ECF credentials,

and no attorney had made an appearance on Xclaim's behalf in this proceeding when the Xclaim

Submission was filed.  It is "well established that a layperson may not represent a corporation" in

federal court.  *Pridgen v. Andresen*, 113 F.3d 391, 393 (2d Cir. 1997).  In the Xclaim OSC Brief,

Xclaim revealed that, in fact, Xclaim was advised by Latham attorney Kimberly Posin in

connection with the submission.  (Xclaim OSC Brief at 10.)  The relevance of Ms. Posin's

representation of Xclaim in connection with the Xclaim Submission is addressed *infra*.

### 4.    Protection of PII of Federal Judges, Senior Government Officials, and Court Personnel

The Clerk restricted public access to the Xclaim Submission when the Clerk's Office saw

that the submission included email addresses of fifty-one public servants comprising five federal

judges, the Director of the AO, the Director of the EOUST, United States Trustee for Regions 3

and 9, the Bankruptcy Clerks of this Court and the Delaware Bankruptcy Court, ten other federal

court employees, two other AO employees, and twenty-nine other attorneys of the Department of

Justice.  As set forth above, PII including an individual's email address[19] can be protected under

section 107(c) of the Bankruptcy Code where "disclosure of such information would create

undue risk of identity theft or other unlawful injury to the individuals."  11 U.S.C. § 107(c); *see,*

*e.g.*, *Endo Int'l plc*, 2022 WL 16640880, at *10-11; *Celsius*, 644 B.R. at 294; *accord Burgess*,

---

[19]    An individual's email address is specifically included as a "means of identification" under 18 U.S.C. §
1028(d)(7)(C) which is directly referenced in 11 U.S.C. § 107(c)(1)(A).

2012 WL 4344194, at *11; *Google Dig. Advert. Antitrust Litig.*, 2021 WL 4848758, at *5;

*Kewazinga*, 2021 WL 1222122, at *5.

There is good reason to protect the direct contact information of federal judges as well as other public servants who perform essential functions in the operation of the federal courts.  In 2021, the United States Marshals Services reported that there were 4,511 total threats and inappropriate communications against federal judges, prosecutors, and court personnel.  UNITED STATES MARSHALS SERVICE, Judicial Security Fact Sheet 2022 (Feb. 17, 2022), https://www.usmarshals.gov/sites/default/files/media/document/2022-Judicial-Security.pdf.  This figure represents an almost *five-fold* increase since 2015.  Having these email addresses available for public viewing on the court docket in a single document would plainly make it easier for disgruntled parties or malicious actors to have a direct and easy means of communication to threaten, intimidate, or harass judges and other public servants.  *See, e.g.*, *United States v. Stacy*, No. 13–2154, 568 F. App'x 545, 546-48 (10th Cir. 2014) (defendant sent emails to presiding judge that were "vicious and frightening, laced with expletives, racial epithets, and claims that the author had killed others and would kill" the judge); *Fed. Trade Comm'n v. Trudeau*, 606 F.3d 382, 384-85 (7th Cir. 2010) (judge received over 300 emails, including ones with "threatening overtones," to email address he had not published after radio show host urged his devoted audience to email the judge using an email address which, unbeknownst to the judge, was listed on a law school's website); *United States v. Kaetz*, 2:20-CR-1090-1, 2021 WL 37925, at *1-3 (D. N.J. Jan. 4, 2021) (litigant emailed the judge making death threats, posted the judge's home address on social media after obtaining it from a paid internet search service, and encouraged others to let the judge "feel your anger"); *United States v. Kabbaj*, Criminal No. 16-365, 2016 WL 11660082, at *4-5 (E.D. Pa. Sept. 12, 2016) (defendant attempted to email federal judge

threatening other officials with death and decapitation, and suggesting that others might

decapitate the judge); *United States v. White*, No. 6:13–cr–304–Orl–28GJK, 2014 WL 4450097,

at *1 n.2 (M.D. Fla. Sept. 5, 2014) (defendant emailed violent threats to judge, prosecutor, and

FBI agent assigned to criminal case against white supremacist organization and included the

officials' home addresses to substantiate the threats).[20]

In addition to direct threats and harassment, an email address can potentially be used by

an ill-intentioned person to obtain other PII to exploit or harm an individual. *See United States v.

Hastie*, 854 F.3d 1298, 1303 (11th Cir. 2017) ("With a simple search engine or a service like

Spokeo, an email address can also be used to find personal information such as a corresponding

username or physical address."); *see also Burgess*, 2012 WL 4344194, at *11 ("The Internet has

revolutionized the scope and manner in which information is available for public access and has

also, unfortunately, provided criminals with a new medium through which to commit crimes. . . .

By gathering such individual pieces of information as a home address, e-mail address, phone

number, and the like, a criminal may obtain enough personal information to exploit an

individual.") (citation omitted).  Tragically, using the internet to compile an individual's PII was

precisely the method used by the deranged and disgruntled attorney to locate and murder New

Jersey District Judge Esther Salas' son and seriously injure her husband in July 2020.  Devlin

Barrett, *Federal Judge Whose Son Was Slain Issues Tearful Plea for Better Protection of

Personal Information*, THE WASHINGTON POST, Aug. 3, 2020 ("The free flow of information

from the Internet allowed this sick and depraved human being to find all our personal

information and target us . . . .  Currently, federal judges' addresses and other information is

---

[20]    Unfortunately, this Court is no stranger to inappropriate communications from parties as it regularly
presides over high-profile bankruptcies such as Purdue Pharma L.P.; Voyager Digital Holdings, Inc.; and Celsius
Network LLC.  The rulings in these cases have greater potential to give rise to frustration and even anger by parties.

readily available on the Internet.  In addition, there are companies that will sell your personal details that can be leveraged for nefarious purposes.  In my case, the monster knew where I lived, what church we attended, and had a complete dossier on my life and family.") (quoting statement by Judge Salas).

To curb the rise in threats and harassment against federal judges, the Threat Management Branch of the AO's Judiciary Security Division has recently instituted various initiatives to identify, remove, and monitor judges' PII including email addresses which appear in data-broker websites, state and local public records, social media, and the dark web.[21]  A public filing which republishes federal judges' email addresses undermines these efforts.

To be sure, public servants must sometimes disclose their email addresses to external constituents as part of their work.  Trial attorneys employed by the UST's office disclose their email addresses on a regular basis when appearing in bankruptcy cases.  Court personnel occasionally use their direct email account (as opposed to a generic chambers or clerk's office email account) when communicating with attorneys and parties.  Even judges sometimes communicate with attorneys directly through email when, for example, the judge is acting as a mediator in a case before a different judge or is on an educational panel with attorneys.  However, a judge's or court employee's email address being disclosed to case parties in an email communication is plainly different than the publication of those email addresses on a public

---

[21]    Several states have enacted legislation to help keep PII of judges and public officials confidential, *see e.g.*, NEV. REV. STAT. §§ 247.500-600, 250.100-230, 293.900-920; ILL. COMP. STAT. §§ 90/1, 90/2, 90/3, 90/4; VA. CODE ANN. § 18.2-186.4:1; UTAH CODE ANN. § 63G-2-303; MASS. GEN. LAWS ANN. 66 § 10B, and there is promising proposed federal legislation which would also protect judges' PII.  *See* Madison Alder, *Judicial Security Measure Added to Must-Pass Senate Defense Bill*, BLOOMBERG LAW, Oct. 11, 2022 (reporting that the Daniel Anderl Judicial Security and Privacy Act of 2021 – a bill that would protect federal judges' PII online – has been added to the National Defense Authorization Act of 2023).

court docket. The latter would exponentially and unnecessarily increase the risk of harassment and threats discussed above.

Xclaim's arguments to the contrary are unpersuasive. Xclaim suggests that the email addresses should not be protected because it was able to locate most of the addresses on other parts of the internet. (*See* Xclaim OSC Brief at 4 ("Xclaim's review indicates that 51 of the 57 listed email addresses are publicly available.").) As stated above, this is precisely the issue that the AO and the Judiciary are trying to remedy and the very problem Judge Salas described in her statement. Permitting Xclaim to post the PII of federal judges and court officials on the court docket would only exacerbate the problem.

Xclaim also contends that it did not technically violate any rule including Federal Bankruptcy Rule 9037[22] by publicly filing the PII and, "[i]f anything, Xclaim lacked the authority to redact email addresses and telephone numbers for government officials." (*Id*. at 7.) This hyper-technical argument is inaccurate as PII of individuals including email addresses have been redacted by numerous courts in this Circuit including under 11 U.S.C. § 107(c) as explained above. The protection of information that is covered by 11 U.S.C. § 107(c) (information that would create undue risk of identity theft or other injury to an individual) or 107(b) (trade secret,

---

[22]     Rule 9037(a) of the Federal Rules of Bankruptcy Procedure provides:

(a)   **Redacted Filings**. Unless the court orders otherwise, in an electronic or paper filing made with the court that contains an individual's social-security number, taxpayer-identification number, or birth date, the name of an individual, other than the debtor, known to be and identified as a minor, or a financial-account number, a party or nonparty making the filing may include only:

　　(1)   the last four digits of the social-security number and taxpayer-identification number;

　　(2)   the year of the individual's birth;

　　(3)   the minor's initials; and

　　(4)   the last four digits of the financial-account number.

confidential commercial information or scandalous/defamatory matter) requires the attorney filing the pleading to exercise a certain level of discretion and good judgement. A conscientious attorney will move for an order permitting him or her to file a redacted or sealed version of the pleading to protect the sensitive information, and that procedure has been the custom and practice of competent attorneys appearing in this Court. *See* Bankr. S.D.N.Y. R. 9018-1. Under Xclaim's interpretation of section 107, an attorney should publicly file sensitive information under subsections (b) and (c) on the docket and leave it for the Court and other interested parties to protect it after the information has already been posted.

Xclaim's contention that it "lacked the authority" to redact email addresses is also disingenuous. Many of the Government email addresses appeared as recipients of three emails attached to the Xclaim Submission as an exhibit. While Xclaim did not redact the email addresses of federal judges and Government officials, it did redact the email address of the sender as well as the sender's name listed on the bottom of each email.[23] Thus, although Xclaim does not explain its reasoning, Xclaim clearly believed it had the "authority" to redact the PII (including the name) of the sender of these emails.[24]

### 5.       Conclusion Regarding the Xclaim Submission

For the reasons stated, the Xclaim Submission is stricken as a procedurally defective filing made for an improper purpose by an entity that is not a "party in interest" within the meaning of 11 U.S.C. § 1109(b). Further, the Court finds that the email addresses of federal

---

[23]       Xclaim redacted the identifying portion of the sender's email address, but the latter part showed that it was a "yahoo.com" email address.

[24]       There are additional considerations favoring the nondisclosure of federal judges' email addresses. Public disclosure of judges' email addresses would increase the likelihood and frequency of *ex parte* communications which are prohibited under Federal Bankruptcy Rule 9003. Federal judges are also likely viewed as attractive targets for cyber criminals and hackers who seek to infiltrate the Judiciary's computer system.

judges, senior Government officials, and court personnel are entitled to protection under 11

U.S.C. § 107(c).  The filing of a redacted version of the Xclaim Submission is unnecessary,

however, because the document is stricken.

**B.     The Xclaim Accountholders Misused Their Limited-Access ECF Accounts**

As stated, the Limited E-Filing Agreements gave the Xclaim Accountholders "limited

access to the ECF System for the purpose of filing electronically certain claims-related

documents and/or affidavits of service."  (Limited E-Filing Agreement ¶ 1.)  The agreements

allow the Clerk to terminate the Xclaim Accountholders' ECF accounts "in the event of any

misuse of the account, or for any other reason."  (*Id*. ¶ 8; *accord* SDNY E-Filing Procedures §

I.B.6.)  The electronic filing of the Xclaim Submission by the Xclaim Accountholders was a

clear violation of the Limited E-Filing Agreements.  Therefore, the Court could terminate the

Xclaim Accountholders' e-filing access under the plain terms of the Limited E-Filing

Agreements.[25]

In its brief, Xclaim argued that the Court may not impose sanctions because the Order to

Show Cause failed to identify the authority to impose sanctions and the sanctionable conduct.

(*See* Xclaim OSC Brief at 8.)  This argument lacks merit because, as the UST aptly observed

(UST OSC Brief at 6), the Order to Show Cause specifically referenced the provisions of the

Limited E-Filing Agreements described in the prior paragraph including the Clerk of Court's

authority to terminate the Xclaim Accountholders' ECF accounts.  (Order to Show Cause at 1.)

At the hearing, Xclaim's counsel acknowledged that the Court has the authority to terminate

Xclaim's e-filing rights for violating the terms of the Limited E-Filing Agreements.  (*See* Hr'g

---

[25]     Because the imposition of sanctions regarding the Xclaim Accountholders' e-filing privileges flow from the express terms of the Limited E-Filing Agreements, the Court need not rely on its inherent sanctioning powers or section 105(a) of the Bankruptcy Code.

Tr. at 15:8-13 ("THE COURT:  And since [the Xclaim Accountholders] violated the e-filing

agreement, couldn't the clerk simply cancel their ECF accounts under the terms of the e-filing

agreement?  MR. CAREY:  We do not dispute that . . . .").)[26]

Xclaim's remaining arguments relate to Xclaim's purported good faith in filing the

Xclaim Submission.  In this regard, Xclaim contends that it should not be sanctioned because (1)

it relied on the advice of counsel – Latham attorney Kimberly Posin, Esq. – in filing the Xclaim

Submission (Xclaim OSC Brief at 10), and (2) Xclaim was prompted to make the submission in

response to the Kroll Submission.  (*Id*. at 2-3.)  Each contention is addressed in turn.

"Once a party announces that it will rely on advice of counsel . . . the attorney-client

privilege is waived."  *In re EchoStar Commc'ns Corp.*, 448 F.3d 1294, 1299 (Fed. Cir.), *cert.*

*denied sub nom. TiVo v. Echostar Commc'ns Corp.*, 549 U.S. 1096 (2006); *Chen-Oster v.*

*Goldman, Sachs & Co.*, 293 F.R.D. 547, 556 (S.D.N.Y. 2013) ("Assertion of an advice of

counsel defense is the quintessential example of an implied waiver.") (internal quotation marks

and citation omitted).  To avail itself of the advice-of-counsel defense, a party must show that it

"(1) honestly and in good faith sought the advice of counsel; (2) fully and honestly laid all the

facts before his counsel; and (3) in good faith and honestly followed counsel's advice, believing

it to be correct and intending that his acts be lawful."  *United States v. Colasuonno*, 697 F.3d

164, 181 (2d Cir. 2012) (alterations, internal quotation marks, and citation omitted).

Assuming that the advice-of-counsel defense is relevant here, Xclaim does not satisfy the

requirements.  The defense "is only viable when the advice relied upon is legal advice."  *Larkin*

*v. Raineri (In re Larkin)*, Civil Action No. 14–4325 (MAS), 2015 WL 1472115, at *3 (D. N.J.

---

[26]    Xclaim additionally complains about a lack of notice.  (Xclaim OSC Brief at 9.)  However, an order to
show cause and an opportunity to be heard provides sufficient due process when issuing sanctions.  *See Komatsu v.*
*City of New York*, 20-CV-10942 (VEC), 2021 WL 3363553, at *4 (S.D.N.Y. Aug. 3, 2021).

Mar. 31, 2015), *appeal dismissed*, No. 15–2105, 2017 WL 5151309 (3d Cir. May 2, 2017).  The

Xclaim-Posin Communications provided to the Court contained eleven emails (some of which

were email chains) between Ms. Posin and Xclaim representatives in the five-day period between

September 18 and September 23, 2022.  Much of the advice Ms. Posin gave to Xclaim was not

legal advice which is not surprising given that Xclaim is not a party-in-interest and has no

enforceable legal right in this proceeding.  Instead, the advice was more geared toward effective

messaging and themes that the Xclaim Submission should focus on.  For example, she (i)

suggested that Xclaim focus on Xclaim's access to claims data rather than to attack Kroll and (ii)

advised Mr. Sedigh against attaching a May 2019 internal Xclaim email to the submission

because it implied that the existence of the Synchronization Agreements should have been

disclosed to bankruptcy courts by the claims agents from the outset.  On the eve of the filing, Mr.

Sedigh sent a draft of the Xclaim Submission to Ms. Posin for her review, and Ms. Posin

provided comments the following day.  She suggested that the submission not refer to the claims

agents that were party to Synchronization Agreements as "partners" of Xclaim; otherwise, her

comments were largely stylistic in nature.

Ms. Posin did provide one comment to the draft Xclaim Submission that constitutes legal

advice.[27]  She advised against attaching to the submission two internal emails from an Xclaim in-

house lawyer – one from July 2019 and another from February 2020 – because the

---

[27]     Although it would not preclude Xclaim's assertion of the advice-of-counsel defense, *see Sec. & Exch. Comm'n v. Westport Capital Mkts. LLC*, No. 3:17-cv-02064 (JAM), 2020 WL 948434, at *3 (D. Conn. Feb. 27, 2020) ("the touchstone in examining reliance on advice is the expertise of the expert, and not her licensure"), Ms. Posin's providing legal advice as Xclaim's counsel in connection with a filing in a New York federal court is a violation of New York law.  *State of New York ex rel. Stephen B. Diamond v. My Pillow, Inc.*, 180 A.D.3d 419, 419 (N.Y. App. Div. 1st Dep't 2020) ("Judiciary Law § 478 provides that it is unlawful for a person to practice law in New York without having first, inter alia, been duly and regularly licensed or admitted pro hac vice.  The Court of Appeals has interpreted this section broadly to include 'legal advice as counsel as well as appearing in the courts and holding oneself out as a lawyer.'") (quoting *Spivak v. Sachs*, 211 N.E.2d 329, 330 (N.Y. 1965)).  Ms. Posin is not a licensed attorney in New York state, and she did not seek admission *pro hac vice* in this proceeding.

communications were arguably privileged and filing them on the docket could be deemed a

waiver of such privilege.  In a follow-up email, Andrew Glantz – Xclaim's Director of Business

& Legal Innovation – expressed skepticism that the emails were privileged communications.  In

the end, Xclaim did not follow Ms. Posin's advice and both emails were attached as exhibits to

the publicly filed version of the Xclaim Submission.  *Colasuonno*, 697 F.3d at 181 (requiring

that the party previously followed counsel's advice when asserting advice-of-counsel defense).[28]

Xclaim's argument about the impropriety of the Kroll Submission is also unpersuasive.

As stated, the Kroll Submission was divided into three sections: "Response to Order,"

"Additional Statement," and "Rationale."  Xclaim does not assert that the "Response to Order"

section was improper.  In the "Additional Statement" section, Kroll described its interactions

with Xclaim since 2020.  In the Commencement Order, the Court required Kroll to disclose "a

description of any current or former business arrangement with Xclaim."  (Commencement

Order at 2.)  As a claims agent that resisted signing a Synchronization Agreement, it is not

surprising that Kroll would want to describe attempts by Xclaim to engage with Kroll.  Although

it may not be germane to the outcome of this proceeding, Kroll, as a party to this proceeding, did

not violate the Commencement Order by describing its interactions with Xclaim.  In the

"Rationale" section, Kroll explained the reasons why it believed that Synchronization

Agreements were improper.  Although the Commencement Order did not request this

information, a subsequent order would have plainly permitted Kroll to state its views.  (Order

Regarding Further Proceedings and Scheduling Sanctions Hearing, dated Sept. 30, 2022 at 1

---

[28]     Ms. Posin also inquired whether Xclaim would be using its own ECF account to make the filing.  There
was apparently no response to this inquiry, Ms. Posin provided no actual advice other than to raise the question, and
Xclaim used Mr. Vollenhals' ECF account to file the Xclaim Submission in any event.

(permitting parties-in-interest to files briefs addressing whether claims agents party to Synchronization Agreements should be sanctioned) [ECF Doc. # 19].)

Xclaim's assertion that its submission was made "in direct response" to the Kroll Submission is also misleading. (Xclaim OSC Brief at 2.) In the five-page Xclaim Submission, only three paragraphs are devoted to a response to Kroll. Instead, the majority of the Xclaim Submission describes meetings with a few public officials to get ECF credentials and promotes Xclaim's website.

The Court is left to decide whether to terminate the ECF accounts of the Xclaim Accountholders for violating the Limited E-Filing Agreements. As mentioned, the ability to file electronically is a privilege, not a right. *Wall*, 2021 WL 3008588, at *3; *Huminski*, 2015 WL 1825966, at *3. So that Xclaim could effectively operate its business, the Clerk of Court granted the Xclaim Accountholders limited e-filing rights in this Court in 2020. Rather than abide by the terms of the agreements, Xclaim – a seemingly sophisticated entity operated by restructuring professionals – made a conscious and strategic decision to file a sixty-eight-page document designed to bolster its corporate image while seeking no relief in a proceeding to which they are not a party. When the Order to Show Cause previewed that the Court might terminate the Xclaim Accountholders' e-filing privileges for violating the Limited E-Filing Agreements, Xclaim neither addressed nor acknowledged this violation in the Xclaim OSC Brief. Xclaim's actions here lead the Court to conclude that it does not take seriously its obligations under the Limited E-Filing Agreements.

The Court is also concerned about Xclaim's views regarding the disclosure of PII of federal judges. After the hearing, Xclaim reiterated its views that publicly filing the PII of federal judges was permissible. (*See* Motion to Seal ¶ 10 ("Xclaim's position, instead, is that

32

there is no blanket rule prohibiting the public filing of any and every type of identifying

information that could be deemed 'PII' under Section 101(41A).  Rather, absent further order of

the Court, the only types of PII affirmatively prohibited from public disclosure are the categories

listed in Bankruptcy Rule 9037.").)  In this Court's opinion, Xclaim's position shows a complete

lack of discretion and disregard for the safety of judges.  Judges' PII should be protected as

detailed above.[29]

---

[29]     Xclaim's views on the sensitivity of individual-creditor PII are also troubling.  In the Celsius case referenced *supra*, the debtors moved to protect the PII of individual crypto accountholders because "disclosure of such information could potentially result in a customer becoming the target of identity theft, blackmail, harassment, stalking, and doxing."  (Celsius debtors' motion to redact ¶ 13 [ECF Case No. 22-10964 Doc. # 344].)  The accountholders themselves expressed similar concerns about the disclosure of their PII.  (*See id.*, Ex. C showing Reddit threads among Celsius accountholders ("I'm more concerned about the release of phone numbers and email addresses"); ("Emails and phone numbers are not getting released right?"); ("what about phone number and email?"); (expressing concern about emails from "scammers" – "You will now get 20 emails a day from 'Stratto' [*i.e.*, someone impersonating the claims agent] that aren't from [Stretto]. Hopefully you don't respond to the phishing email by mistake"); *see also id.* Ex. D showing emails from concerned Celsius accountholders ("Is there any way to make sure my personal identifying information (name, email, phone number, address) is redacted or anonymized . . . .  Will I have any ability to decide how much of my information is listed?").)  The Celsius debtors' motion was supported by the official committee of unsecured creditors as well as two *ad hoc* groups that were formed to represent the interests of different categories of individual accountholders, [*see* ECF Case No. 22-10964 Doc. ## 399, 633, 642], and this Court granted the motion in part to protect the accountholders' physical and email addresses pursuant to 11 U.S.C. § 107(c).  *Celsius*, 644 B.R. at 294.  Protection of individual-creditor PII in crypto cases has been the trend in the recent spate of crypto-related bankruptcy filings.  *See* Order, dated July 8, 2022, authorizing redaction of accountholder PII in *In re Voyager Digital Holdings, Inc.*, Case No. 22-10943 (MEW) (Bankr. S.D.N.Y. ECF Case No. 22-10943 Doc. # 54); Interim Order, dated Nov. 23, 2022, authoring redaction of accountholder PII in *In re FTX Trading Ltd.*, Case No. 22-11068 (JTD) (Bankr. D. Del. ECF Case No. 22-11068 Doc. # 157); Interim Order, dated Nov. 30, 2022 authorizing redaction of accountholder PII in *In re BlockFi*, Case No. 22-19361 (MBK) (Bankr. D. N.J. Case No. 22-19361 Doc. # 53).  These concerns materialized in the Celsius case as hackers emailed certain accountholders impersonating debtors' counsel with illegitimate weblinks and seeking PII and information about their claims.  *See Notice of Phishing Attempts*, dated Nov. 30, 2022 (notifying creditors of phishing attempts and stating that counsel will not seek account or personal information from them absent a court order) [ECF Case No. 22-10964 Doc. # 1527]; *cf.* Motion, dated July 11, 2019, to redact employee PII in *In re Charming Charlie Holdings Inc*, Case No. 19-11534 (MFW) ("This risk is not merely speculative.  During the Debtors' prior chapter 11 cases, for example, the abusive former partner of one of the Debtors' employees used the publicly accessible creditor and employee information filed in the cases to track the employee at her new address not publicly available until then, forcing the employee to change addresses again.") [Bankr. D. Del. ECF Case No. 19-11534 Doc. # 4].)  Had the Court not ordered redaction of email addresses, the phishing attempts against Celsius accountholders would have undoubtedly been much more pervasive and widespread.

In a recent article, Xclaim leadership was critical of the Court's decision in the Celsius case and the redaction order in the Voyager case.  *See* Andrew E. Glantz & Matthew Sedigh, *When Creditors Seek an Early Offramp, Are Claim-Purchasers the Only Answer?*, 41 AM. BANKR. INST. 42 (Dec. 2022).  According to Xclaim, individual creditors' privacy interests should yield to the interests of potential claim purchasers or intermediaries, like Xclaim, to solicit creditors using their PII posted on the docket:

At the same time, the Court is aware that Xclaim relies heavily upon e-filing access to operate its claims-trading website.  Claims trading can provide important sources of liquidity for creditors who do not wish to await potentially lengthy court proceedings before creditor distributions are made in bankruptcy cases.  Terminating Xclaim's limited e-filing privileges would require an Xclaim representative to come to the Clerk's Office counter every time it needs to file a notice of claims transfer.  The Court is reluctant to impose that result absent further misconduct by Xclaim.  Therefore, to the extent the Xclaim Accountholders (or any other Xclaim representative) wants to continue to electronically file documents in this Court in accordance with the Limited E-Filing Agreements, the Court will require that for a period of one-year from the date of this Opinion and Order, each filing by Xclaim must be accompanied by a certification of an attorney admitted to practice in the State of New York and the Southern District of New York that the filing (i) complies with the Limited E-Filing Agreement, the SDNY E-Filing Procedures, and any other applicable statutes, rules, and guidelines, and (ii) does not republish the PII of any individual other than as required in connection with the filing of a claims-transfer notice under Federal Bankruptcy Rule 3001(e).

---

> The [Celsius decision and Voyager order] exacerbate this problem by readily granting debtors' requests to seal creditor information pursuant to § 107(c) of the Bankruptcy Code. . . .  While these decisions may protect individuals from important – potential – harms, they have indiscriminately foreclosed the only path to immediate liquidity for most creditors: inbound solicitations from claim buyers or intermediaries based on public records.

*Id.* at 42-43.  However, Xclaim's own website suggests that Celsius and Voyager creditors who seek to sell their claims are not "foreclosed" from doing so including by contracting with Xclaim to post their claims on its website. Indeed, Xclaim has an entire webpage devoted to the Celsius case (https://www.x-claim.com/case/celsius-network-llc (last visited Dec. 8, 2022) and another devoted to the Voyager case (https://www.x-claim.com/case/voyager-digital-holdings-inc (last visited Dec. 8, 2022)) each inviting creditors to "[c]omplete the fields below to list your claim on the Xclaim Marketplace to begin receiving offers immediately."  Rather, Xclaim's gripe seems to be that redaction of individual creditor PII frustrates Xclaim's ability to send "inbound solicitations" (*i.e.*, unsolicited inquiries) to those creditors to sell Xclaim's services.  *See* Kroll Submission, Ex. 6 ("As you know, XCLAIM has been manually copying all public claims data from Prime Clerk's website.") (April 26, 2021 email from Mr. Sedigh to Kroll representatives); *see also id.*, Ex. 3 (Xclaim solicitation email to a creditor).  The interest in protecting certain individual creditors from hackers, identity theft, phishing attacks, and other harassment outweighs Xclaim's business interest in selling its services to creditors en masse.

34

## IV.    <u>CONCLUSION</u>

For the reasons explained above, the Xclaim Submission is stricken in its entirety as a procedurally defective filing made for an improper purpose by a nonparty.  The Xclaim Accountholders are sanctioned for violating the terms of the Limited E-Filing Agreements and must append an appropriate certification of counsel to any filings in this Court.  A form certification of counsel will be appended to a separate order to be entered shortly after the issuance of this memorandum decision, and such certification must be appended to any Xclaim filing for a period of one year following the entry of that order.  Any future violation by Xclaim of the Limited E-Filing Agreement, or of any applicable federal statutes, court rules or orders (including this Opinion and Order) will result in the termination of Xclaim's privilege of filing any documents with the Clerk of the Court absent further order of the Court, and potentially other sanctions as well.

**IT IS SO ORDERED.**

Dated:  December 8, 2022
New York, New York

___*Martin Glenn*_____
Martin Glenn
Chief United States Bankruptcy Judge