**DAVIS POLK & WARDWELL LLP**
450 Lexington Avenue
New York, New York 10017
Telephone: (212) 450-5000
Facsimile: (212) 701-5800
Elliot Moskowitz
Isaac Gelbfish

*Attorneys for Donlin, Recano & Company, Inc.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>MATTER OF CERTAIN CLAIMS AND NOTICING AGENTS' RECEIPT OF FEES IN CONNECTION WITH UNAUTHORIZED ARRANGEMENTS WITH XCLAIM INC. | Misc. Pro. No. 22-00401 (MG) |

**RESPONSE OF DONLIN, RECANO & COMPANY, INC., TO ORDER DATED DECEMBER 7, 2022 REGARDING SUPPLEMENTAL BRIEFING**

Pursuant to this Court's Order dated December 7, 2022, ECF No. 49, Donlin, Recano & Company, Inc. ("DRC") submits this supplemental brief to address the disclosure-related arguments raised by the United States Trustee (the "Trustee") in its brief dated November 4, 2022 ("Trustee Brief"), ECF No. 44, and to supplement DRC's initial brief submitted on November 4, 2022, ECF No. 42 ("November 4 Brief") based on the factual record, which is now complete. For the reasons set forth below and in the November 4 Brief, DRC respectfully submits that the imposition of any sanctions is not warranted.

**PRELIMINARY STATEMENT**

In its November 4 Brief, DRC submitted that sanctions should not issue for any violation of 28 U.S.C. § 156(c) under this Court's inherent authority, which requires a

finding that DRC acted in bad faith. On the same day, the Trustee filed a brief arguing that this proceeding should not be limited to potential sanctions for any violation of Section 156(c), but should also encompass potential violations of disclosure obligations under Fed. R. Bankr. P. 2014 in connection with applications under Sections 327(a) or 1103(a) of the Bankruptcy Code (the "Code"). The Trustee also argued that further development of the record was needed to determine the amount of fees each claims agent had been paid in every bankruptcy case nationwide since the execution of the Synchronization Agreement.

The Trustee's Brief offered only cursory and conclusory arguments as to why disclosure of the Synchronization Agreement was mandated by these provisions. DRC has done its best to engage with the Trustee since then to understand the basis for the Trustee's position, which will presumably be expanded upon in the Trustee's forthcoming brief.

DRC believes that none of the applicable provisions in the Code require that the Synchronization Agreement be disclosed. Section 156(c) does not in itself contain a disclosure requirement, and the Southern District of New York Protocol for the Employment of Claims and Noticing Agents under 28 U.S.C. § 156(c) (the "Protocol") requires that a professional represent only that it is "disinterested," which Section 101(14) of the Code defines in relevant part as not having an "interest materially adverse to the interest of the estate." Section 327(a) similarly requires only that a professional be "disinterested" (again, as defined in Section 101(14)) and not have an "interest adverse" to the estate. DRC does not believe any argument can be made that the Synchronization Agreement caused DRC to be materially adverse to any estate or any other party in

2

interest (and does not believe the Trustee contends—or can contend—otherwise). Further, while Rule 2014 requires disclosure of any "connections with the debtor, creditors [or] any other party in interest," this Court has already concluded that Xclaim is not a party in interest in this proceeding (and its rationale applies to any chapter 11 case). DRC believes that an agreement to provide publicly available data to a third party does not constitute a "connection with the debtor" where the debtor was neither a party to the agreement nor was charged any fees associated therewith. This is especially true for the cases in which DRC did not share any data with Xclaim even after the execution of the Synchronization Agreement in 2019.

In responding to the Trustee's anticipated arguments, DRC is careful to distinguish between what is legally required and what it would have disclosed in an exercise of caution. With the benefit of hindsight, DRC would have disclosed the Synchronization Agreement and has done so in all applications following the commencement of this proceeding, even though the agreement has since been terminated. DRC reiterates the apology expressed in its November 4 Brief to this Court and the judges of this District.

Whether or not the Court agrees with DRC's position on the law, there should be no debate regarding what the record—which is now complete—demonstrates as to DRC's intentions and good faith. In its November 4 brief, the Trustee noted that "a critical question" is "whether such omission [of the Xclaim Agreement] was deliberate and purposeful on the part of the Approved Claims Agent" which would require additional discovery and "information in the record . . . to evaluate these factors." Trustee Brief at 10. The Trustee's statement had no factual support when it was made on

3

November 4, and the record developed since November 4 completely rebuts the Trustee's suggestion of bad faith. The Court in its December 7 order provided the Trustee with an opportunity to take additional discovery, and the record is now both complete and clear: There is not a *single* fact that suggests that DRC acted in bad faith with respect to the Synchronization Agreement, or that DRC ever deliberately tried to conceal its arrangement with Xclaim.

There is also no reasonable basis for any allegation that DRC's non-disclosure was motivated by any material profit. DRC earned *nationwide* from Xclaim a mere $2,115.28 in fees, and $410.93 for the two cases in Southern District of New York, in the approximately three years since the Agreement was signed.[1]

Accordingly, DRC respectfully submits that sanctions against DRC are entirely unwarranted. DRC believes that the Trustee's assertion that DRC was required to disclose the Synchronization Agreement is incorrect. Certainly, based on the record, its suggestion that DRC acted with *any* malintent or bad faith is wrong. The overhang of this proceeding has already impacted DRC as its competitors try to take—and have taken—advantage of the situation, and DRC is spending significant time, resources and legal fees to defend its integrity and commercial position. The imposition of sanctions against DRC would have a devastating effect on its business, which relies on DRC's reputation in a highly competitive industry. Because DRC acted in good faith, based on a reasonable interpretation of the applicable law, it respectfully submits that under these circumstances sanctions are not warranted.

---

[1] Although the Synchronization Agreement was signed in 2019, DRC understands that the Xclaim trading platform was not operational—and no data was shared by any claims agents—until at least August 2020.

# ARGUMENT

## I. DRC Complied with its Disclosure Obligations under Section 156(c) and the SDNY Protocol

Pursuant to 28 U.S.C. § 156(c), "[a]ny court may utilize facilities or services" in a chapter 11 bankruptcy case for the provision of notices, dockets, and other administrative information "where the costs of such facilities or services are paid for out of the assets of the estate and are not charged to the United States." While Section 156(c) does not in itself provide for any disclosure or conflict of interest rules governing the retention of such services, in this District the Protocol requires that claims agents "should be a *disinterested person as that term is defined in Section 101(14) of the Bankruptcy Code*." Protocol at 2 (emphasis added). Section 101(14) defines a "disinterested person" to mean a person who:

> (A) is not a creditor, an equity security holder, or an insider;
>
> (B) is not and was not, within 2 years before the date of the filing of the petition, a director, officer, or employee of the debtor; and
>
> (C) does not have an interest materially adverse to the interest of the estate or of any class of creditors or equity security holders, by reason of any direct or indirect relationship to, connection with, or interest in, the debtor, or for any other reason

11 U.S.C. § 101(14).

Based on these provisions, the Trustee has no grounds to argue—and in fact *does not* argue in its November 4 brief—that DRC's disclosures under Section 156(c) were inadequate. This is because DRC is plainly a "disinterested person" under each of the three prongs of Section 101(14).

First, DRC was not a creditor, equity security holder, or an insider in any of the bankruptcy cases at issue. Second, DRC was not a director, officer, or employee of the debtor. Third, DRC did not have an interest materially adverse to the interest of the estate or of any class of creditors or equity security holders. The existence of the Synchronization Agreement did not make DRC "adverse" to any estate or compromise DRC's ability impartially to administer DRC's duties as claims agent. While the Code does not define the term "adverse interest," courts understand this term to mean "(1) the possession or assertion of any economic interest that would tend to lessen the value of the bankruptcy estate or create an actual or potential dispute with the estate as a rival claimant, or (2) a predisposition of bias against the estate." *In re Granite Partners, L.P.*, 219 B.R. 22, 33 (Bankr. S.D.N.Y. 1998) (internal quotation marks omitted).[2] DRC had no such interest or bias vis-à-vis any estate because of the Synchronization Agreement. This is obviously true for those cases in which DRC did not even share data with Xclaim. As to cases in which DRC shared data, Xclaim did not engage in trading for most of them. Even where trading occurred—giving DRC the opportunity to earn a tiny fee—the fee was paid by Xclaim, not the estate. It goes without saying, then, that no debtor in the country has, to DRC's knowledge, contended that the Synchronization Agreement caused any harm to any estate or DRC to be impartial.

Given the standards of law identified in the Protocol, this District's sample Section 156(c) retention application does not contemplate a disclosure other than

---

[2] In addition, "[i]nterests are not considered to be 'materially adverse' just because it is possible to imagine a set of remote and unlikely circumstances that might create issues." *In re SAS AB*, 645 B.R. 37, 42 (Bankr. S.D.N.Y. 2022). "Instead, the question to be decided by the Court is whether a given set of facts gives rise to a bias against the estate or to an economic interest that actually has a significant potential to affect the professional's loyalty, to undercut the value of the professional's services, or to give rise to a dispute in which the estate would be a rival party." *Id.*

requiring the claims agent to represent that it "is a 'disinterested person' as that term is defined in Section 101(14) of the Bankruptcy Code with respect to the matters upon which it is to be engaged."  SDNY Sample Application for an Order Authorizing Retention and Appointment of Claims and Noticing Agent, ¶ 9(d).  Consistent with this standard, the affidavits DRC filed in connection with Section 156(c) applications were limited to disclosures regarding "disinterestedness" and were thus true and accurate.  For example, in the only two cases in this District in which DRC shared data with Xclaim—*Evergreen* and *Cosmoledo*, *see* November 4 Brief at 5, 9—DRC represented the following:

> DRC is a "disinterested person" as that term is defined in section 101(14) of the Bankruptcy Code with respect to the matters upon which it is to be engaged;
>
> . . .
>
> Based on the foregoing, I [*i.e.*, Nellwyn Voorhies] believe that DRC is a "disinterested person" as that term is defined in section 101(14) of the Bankruptcy Code in that DRC and its personnel: (a) are not creditors, equity security holders, or insiders of the Debtor; (b) are not and were not, within two years before the date of the filing of this Chapter 11 Case, a director, officer, or employee of the Debtor; and (c) do not have an interest materially adverse to the interests of the Debtor's estate or any class of creditors or equity security holders, by reason of any direct or indirect relationship to, connection with, or interest in, the Debtor.

*In re Evergreen Gardens Mezz LLC*, Case No. 21-10335 (MG) (Bankr. S.D.N.Y.), ECF No. 68, Ex. B at ¶¶ 5(f), 8; *see also In re Cosmoledo LLC*, Case No. 20-12117 (Bankr. S.D.N.Y.), ECF No. 7, Ex. A at ¶¶ 4(f), 10.  In fact, in these same cases, the Trustee expressly acknowledged that Section 156(c) has no governing conflict of interests standard, stating in *Cosmoledo*: "In contrast to section 327(a) of the Bankruptcy Code, there is no specific provision in section 156(c) that requires a party seeking to be retained

7

under section 156(c) demonstrate that it does not hold or represent an interest adverse to the estate and that it is a disinterested person." *Id.*, ECF No. 21 at 1.

In short, there can be no question that, as to DRC's employment under Section 156(c), DRC's disclosures were adequate. This is significant for two reasons. First, employment under Section 156(c) is the subject of Judge Lane's *Madison Square* opinion. There, Judge Lane held the Synchronization Agreement (*i.e.*, the sharing of claims data received pursuant to Section 156(c), where claims agents acted as an agent of the clerk of court) was improper under Section 156(c). *In re Madison Sq. Boys & Girls Club, Inc.*, 642 B.R. 487 (Bankr. S.D.N.Y. 2022). Judge Lane's opinion did not address employment under Section 327(a). Second, the discovery sought by the Trustee and produced by DRC shows that approximately *90%* of the total fees earned by DRC since the effective date of the Synchronization Agreement were in connection with employment under Section 156(c), not Section 327(a) or Section 1103(a). ECF No. 58, Ex. A–B. In other words, even if the Trustee were correct (and it is not) that DRC should have disclosed the Synchronization Agreement under Rule 2014, *see infra*, the alleged failure to disclose relates to only a fraction—approximately 10%, *i.e.*, those fees earned under Section 327(a) or Section 1103(a)—of the total fees for which the Trustee has sought discovery.

**II. DRC Complied with its Disclosure Obligations under Section 327(a) and Rule 2014**

Perhaps recognizing that Section 156(c) does not support its position on disclosure, the Trustee in its November 4 brief focused instead on Section 327(a) and Rule 2014 to assert that the claims agents improperly failed to disclose the Synchronization Agreement. While DRC acknowledges that it should have disclosed the

8

agreement in an exercise of caution, a plain reading of Section 327(a) and Rule 2014 demonstrates that disclosure was not required as a matter of law.

First, there is no basis for disclosure under Section 327(a), which states the Trustee may employ professionals "that do not hold or represent an *interest adverse to the estate*, and that are *disinterested persons*, to represent or assist the trustee in carrying out the trustee's duties under this title." 11 U.S.C. § 327(a) (emphasis added). As noted above, "disinterested persons" is a term defined in Section 101(14) and requires that a person not be "materially adverse" to interested parties. As set forth above with respect to Section 156, there is no plausible argument as to Section 327(a) that DRC was "materially adverse" to any interested party.

Not surprisingly, for this reason, the Trustee relies primarily on Rule 2014. Rule 2014 pertains to an application for employment pursuant to "§ 327, § 1103, or § 1114" (notably, *not* Section 156(c)), and requires disclosure of "all of the person's connections with the debtor, creditors, any other party in interest . . ." Fed. R. Bankr. P. 2014(a).[3] The Trustee argues that "while retention under section 327 is only limited by interests that are 'materially adverse,' under Rule 2014, 'all connections' that are not so remote as to be *de minimis* must be disclosed." Trustee Brief at 9 (quoting *In re Leslie Fay Cos., Inc.*, 175 B.R. 525, 536 (Bankr. S.D.N.Y. 1994)). The Trustee then conclusorily states that "[t]here can be no question that in any application for an Approved Claims Agent to be employed as an estate professional pursuant to §§ 327 or 1104 of the Bankruptcy

---

[3] A party in interest is generally one with a "direct financial stake in the outcome" of the bankruptcy case. *In re Teligent, Inc.*, 640 F.3d 53, 60 (2d Cir. 2011) (internal quotation marks omitted). In addition, Section 1109 of the Code provides a list of parties in interest to include "the debtor, the trustee, a creditors' committee, an equity security holders' committee, a creditor, an equity security holder, or any indenture trustee, may raise and may appear and be heard on any issue in a case under this chapter." 11 U.S.C. § 1109(b).

9

Code, the existence of any Synchronization Agreement . . . should have been disclosed pursuant to Bankruptcy Rule 2014." Trustee Brief at 9.[4]

But the Trustee never explains the "connection" DRC was required to disclose or the reason for such disclosure. The Trustee does not seem to contend that DRC had any connection to creditors or any other party in interest by virtue of the Synchronization Agreement. DRC's counterparty under the agreement, *i.e.*, Xclaim, was not a creditor in the applicable cases nor was it a party in interest, as this Court has already concluded with respect to this proceeding. *See, e.g.*, ECF No. 50 at 18 ("Xclaim is also not a 'party in interest' within the meaning of 11 U.S.C. § 1109(b) that 'may appear and be heard on any issue' in a chapter 11 case."). The Court's rationale applies with equal (if not greater) force to the chapter 11 cases in which the claims agents provided services. Xclaim is not a party in those cases, nor does it have a "direct financial stake" in the outcome of such cases or a "legal right which is sought to be enforced." *See id.* at 17–19 (collecting cases).

The only remaining possibility is that DRC had a "connection to the debtor" because of the Synchronization Agreement. This argument has no basis either. First, as to cases in which no data was shared, it is inconceivable that the mere *potential* that data could have been shared, but never was, created a connection between DRC and the

---

[4] In response to the Trustee's assertion that there "can be no question," Trustee Brief at 9, that the claims agents were required to disclose the Synchronization Agreement, the record indicates that it took significant time for the Trustee to arrive at a conclusion it now contends is obvious. As noted in its prior submission, DRC voluntarily provided a full copy of the agreement to the Trustee on January 7, 2022. ECF No. 43 at ¶¶ 8–11. In discussions with the Trustee that day, the Trustee did not raise any concern with respect to disclosure. *Id.* DRC is not aware of any chapter 11 proceeding over the following nine months in which the Trustee argued that the Synchronization Agreement had to be disclosed or that there was anything wrong with a claims agent's disclosure on this basis. Only after this proceeding was commenced and the Court invited the Trustee to file a brief did the Trustee stake out the position that failure to disclose the agreements was a manifest breach of Section 327 and Rule 2014.

10

applicable debtor at the time DRC submitted an application under Rule 2014. As to the cases in which data was shared, it is still difficult to see how DRC's connection with Xclaim, a third party, established a connection with a debtor who had no involvement or financial stake in the Synchronization Agreement, and did not pay or receive anything under it. DRC is aware of no analogous case that would stand for this proposition.[5]

Indeed, concluding that the mere existence of the Synchronization Agreement is tantamount to a "connection to the debtor" would mean that every claims agent party to such an agreement has a connection to every debtor for which it serves as claims agent—past, present and future. DRC is aware of no example in which a professional is deemed to be connected to every case in which the professional becomes involved.

Finally, the case law cited by the Trustee regarding the types of "connections" disclosable under Rule 2014 is inapposite. In each case, there were significant connections to the debtor or other parties that posed a clear *conflict of interest*. None is present here. For example, in *Leslie Fay*, attorneys for the debtor failed to disclose significant professional connections to Audit Committee members who were targets of the attorneys' investigation, and the Court determined that because of these connections the attorneys represented interests "materially adverse" to the debtor. *In re Leslie Fay*, 175 B.R. at 533–36. Once these undisclosed conflicts were made public, the integrity of the attorneys' investigation was naturally called into question, which required, among other things, *further* investigation (and expense to the debtor) by an independent

---

[5] In addition, it is notable that Judge Lane found in *Madison Square* that claims data is the property of the Clerk of Court, not the debtor. *See Madison Square*, 642 B.R. at 494. The Trustee has not articulated how the sharing of *public* claims "owned" by the Clerk of Court somehow makes DRC "connected" to the debtor.

11

examiner. *Id.* at 537.  The Court therefore determined that the "[attorneys'] nondisclosure caused [the debtor] very real harm" and "actual injury." *Id.* at 536–37.  In other words, the facts of *Leslie Fay*, where there were clear and materially adverse connections that caused tangible harm to the estate, are entirely distinguishable.  The same is true for other cases cited by the Trustee, which involve (unlike here) professionals having clear and undisputed adverse interests to the debtor.  *See, e.g.*, *In re Granite*, 219 B.R. at 36 (conflict of interest where law firm hired to investigate estate claims failed to disclose connection to the subjects of the potential claims, such that attorneys represented "adverse interests, and had a meaningful incentive, or the perception of one, to act contrary to the interest of the estates" which thus "tainted" the investigation it conducted); *In re Balco Equities Ltd.*, 345 B.R. 87, [112] (Bankr. S.D.N.Y. 2006) (undisclosed connections between law firm and debtor that were disqualifiable under Section 327(a) and where it was "impossible for this Court to believe that the failures were anything other than deliberate").  Here, on the other hand, the Trustee cannot articulate any "connection" between DRC and the debtors around the country it served, and, *a fortiori*, that any "connection" posed a conflict of interest (let alone a "material adverse" interest).

### III.    No Sanction Should Issue Against DRC

    1.    <u>Sanctions in the Form of Disgorgement are Unwarranted</u>

In its November 4 brief, the Trustee suggested that sanctions in the form of disgorgement are appropriate for any failure to disclose the Synchronization Agreement.  The Trustee observed that "[c]ourts may impose appropriate sanctions" against "estate professionals [who] failed to comply with the disclosure requirements under the

12

Bankruptcy Code and Bankruptcy Rules." Trustee Brief at 10. As discussed above, there was no disclosure violation. Disgorgement on this basis is therefore not warranted.

Moreover, even if the Court concludes that there was a disclosure violation, disgorgement is not appropriate under the instant facts. In considering disgorgement for a disclosure violation, "[t]he Court must consider sanction issues on a case-by-case basis, and reach an equitable result in accordance with the circumstances that are presented to it." *In re Granite*, 219 B.R. at 42. First, the court should consider whether because of the conflict the professional would have been *disqualified* under Section 327(a) on account of the conflict. In that case, "denial of all fees for those services is required." *In re Balco*, 345 B.R. at 112 (internal citations omitted); *see also* Bankr. Proc. Manual § 2014:8 Sanctions for violation of Rule 2014 (2022 ed.) ("Courts have considered the following factors in determining the appropriate sanctions for failing to comply with the disclosure requirements of Rule 2014(a): Whether the connections at issue would have created a disqualifying interest under section 327(a); whether the failure to disclose was inadvertent or intentional; the materiality of the information omitted; counsel's efforts to correct the deficiency; and the benefits provided to the estate by counsel."). Second, to the extent there was no disqualifiable conflict, the court may then consider "the value of services performed and the *degree of harm or prejudice to the estate* from the conflicted representation or employment." *In re Granite*, 219 B.R. at 41 (emphasis added). "Where the professional has performed some service of unquestioned value, total denial of fees might result in an inequitable windfall to the estate." *Id.* Third, the court should consider the parties' intent. "[W]ilful or intentional failure to disclose merits the harshest sanctions." *Id.* Based on these factors, courts have carefully reviewed the nature and

13

extent of undisclosed conflicts and tailored disgorgement, if any, to account for *how* the undisclosed conflict affected or harmed the estate. *See, e.g.*, *In re Leslie Fay*, 175 B.R. at 539 (disgorgement of amount of fees that estate was required to pay for independent examiner because of the undisclosed conflict); *In re Granite*, 219 B.R. at 44 (disgorgement of all fees relating to attorneys' investigation, to which the conflict pertained, and awarding 85% of non-investigation fees untainted by the conflict).

Here, as to DRC, these factors militate against any disgorgement. First, as explained above, had the Synchronization Agreement been disclosed, it would *not* have presented a "material adverse" conflict that would have disqualified DRC under Section 327(a). Wholesale denial or repayment of all fees earned by DRC would therefore not be appropriate.

Second, DRC has provided "unquestioned value" to the estate in each of the bankruptcy cases in which it served as a professional under Sections 156(c), 327(a), or 1103(a). Neither the Trustee nor any debtor has suggested there has been *any* "degree of harm or prejudice" to the estate because of the Synchronization Agreement. Nor is there any allegation that the value or integrity of DRC's work was impaired in any way.[6]

Finally, the record developed since November 4 contains no evidence that DRC acted intentionally in not disclosing the Synchronization Agreement. To the contrary, it

---

[6] The fact that there is no adverse party here claiming any injury reflects the unique scenario presented in this case, and one for which we have found no analogous precedent in the case law. Here, the Trustee is seeking the repayment of fees already paid and there is not a single other party allegedly affected by the undisclosed conflict that is *present* and similarly advocating for the repayment of such fees. This scenario is wholly different from the scenario expressly contemplated by the Code, which provides that the appropriate remedy and procedure in context of a potential disqualification is for "the court ... [to] deny allowance of compensation for services and reimbursement of expenses" of the disinterested professional. 11 U.S.C. § 328(c).

clearly shows that DRC had no motive *not* to disclose the Synchronization Agreement and that DRC earned only *de minimis* fees under the agreement. The record further demonstrates that DRC was not even contemporaneously aware of fees it was earning from Xclaim, which means that such fees could not have motivated DRC to conceal the existence of the Synchronization Agreement. ECF No. 43 at ¶ 14. Moreover, DRC has confirmed to the Trustee in discovery that DRC never discussed the question of disclosing the Synchronization Agreement until the commencement of this proceeding, demonstrating that DRC's conduct was not intentional. In light of this undisputed evidence, the Trustee simply cannot argue that DRC's actions were "deliberate" in some way.

    2.    <u>Disgorgement as a Remedy, if any, Must be Narrowly Tailored</u>

Even if disgorgement were an appropriate remedy (and it is not), the type of fees that could possibly be the subject of disgorgement are much narrower than what the Trustee appears to suggest. First, as noted above, Section 156(c) fees should be completely outside the scope of this proceeding because DRC's disclosures as to those fees were unquestionably proper. Second, as to fees earned under Sections 327(a) and 1103(a), it is inconceivable that the Trustee could seek disgorgement for those cases in which DRC did not actually provide data to Xclaim, *i.e.*, cases to which the agreement was not even applied. Third, the Trustee has not explained why disgorgement of fees earned by DRC from the estate (which, as noted above, was not harmed in any way) is the more appropriate remedy rather than disgorgement of fees earned by DRC *from Xclaim under the Synchronization Agreement* ($2,115.28 nationwide and $410.93 in the Southern District of New York). Of course, while there are no fees to disgorge—because DRC never received any money from Xclaim and learned that it earned fees from Xclaim

15

only in context of this proceeding—in principle the Court could use the earned amount as the basis for disgorgement, to the extent disgorgement is appropriate at all (which it is not).

Finally, should this Court decide to issue a monetary penalty notwithstanding DRC's arguments to the contrary, DRC respectfully submits that this Court does not have jurisdiction to impose such a sanction for cases that are not before this Court or where there is no case or controversy before this Court to establish Constitutional Article III or statutory standing. *See Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560 (1992).[7]

3. <u>Draconian Sanctions Against DRC in the Form of Removal or Suspension from the Approved Claims Agents List are Unwarranted</u>

This Court has suggested that it may consider as a sanction the removal or suspension of DRC from the approved claims agents list, although it has also stated its reluctance to do so because such a sanction would be draconian. Hearing Transcript (Nov. 17, 2022) at 38. The Trustee does not appear to advocate for such removal or suspension, and DRC respectfully submits that removal or suspension is not an appropriate sanction. As explained in DRC's November 4 Brief, DRC acted in good faith when it entered into the Synchronization Agreement to provide publicly available data to

---

[7] We understand from the Court's comments in the November 4 hearing that the Court did not believe it would have jurisdiction to impose disgorgement as to cases not before this Court. Hearing Transcript (Nov. 17, 2022) at 12 ("It may be if the U.S. Trustee wants to seek disgorgement of amounts that were obtained in another district, the U.S. Trustee can go and seek it from a judge who had the case before him or her..."). In addition, and whereas DRC has addressed in this brief its conduct vis-à-vis the local rules and practices of this District, it is important to note that local rules and practices vary significantly by district, making uniform analysis of DRC's conduct, or the application of any penalty, impossible. In some districts, DRC may be employed as a claims and noticing agent under Section 327 (where Judge Lane's opinion has no application) whereas in other districts for the *same* employment DRC may be employed under Section 156(a) (where there is no cross-jurisdiction standard conflicts of interest). To the extent this Court, or the Trustee in its briefing, believes that sanctions may appropriately be imposed on DRC for conduct occurring outside this jurisdiction or that such conduct is otherwise relevant to the instant proceeding, it would be necessary for the Court to evaluate the standards and local rules that are particular to each such jurisdiction before issuing a ruling

16

Xclaim.[8] Like other major claims agents who executed similar agreements with Xclaim, DRC believed that the Agreement complied with applicable law, and the record is devoid of any bad faith conduct, a requirement for the Court to issue sanctions under its inherent authority. In addition, as noted in DRC's November 4 Brief, there is no basis to sanction DRC to ensure future compliance with orders of this Court or any other. DRC has terminated its agreement with Xclaim, has no history of noncompliance, and has further committed in a sworn declaration never to enter into this type of agreement absent express authority to do so from a court of competent jurisdiction.[9]

This Court has also suggested that the ordinary standards for sanctions, *i.e.*, bad faith, may not be the appropriate standard for removal from the claims agents list. Hearing Transcript (Nov. 17, 2022) at 37–38. The Court observed that, while removal from the list would be tantamount to a "death sentence," the Court suggested that the ordinary standards for sanctions would not be "the standard for removal of a claims agent from the approved list." *Id.* The Court did not articulate what standard it would adopt under the Protocol, and DRC respectfully submits that the ordinary standards for

---

[8] Of note, even for those cases where claims data was shared with Xclaim, the data was shared through Excel files, similar to those that DRC regularly provides to parties who request claims data or registers. The Synchronization Agreement contemplates the parties establishing an application programming interface ("API") to have an automated process to "allow XCLAIM to synchronize [claims] data" on its system, *see* ECF ECF No. 14, Ex. A. at § 2.1 (emphasis added), but this component of the Synchronization Agreement was never implemented. Nor, as the Synchronization Agreement contemplates, was there any API that would allow Xclaim to "transmit updates" to the DRC claims register. *Id.* Instead, for the cases in which DRC shared data with Xclaim, DRC provided publicly available claims data in an Excel format, and these Excel spreadsheets reflected snapshots of the claims register at that point in time, and were therefore not an ongoing and live synchronization of DRC's systems with Xclaim. As noted above, DRC never received any fees for sharing data and these Excel files with Xclaim.

[9] As noted in DRC's November 4 Brief, Xclaim has appealed Judge Lane's *Madison Square* decision and DRC respectfully submits that the outcome of the appeal cannot be known. There is certainly a possibility that Xclaim will prevail, and that possibility of reversal further suggests that DRC had a good faith basis to believe the Agreement was lawful. *See* November 4 Brief at 9, n.5.

17

sanctions under the Court's inherent authority are the only appropriate ones in this case. Fundamentally, removal or suspension from the list would be a sanction, and the rationale for applying a bad faith finding before the imposition of a sanction based on the Court's inherent authority, *see* November 4 Brief at 7–12, applies with equal force here (and maybe greater force given the potential sanction's draconian nature and resulting damage). At bottom, the imposition of sanctions would be devastating to DRC, which has for over 30 years acted with integrity and transparency in all its dealings. A standard *other* than bad faith would ignore these important mitigating factors and impose a sanction disproportionate to the alleged misconduct committed. For this reason, as explained in DRC's November 4 Brief, courts carefully review a number of factors before imposing any "extreme" sanction, all of which disfavor extreme sanctions here. *See* November 4 Brief at 9–12 (identifying factors such as bad faith, history of noncompliance, effectiveness of lesser sanctions, prior warnings, complicity, and harm to moving party). DRC submits that due process and the fair administration of justice mandate that DRC have acted with bad faith for the significant sanction of removal to be imposed.

Finally, removal of DRC from the list would only serve to harm the estates in this District, who would be deprived of additional choices for claims and noticing agent services and healthy competition among agents. There are currently ten approved claims agents under the District's approved list, although DRC understands that as a practical matter three of the claims agents (American Legal Services, Logan and Company, and

18

CPT Group) do not currently provide services in this District.[10] The removal or even suspension of five additional claims agents who entered into agreements with Xclaim would leave estates in this District with just *two* options and no ability to comply with the Protocol, which requires by the applicant "the review and competitive comparison of at least three (3) proposals." Protocol at 1, ¶ 2.

**IV.    DRC Requests the Opportunity to Respond to Any Additional Allegations**

DRC has made its best efforts in this brief to respond to the Trustee's argument as articulated in the Trustee's November 4 brief. At the same time, as noted in DRC's November 4 Brief, "[d]ue process requires that courts provide notice and opportunity to be heard before imposing any kind of sanctions." *In re 60 E. 80th St. Equities, Inc.*, 218 F.3d 109, 117 (2d Cir. 2000) (internal quotation marks and emphasis omitted); *see also Markus v. Rozhkov*, 615 B.R. 679, 707–08 (Bankr. S.D.N.Y. 2020). Thus, to the extent the Trustee raises in its January 13 brief, due the same day as the instant filing, additional arguments or advances new bases or theories to support its position that sanctions are warranted, DRC respectfully requests an opportunity to respond in writing.

---

[10] For example, American Legal Services disclosed in this case that it has only twice served as a claims agents in the Southern District of New York, in cases dating back to 2012 and 2013. *See* ECF No. 30 at ¶ 4.

## **CONCLUSION**

For the reasons stated above, DRC respectfully submits that the imposition of sanctions is unwarranted.

| | |
|---|---|
| Dated: New York, New York<br>January 13, 2023 | By: /s/ *Elliot Moskowitz*<br>**DAVIS POLK & WARDWELL LLP**<br>Elliot Moskowitz<br>Isaac M. Gelbfish<br>450 Lexington Avenue<br>New York, New York 10017<br>(212) 450-4000<br>*Attorneys for Donlin,*<br>*Recano & Company, Inc.* |