UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
In re:                                                  :
                                                        :
MATTER OF CERTAIN CLAIMS AND                            :
NOTICING AGENTS' RECEIPT OF FEES IN         :          Misc. Pro. No. 22-00401(MG)
CONNECTION WITH UNAUTHORIZED                :
ARRANGEMENTS WITH XCLAIM INC.               :
                                                        :
-------------------------------------------------------------X

## UNITED STATES TRUSTEE'S SUPPLEMENTAL RESPONSE
## REGARDING SANCTIONS AGAINST CLAIMS AGENTS

WILLIAM K. HARRINGTON
UNITED STATES TRUSTEE

*By:*    /s/ *Annie Wells*
         Annie Wells
         Andrea B. Schwartz
         Andy Velez-Rivera
         Trial Attorneys
Office of The United States Trustee – NY Office
One Bowling Green
New York, NY   10004
Phone: (212) 510-0500

# TABLE OF CONTENTS

I.   Preliminary Statement ...............................................................................................1

II.  Facts…....................................................................................................................3

        A.   The Claims Agents' Exclusive Access Agreements with Xclaim ...................3

        B.   The Miscellaneous Proceeding……………………………………………6

III. Analysis……………………………………………………………………….10

        A.   The Claims Agents' Duty to Disclose …………10

                (i)    Retention as Administrative Advisors Under 11 U.S.C. § 327 or 1103....10

                (ii)   False Affidavits in Support of Section 156(c) Retentions ……………...14

        B.   Serious Sanctions Must be Imposed ……………………………………….18

V.   Conclusion………………………………………………………………….20

# TABLE OF AUTHORITIES

## Reported Decisions

*In re Am. Int'l Refinery, Inc.*, 676 F.3d 455 (5th Cir. 2012) ……………….…….………….11

*In re Automend, Inc.*, 85 B.R. 173 (Bankr. N.D. Ga. 1988)………………….………………16

*Banner v. Cohen, Estis & Assocs., LLP (In re Balco Equities Ltd., Inc.)*
    345 B.R. 87 (Bankr. S.D.N.Y. 2006)…………………………………….……………...18

*In re B.E.S. Concrete Prods., Inc.*, 93 B.R. 228 (Bankr. E.D. Cal. 1988)……..……………..…14

*In re Byington*, 454 B.R. 648, 657 (Bankr. W.D. Va. 2011)………………….……………….14

*In re C & C Demo, Inc.*, 273 B.R. 502 (Bankr. E.D. Tex. 2001)…………….…….……………14

*In re Continental Airlines*, 150 B.R. 334 (D. Del. 1993)……………………………………...12

*In re Davis,* No. BK 00 73045 CMS, 2007 WL 1219718 (Bankr. N.D. Ala. Apr. 25, 2007)…...10

*Diamond Lumber, Inc. v. Unsecured Creditors' Comm. of Diamond Lumber, Inc.*,
    88 B.R. 773 (N.D. Tex. 1988)…………………………………………….…….……19

*In re Donahue*, No. BAP NH 11-026, 2011 WL 6737074 (B.A.P. 1st Cir. Dec. 20, 2011) ……16

*In re Enron Corp.*, No. 02 CIV. 5638 (BSJ), 2003 WL 223455 (S.D.N.Y. Feb. 3, 2003)…...….13

*In re EBW Laser Inc.*, 333 B.R. 351 (Bankr. M.D.N.C. 2005)………….……..…………….…18

*In re EWC, Inc.*, 138 B.R. 276 (Bankr. W.D. Okla. 1992)…………………………....……13

*In re Filene's Basement, Inc.*, 239 B.R. 845 (Bankr. D. Mass. 1999)………………….……18

*In re Fibermark, Inc.*, No. 04-10463, 2006 WL 723495 (Bankr. D. Vt. Mar. 11, 2006)……….17

*In re Fretter, Inc.*, 219 B.R. 769 (Bankr. N. D. Ohio 1998)………………..……..………..18

*In re Granite Partners, L.P.*, 219 B.R. 22 (Bankr. S.D.N.Y. 1998)………..……….....11, 14, 21

*Grubin v. Rattet (In re Food Mgmt. Grp.)*, 380 B.R. 677 (Bankr. S.D.N.Y. 2008)……….…….11

*In re GSC Grp., Inc.*, 502 B.R. 673 (Bankr. S.D.N.Y. 2013)……………….…………….11, 21

*In re Lee,* 94 B.R. 172 (Bankr. C.D. Cal. 1988)………………………..………………....12, 17

*In re The Leslie Fay Cos.*, Inc., 175 B.R. 525 (Bankr. S.D.N.Y. 1994)…………..…………..11

*In re Madison Square Boys & Girls Club, Inc.*, 642 B.R. 487 (Bankr. S.D.N.Y. 2022)……..7, 16

*In re Matco Elec. Grp., Inc.*, 383 B.R. 848 (Bankr. N.D.N.Y. 2008)…..………………….…13

*In re Midway Indus. Contractors*, 272 B.R. 651 (Bankr. N.D. Ill. 2001)………………..…..…14

*In re NNN 400 Cap. Ctr. 16, LLC*, 619 B.R. 802 (Bankr. D. Del. 2020)………………………19

*Rome v. Braunstein*, 19 F.3d 54 (1st Cir. 1994)..……………………………………….…….…12

*Smith v. Grondin (In re Grondin)*, 232 B.R. 274 (B.A.P. 1st Cir. 1999)………………..…….16

*In re Source Enterprises, Inc.*,
     No. 06-11707 (AJG), 2008 WL 850229 (Bankr. S.D.N.Y. Mar. 27, 2008)…………19, 21

*In re THR & Assocs., Inc.*, No. 12-72022, 2018 WL 279741 (Bankr. C.D. Ill. Jan. 3, 2018) ….12

*United States v. Gellene*, 182 F.3d 578 (7th Cir. 1999)……………………………………..13, 18

*In re Universal Bldg. Prods.*, 486 B.R. 650 (Bankr. D. Del. 2010)…………..……………….…14

*City of Waltham v. U.S. Postal Svc.*, 11 F.3d 235 (1st Cir. 1993)……………………….…..…..18

## Unreported Cases

*In re SunEdison, Inc.*, Case No. 16-10992-SMB [ECF 5924]………………………..……… 21

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------X

In re:                                                      :
                                                            :
MATTER OF CERTAIN CLAIMS AND                                :
NOTICING AGENTS' RECEIPT OF FEES IN                         :        Misc. Pro. No. 22-00401(MG)
CONNECTION WITH UNAUTHORIZED                                :
ARRANGEMENTS WITH XCLAIM INC.                               :
                                                            :
---------------------------------------------------------------X

### UNITED STATES TRUSTEE'S SUPPLEMENTAL RESPONSE
### REGARDING SANCTIONS AGAINST CLAIMS AGENTS

**TO:**  **THE HONORABLE MARTIN GLENN,**
**CHIEF UNITED STATES BANKRUPTCY JUDGE:**

William K. Harrington, the United States Trustee for Region 2 (the "United States Trustee"),

respectfully submits this Supplemental Brief pursuant to the Court's *Order Granting United States*

*Trustee's Request (I) Directing Claims and Noticing Agents to Provide Additional Disclosures and*

*(II) Fixing Deadlines* dated December 7, 2022 [ECF 27] (the "Disclosure Order"), filed in the above

captioned miscellaneous proceeding (the "Miscellaneous Proceeding").  In support thereof, the

United States Trustee respectfully states:

### SUMMARY STATEMENT

By now, it should be clear that the Claims Agents[1] had plainly engaged in improper conduct

by entering into "Exclusive Access Agreements" with Xclaim to provide synchronization services

of debtors' claims data for compensation in bankruptcy cases for which the Claims Agents served as

a noticing and claims agent pursuant to 28 U.S.C. § 156(c) and the NYSB Claims Agent Protocol.

This Court has concluded in the *Madison Square Decision* that such arrangement is impermissible

---

[1] The "Claims Agents" (and each a "Claims Agent") are defined and referred to herein as those approved claims agents
that were, at one point, a party to an "Exclusive Access Agreement" or "Synchronization Agreement" with Xclaim, Inc.
("Xclaim"): BMC Group, Inc. ("BMC"), Donlin, Recano & Co., Inc. ("DRC"), Epiq Corporate Restructuring LLC
("Epiq"), Omni Agent Solutions, Inc. ("Omni"), and Stretto, Inc. ("Stretto").

because a Claims Agent acts in a capacity as an agent of the Clerk of the Court, and the Clerk is not authorized to enter into such a relationship with Xclaim or receive such fees.

But the Claims Agents' misconduct goes beyond violating judicial procedure and the Judicial Code of Conduct.  For years, the Claims Agents have also violated the Bankruptcy Code and rules, and the fundamental bankruptcy tenet of disclosure, by failing to disclose the existence of the Exclusive Access Agreements and their connections with Xclaim in any of their applications for retention as claims and noticing agents under 28 U.S.C. § 156(c) or as administrative advisors under Bankruptcy Code §§ 327 or 1103, or in the affidavits filed in support of their applications.  Based on those false affidavits, the Claims Agents' retentions were approved in hundreds of cases across multiple districts, earning them hundreds of millions of dollars in fees and profits.

The Claims Agents maintain that no sanctions whatsoever should be imposed against them for their misconduct, since no significant fees were paid to them by Xclaim under the Exclusive Access Agreements.  That, of course, is simply a convenient and self-serving after-the-fact justification, premised on nothing more than fortuity.  At the time that the Claims Agents negotiated and entered into their Exclusive Access Agreements, a realistic possibility, if not the expectation, for significant fees from Xclaim was triggered, as was the Claims Agents' fundamental duty to disclose.  In other words, the Claims Agents' duty to disclose the Xclaim arrangement was not a function of whether such arrangement turned out to be profitable . . . long after the fact.

Similarly, any argument that sanctions are not warranted because there was "no harm, no foul" only evinces a failure to appreciate the gravity of the harm that results from a lack of accurate and complete disclosures.  That is a harm to the basic integrity of our bankruptcy system, irrespective of any bad faith on the part of a Claims Agent.  Moreover, there is evidence that not only was Xclaim aware of the Claims Agents' obligation to disclose the Exclusive Access Agreements, but at least one of the Claims Agents also considered the need to disclose these

2

arrangements. Insofar as the Claims Agents contend that they did not know of their obligation to provide complete disclosures of their agreements and connections with Xclaim in their retention applications, they certainly should have known.

The Claims Agents should not be given mere slaps on the wrists for their non-compliance. As a general matter, they are showing few signs of taking this Miscellaneous Proceeding seriously, quite possibly in light of the Court's earlier-expressed reluctance to remove them from the Clerk's list of approved noticing and claims agents. But the Court need not go that far. Instead, the Court could impose temporary suspensions of the Claims Agents from the Court's approved claims agents list, which would send a strong message that the Claims Agents' failure to disclose will not be tolerated. At the very least, imposition of truly meaningful monetary penalties and/or partial disgorgement of the more than $360 million in professional fees that the Claims Agents have received or will receive on the backs of debtors and creditors, is an appropriate sanction.

## BACKGROUND

A.    *The Claims Agents' Exclusive Access Agreements with Xclaim*[2]

1.    Beginning in 2019, and into 2020, each of the Claims Agents entered into an "Exclusive Access Agreement" with Xclaim. *See, e.g.*, BMC Initial Declaration ¶ 4 ("BMC had previously signed an agreement with Xclaim dated April 23, 2019"). The Exclusive Access

---

[2] The information described in this paragraph is based on the Initial Responses (each of which attached a copy of the executed Exclusive Access Agreement) filed by the Approved Claims Agents in the Miscellaneous Proceeding, in response to this Court's MP Order. *See*:

**BMC**: *Notice of and Declaration Made on Behalf of BMC Group, Inc.* [ECF 10] ("BMC Initial Response");

**Epiq**: *Epiq Notice & Response to August 25, 2022 Order* [ECF 12] ("Epiq Initial Response") at ¶ 11(noting Exclusive Access Agreement was entered into on October 3, 2019, which was replaced by the Access Agreement dated June 24, 2022);

**Stretto**: *Notice re: Miscellaneous Proceeding* [ECF 13] ("Stretto Initial Response") at ¶ 2 (Stretto was party to a data transmission agreement with Xclaim dated November 23, 2020);

**DRC**: *Donlin Recano & Company, Inc.'s Response* [ECF 14] ("DRC Initial Response") at ¶ 1 (entered into Xclaim contract on November 4, 2019); and

**Omni**: *Notice and Response of Omni Agent Solutions Inc.* [ECF 8] ("Omni Initial Response") at ¶ 1 (executed Xclaim agreement on October 16, 2019).

Agreement with each Claims Agent was substantially identical.  Under the terms of the Exclusive

Access Agreement, the Claims Agent thereunder was required to provide to Xclaim (i) (within 5

days of the agreement's effective date) an "Initial Delivery" of a list of all pending bankruptcy

proceedings in which such Claims Agent serves as a claims agent; and (ii) electronic access to all

Required Data (as defined in the Exclusive Access Agreement) with respect to any claims registers

that are created or modified after the effective date of the agreement.  *See* Exclusive Access

Agreement §§ 3.1, 3.2.  In turn, Xclaim shall pay to the Claims Agent a processing fee equal to a

percentage of the commissions collected by Xclaim related to any claims transfers facilitated by

Xclaim's platform in any bankruptcy proceedings in which such Claims Agent served as the

approved claims agent, and for which such Claims Agent affected the claims transfer.  *See id.* § 4.1.

2.       In the nearly three-years between when the first Claims Agent entered into an

Exclusive Access Agreement, (BMC: April 23, 2019), to the time that the last of the Claims Agents

terminated its Exclusive Access Agreement, (Epiq: September 9, 2022),[3] the Claims Agents had

collectively served as Court-approved claims and noticing agents pursuant to 28 U.S.C. § 156(c)

and/or administrative advisors pursuant to Bankruptcy Code §§ 327 and/or 1103 in over 580 cases

across multiple judicial districts, and collectively earned or received fees from such retentions of

close-to $365 million, as set forth below:[4]

---

[3]  Epiq is one of two Claims Agents that terminated its Exclusive Access Agreement with Xclaim after this Court's ruling in the Madison Square Case in July 2022.  Stretto terminated its Exclusive Access Agreement on September 6, 2022.  *See* Stretto Initial Response at ¶ 4.

[4]  The data herein is based on the "Disclosure Declarations" filed by the Claims Agents in response to the Disclosure Order.  *See*:
> **Stretto**: *Declaration of Christopher Updike Providing Required Disclosures* [ECF 51] ("Stretto Disclosure Declaration")
> **DRC**: *Declaration of Donlin, Recano & Company, Inc.* [ECF 52] & *Supplemental Declaration of Donlin, Recano & Company, Inc.* [ECF 58] ("DRC Disclosure Declaration")
> **Omni**: *Declaration of Brian Osborne, Chief Executive Officer of Omni Agent Solutions, Inc.* [ECF 53] ("Omni Disclosure Declaration")

4

| Claims Agent | Section 156(c) Fees | Section 327 and/or 1103 Fees | Number of cases |
|---|---|---|---|
| BMC | $11,513,880.77 | $10,248,554.85 | 63 |
| DRC | $25,070,900.04 | $2,384,014.62 | 128 |
| Epiq | $201,313,578.89 | $16,375,040.39 | 183 |
| Omni[5] | $52,902,377.89 | $19,947,940,53 | 112 |
| Stretto | $23,223,285.82 | $1,109,603.13 | 101 |
| **TOTALS** | **$314,024,023.41** | **$50,065,153.52** | **587** |

3.      None of the Claims Agents ever disclosed, or ever sought to supplement their prior disclosures to include, the existence of their Exclusive Access Agreements or their connections with Xclaim in the retention applications in these 587 bankruptcy cases for which they were approved to serve as claims and noticing agents pursuant to 28 U.S.C. § 156(c) or as estate professionals pursuant to Bankruptcy Code §§ 327 and/or 1103. *See, e.g.*, Omni Disclosure Declaration at ¶ 9 ("Omni states that it did not, before June 20, 2022, disclose in any retention application, or exhibit or declaration in support thereof, or in any subsequent filing, the existence of its Synchronization Agreement with Xclaim."). It was not until after May of 2022, when this Court, in the chapter 11

**Epiq**: *Declaration Of Brad Tuttle of Epiq Corporate Restructuring, LLC in Response to December 7, 2022 Order* [ECF 54] ("Epiq Disclosure Declaration")
**BMC**: *Declaration of Tinamarie Feil Providing Required Disclosures in Response to December 7, 2022 Order* [ECF 55] ("BMC Disclosure Declaration"). BMC subsequently provided the United States Trustee with supplemental data that separated fees earned between section 156(c) retentions and section 327 retentions.

Any typographical or mathematical errors in reproducing the Claims Agents' data in chart form are inadvertent. In the event of any inconsistencies, the Disclosure Declarations control.

This chart aggregates the Claims Agents' collective data, so as to provide a comprehensive portrayal to assist the Court in determining appropriate sanctions. To the extent the Court elects to focus solely on cases filed in New York, the total fees attributable to New York cases (in all four districts) are $92,448,837.61 for retentions under 28 U.S.C. § 156(c) [**Omni**: $3,402,181.78; **Epiq**: $83,287,629.84; **Stretto**: $4,033,952.96; **BMC**: $566,687.60; and **DRC**: $1,158,385.43]; and $3,043,891.98 for retentions under §§ 327 and/or 1103 [**Omni**: $357,917.51; **Epiq**: $2,225,248.47; **Stretto**: $260,356.81; **BMC**: $16,564.49; and **DRC**: $83,804.70].

[5] Omni's fees also include reimbursement of expenses.

5

case of *In re Pareteum Corp.*, inquired as to possible claims trading arrangements with Xclaim or other similar third-party claims traders, that the Claims Agents begin to make the requisite disclosures concerning Xclaim.[6]

**B.**     *The Miscellaneous Proceeding*

4.      On July 29, 2022, in the chapter 11 case of *In re Madison Square Boys & Girls Club, Inc.*, Case No 22-10910 (SHL) (the "Madison Square Case"), Judge Lane entered the *Final Order Authorizing Retention and Appointment of Epiq Corporate Restructuring, LLC as Claims and Noticing Agent Under 28 U.S.C. § 156(c), 11 U.S.C. § 105(a), and Local Rule 5075-1 and Granting Related Relief*, which authorized the debtor's retention of Epiq as claims and noticing agent, subject to the condition that it "exclude [the Madison Square Case] from any file sharing or similar service to facilitate trade or resolution of claims held against bankruptcy or insolvent entities." *See* Case No. 22-10910-SHL, ECF 86, at 3.

5.      Thereafter, on August 18, 2022, the Hon. Judge Lane issued the *Memorandum of Decision Re: Motion To Appoint Epiq Corporate Restructuring, LLC As Claims And Noticing Agent* [Case No. 22-10910-SHL, ECF 143] (the "*Madison Square Decision*"), wherein the Court concluded that it was impermissible for Epiq to have entered into its business arrangement with Xclaim, pursuant to which Epiq received fees from Xclaim in exchange for sharing claims data that Epiq maintained in its capacity as an interim custodian of court records and a claims and noticing agent, pursuant to 28 U.S.C. § 156(c) and the Protocol for the Employment of Claims And Noticing Agents under 28 U.S.C. §156(c) (the "NYSB Claims Agent Protocol"). *See also In re Madison Square Boys & Girls Club, Inc.*, 642 B.R. 487 (Bankr. S.D.N.Y. 2022).

---

[6] *See* Case No. 22-10615-LGB [ECF 42], Hr'g Tr. 5/17/2022, at 22:8-15 ("So, recently, there's been some publicity about five of the largest claims agents having contractual exclusive relationships with an entity called Xclaim. And so our court has -- both the Judges in our court and the Clerk's office have been concerned about this and wanted to get some disclosure about whether or not a particular claims agent that's coming before us for retention has a relationship with Xclaim has a contract with them."). A copy of the transcript is attached hereto as <u>Ex. A</u>.

6.      Following the *Madison Square Decision*, this Court commenced the instant

Miscellaneous Proceeding by Order dated August 25, 2022 (the "MP Order") [ECF 1], pursuant to

which the Approved Claims Agents[7] were ordered to file a notice, setting forth, *inter alia*:

- a description of any current or former business arrangement with Xclaim, the status of any such arrangement, a copy of any and all agreements memorializing any such arrangement, and list of all dates in which the Approved Claims Agent transmitted claims data to Xclaim other than in a format as provided to the public on the Approved Claims Agent's website;

- an accounting of any and all fees, costs, and reimbursements received, or to be received, from Xclaim through the date of the filing of the notice including the date, or anticipated date (if payment is expected in the future), of each payment; [and]

- a list of the bankruptcy cases, with a notation indicating the district in which the case was filed, in which the Approved Claims Agent served as a court-approved claims agent and Xclaim facilitated at least one claims trade from which the Approved Claims Agent received, or will receive, a Fee or any other payment or reimbursement from Xclaim;

MP Order at 2-3 (internal footnotes omitted).[8]

7.      On September 30, 2022, the Court entered a further order (the "Further Order") [ECF

19] in the Miscellaneous Proceeding, directing, among other things, that:

on or before 5:00 p.m., October 18, 2022, the Office of the United States Trustee shall file a letter stating its views on whether additional proceedings and/or disclosures are necessary to create a complete record in this miscellaneous proceeding; and

on or before 5:00 p.m., November 4, 2022, parties in interest including the United States Trustee may each file a brief not to exceed twenty (20) double-spaced pages outlining what sanctions, if any, should be imposed on the Approved Claims Agents that were party to a Synchronization Agreement with Xclaim or otherwise performed activities as a claims agent under 28 U.S.C. § 156(c) that the Clerk of Court could not perform.

---

[7] "Approved Claims Agents" is defined in the MP Order as those "certain private entities approved [by the Clerk of the Court ] o be retained in bankruptcy cases to act as his agent to assist with such administrative tasks." MP Order at 1.

[8] On September 6, 2022, all but one of the Approved Claims Agents filed their respective Initial Responses in the Miscellaneous Proceeding. *See* ECF 8-13. American Legal Claim Services, LLC filed its notice in response to the MP Order on October 25, 2022. *See Declaration of Jeffrey L. Pirrung on behalf of American Legal Claim Services, LLC in Response to Chief Judge Martin Glenn's August 25, 2022 Order* [ECF 25].

Further Order at 1.

8.  In response to the Further Order, the United States Trustee filed a *Letter in Response to Order Regarding Further Proceedings and Scheduling Sanctions Hearing* [ECF 28] (the "UST Letter"), wherein the United States Trustee identified certain Additional Disclosures[9] that are needed for a complete record of the Miscellaneous Proceeding so that the Judges of this Court and the Office of the United States Trustee can better assess whether the Claims Agents had adequately disclosed the existence of the Exclusive Access Agreements and the connections between the Claims Agents and Xclaim in their retentions in chapter 11 bankruptcy cases.[10]

9.  Also in response to the Further Order, each of the United States Trustee and the Claims Agents filed on November 4, 2022, respective briefs setting forth what sanctions, if any, should be imposed against the Claims Agents.  *See* ECF 36-37, 39-44 (collectively, the "Sanctions Briefs").  In substance, each of the Claims Agents argued that no sanctions whatsoever should be

---

[9]  As defined in the UST Letter, the Additional Disclosures consist of:

- If the Approved Claims Agent had entered into a Synchronization Agreement (or similar business arrangement) with Xclaim or any other Third-Party Claims Trader within the last five years, a schedule of all bankruptcy cases within the last five years (with a notation indicating the district where the case was filed), setting forth (in each case):
  A) if the Approved Claims Agent was approved by the Bankruptcy Court to be retained as a (i) noticing and claims agent pursuant to 28 U.S.C. § 156(c), and/or (ii) consultant, agent or other professional pursuant to section 327 or 110[3] of the Bankruptcy Code;
  B) whether the Approved Claims Agent had disclosed in its retention application (or any exhibits in support thereof) the existence of the Synchronization Agreement (or other similar business arrangement) or its relationship with Xclaim or other Third-Party Claims Trader; and
  C) an accounting of any and all fees, costs, and reimbursements received or to be received in connection with such retention; and

- The Approved Claims Agent's designation of an officer, director, agent, employee, or other person responsible for, or with personal knowledge of, the negotiation and oversight of any Synchronization Agreement (or other similar business arrangement) or relationship with Xclaim or any other Third-Party Claims Trader.

[10]  Epiq was the only Claims Agent that filed an opposition to the UST Letter.  *See Objection to U.S. Trustee's Letter Brief in Response to the Court's September 30, 2022, Order* [ECF 29].  Epiq argued that the proposed Additional Disclosures exceeded the limited scope of this Court's inquiry, and would not aid the Court in assessing whether to impose sanctions against the Claims Agents.  *Id.* ¶ 15.

imposed by this Court.  *See, e.g.*, DRC Sanctions Brief [ECF 42] at 2 ("DRC respectfully submits

that no sanctions are warranted for several reasons.").

      10.    This Court held a hearing on November 17, 2022, to consider what sanctions should

be imposed against the Claims Agents, as well as the United States Trustee's request for Additional

Disclosures to supplement the record of the Miscellaneous Proceeding.  *See* Hr'g Tr. 11/17/22 [ECF

47].  Following the hearing, this Court entered the Disclosure Order, pursuant to which each Claims

Agent was ordered to file on the docket of the Miscellaneous Proceeding:

(A)    a schedule of all pending bankruptcy cases (with a notation indicating the district where the case was filed) in which the Responsible Claims Agent was approved by the Bankruptcy Court to be retained as a (i) noticing and claims agent pursuant to 28 U.S.C. § 156(c), and/or (ii) consultant, agent, advisor or other professional pursuant to sections 327 or 110[3] of the Bankruptcy Code, as of the effective date of any Synchronization Agreement or similar business arrangement between such Responsible Claims Agent and Xclaim or other third-party;

(B)    a schedule of all subsequent bankruptcy cases (with a notation indicating the district where such case was filed) in which the Responsible Claims Agent was approved by the Bankruptcy Court to be retained as a (i) noticing and claims agent pursuant to 28 U.S.C. § 156(c), and/or (ii) consultant, agent, advisor or other professional pursuant to sections 327 or 110[3] of the Bankruptcy Code, from the effective date of any Synchronization Agreement or similar business arrangement between such Responsible Claims Agent and Xclaim or other third-party, to the date such Synchronization Agreement or similar business arrangement was terminated;

(C)    for each bankruptcy case identified in the above schedules, a description of whether the Responsible Claims Agent disclosed in its retention application (including any exhibits or declarations in support thereof), or in any subsequent filing, the existence of the Synchronization Agreement or its connection or other similar business arrangement with Xclaim or other third party;

(D)    for each bankruptcy case identified in the above schedules, an accounting of all fees, costs, and reimbursements received, or approved by the applicable Bankruptcy Court to be received, in connection with such retention (i) pursuant to 28 U.S.C. § 156(c) and (ii) pursuant to 11 U.S.C. § 327 or § 1103; and

(E)    the Responsible Claims Agent's designation of an officer, director, agent, employee, or other person responsible for, or with personal knowledge of, the negotiation and oversight of any Synchronization Agreement or other similar

business arrangement or connection with Xclaim or any other third-party (the "Designated Person").

Disclosure Order at 2-3.

11.      The Disclosure Order further ordered (A) the Claims Agents to produce to the United States Trustee any email communications and/or other documentation from or with Xclaim or other third-party concerning the disclosure of any Synchronization Agreement or other similar business arrangement or connection between Xclaim or any other third-party and the Claims Agent, in any application for the Claims Agent to be retained as (i) noticing and claims agent pursuant to 28 U.S.C. § 156(c), and/or (ii) consultant, agent, advisor or other professional pursuant to section 327 or 1103 of the Bankruptcy Code; and (B) that the Claims Agents and United States Trustee may each file a brief to supplement its prior pleadings outlining what sanctions should be imposed on the Claims Agents.  *See id.* at 3.

## **DISCUSSION**

**A.**      ***The Claims Agents' Duty to Disclose***

**1.**      ***Retention as Administrative Advisors Under 11 U.S.C. § 327 or 1103***

Disclosure and transparency are the heart and soul of bankruptcy.  *See In re Davis*, No. BK 00 73045 CMS A3, 2007 WL 1219718, at *8 (Bankr. N.D. Ala. Apr. 25, 2007) ("The protections of the Bankruptcy Code carry with them the duty of transparency for all parties—debtors; creditors; trustees; and their attorneys, as officers of the court. Disclosure is the foundation stone for all."); *see also In re Sanchez*, 372 B.R. 289, 305 (Bankr. S.D. Tex. 2007) ("The three most important words in the bankruptcy system are: disclose, disclose, disclose.").  In the context of retentions of estate professionals, these bankruptcy tenets are particularly crucial, and indeed, explicitly mandated.  In any proposed retention of professional persons under §§ 327, 1103, and 1114 of the Bankruptcy

Code, Federal Rule of Bankruptcy Procedure ("Bankruptcy Rule") 2014 applies, and provides in

relevant part:

> The application shall state the specific facts showing the necessity for the
> employment, the name of the person to be employed, the reasons for the selection,
> the professional services to be rendered, any proposed arrangement for
> compensation, and, to the best of the applicant's knowledge, all of the person's
> connections with the debtor, creditors, any other party in interest, their respective
> attorneys and accountants, the United States trustee, or any person employed in the
> office of the United States trustee.

Fed. R. Bankr. P. 2014.

Courts – most notably, this one – have consistently interpreted the "*all* connections" phrase

of Rule 2014 broadly.  *See In re The Leslie Fay Cos., Inc.*, 175 B.R. 525, 536 (Bankr. S.D.N.Y.

1994) (stating that "while retention under section 327 is only limited by interests that are 'materially

adverse,' under Rule 2014, 'all connections' that are not so remote as to be *de minimis* must be

disclosed."); *In re Granite Partners, L.P.*, 219 B.R. 22, 35 (Bankr. S.D.N.Y. 1998) ("The applicant

and the professional must disclose all connections and not merely those that rise to the level of

conflicts."); *see also In re Am. Int'l Refinery, Inc.*, 676 F.3d 455, 465 (5th Cir. 2012) ("The

disclosure requirements of Rule 2014(a) are broader than the rules governing disqualification, and

an applicant must disclose *all connections* regardless of whether they are sufficient to rise to the

level of a disqualifying interest under Section 327(a).") (emphasis added).  Moreover, as this Court

has repeatedly held, the duty to disclose is a *continuing* duty, and necessarily requires the

professional to supplement its prior disclosures in the event of changed circumstances, or that new

or additional relevant connections are formed or discovered.  *See In re GSC Grp., Inc.*, 502 B.R.

673, 725 (Bankr. S.D.N.Y. 2013) ("Although Bankruptcy Rule 2014(a) does not expressly require a

professional to supplement its initial disclosure, section 327(a) implies a duty of "continuing

disclosure." (citing *Grubin v. Rattet (In re Food Mgmt. Grp.)*, 380 B.R. 677, 690 n.7 (Bankr.

S.D.N.Y. 2008))); *In re Granite Partners*, 219 B.R. at 35 (noting that "a professional's continuing

11

disclosure of conflicts under Rule 2014(a), although not explicit in the rule, is necessary to preserve the integrity of the bankruptcy system and to ensure that professionals remain 'conflict free'"); *Rome v. Braunstein*, 19 F.3d 54, 57-58 (1st Cir. 1994) ("As the bankruptcy court is invested with ample power to deter inappropriate influences upon the undivided loyalty of court-appointed professionals throughout their tenure, the need for professional self-scrutiny and avoidance of conflicts of interest does not end upon appointment.").

Bankruptcy Rule 2014 also explicitly requires an applicant Claims Agent to disclose "any proposed arrangement for compensation." Fed. R. Bankr. P. 2014(a). "The language requiring the disclosure of 'any proposed arrangement for compensation' was added to Rule 2014(a) to make explicit the disclosure requirement that the Second Circuit found under General Order 44. An employment application must include a statement of all payments already received or promised and the source of the payments." *In re Lee*, 94 B.R. 172, 176 (Bankr. C.D. Cal. 1988). While the failure to disclose compensation typically involves attorneys' retainers, the plain language of the rule has no limits on the type of compensation arrangements that must be disclosed. *See, e.g., In re THR & Assocs., Inc.*, No. 12-72022, 2018 WL 279741, at *3 (Bankr. C.D. Ill. Jan. 3, 2018) ("Rule 2014 also provides that the application for employment must disclose "any proposed arrangement for compensation[.]' The rule is applied literally, and it draws no distinction between the source or application of payments." (internal citation omitted)).

As applied here, the Claims Agents were parties to the Exclusive Access Agreements, under which they would receive from Xclaim a fee equal to 10 percent of the commissions from claims traded in each bankruptcy case in which such Claims Agent served as the court-approved noticing and claims agent, and had transmitted claims data. Under a strict construction of Bankruptcy Rule 2014, the Exclusive Access Agreement undoubtedly constitutes a "proposed arrangement for

12

compensation" subject to disclosure in each chapter 11 case in which a Claims Agent was to be retained as a noticing and claims agent.

In addition to being employed as claims and noticing agents pursuant to 28 U.S.C. § 156(c), the Claims Agents were also engaged by debtors and committees to serve as administrative advisors pursuant to Bankruptcy Code §§ 327 or 1103. Indeed, as shown by their Disclosure Declarations (and as summarized above), the Claims Agents have received, or will receive, over $50 million in fees from these § 327 and/or § 1103 retentions. Yet, admittedly, not one Claims Agent complied with its obligation to disclose its connection with Xclaim and the existence of the Exclusive Access Agreement. Nor did any of the Claims Agents fulfill their continuing duties to disclose vis-à-vis Xclaim in any of the pending cases in which they were already employed as estate professionals, even after entering into the Exclusive Access Agreement.

The Claims Agents attempt to explain their non-compliance with Bankruptcy Rule 2014 by contending that Xclaim was not a significant connection that needed to be disclosed, and that the failure to so disclose did not result in any adverse interest or harm to any debtor's estate. These arguments completely miss the mark. "The requirement to disclose all connections is not subjective, whereby the professional discloses only those 'connections' that he/she/it concludes are relevant." *In re Matco Elec. Grp., Inc.*, 383 B.R. 848, 853 (Bankr. N.D.N.Y. 2008) (internal quotation marks omitted). The decision as to what connections are *de minimis* or affects disinterestedness is to be made by the Bankruptcy Court, not the professional. *See United States v. Gellene*, 182 F.3d 578, 588 (7th Cir. 1999) ("The professionals 'cannot pick and choose which connections are irrelevant or trivial.'" (*quoting In re EWC, Inc.*, 138 B.R. 276, 280 (Bankr. W.D. Okla. 1992))). *Cf. In re Enron Corp.*, No. 02 CIV. 5638 (BSJ), 2003 WL 223455, at *4 (S.D.N.Y. Feb. 3, 2003) ("The purpose of Rule 2014(a) is to provide the court and the United States trustee with information to determine whether the professional's employment is in the best interest of the

13

estate."). As Judge Lane said in the *Madison Square Case*, Xclaim's connection to the debtors is clear because the debtors' claims form the very basis of Xclaim's activities in these cases. *See In re Madison Square Boys & Girls Club, Inc.* Hr'g Tr. 7/20/22 at 44:21-24 (noting that Xclaim's business is "really rooted in the claims activity…"). (A copy of the transcript is attached as Ex. B.)

In failing to disclose their connections with Xclaim and the existence of the Exclusive Access Agreements, the Claims Agents have injured the integrity of the bankruptcy system, plain and simple. *See In re Universal Bldg. Prods.*, 486 B.R. 650, 663 (Bankr. D. Del. 2010) ("Defective disclosure is not a minor matter. It goes to the heart of the integrity of the bankruptcy system...." (*quoting In re B.E.S. Concrete Prods., Inc.*, 93 B.R. 228, 236-38 (Bankr. E.D. Cal. 1988))); *see also In re Byington*, 454 B.R. 648, 657 (Bankr. W.D. Va. 2011) ("[L]ack of disclosure in and of itself is sufficient to warrant disqualification, even if in the end there was no prejudice." (*quoting In re Midway Indus. Contractors*, 272 B.R. 651, 664 (Bankr. N.D. Ill. 2001))). Not only have the Claims Agents effectively "usurp[ed] the court's function by choosing, *ipse dixit*, which connections impact disinterestedness and which do not" — *In re C & C Demo, Inc.*, 273 B.R. 502, 507 (Bankr. E.D. Tex. 2001) (*quoting In re Granite Partners, L.P.*, 219 B.R. at 35) — they have also deprived the Court, the United States Trustee and parties in interest of information critical to an evaluation of whether their proposed retentions should have been approved.

### 2. *False Affidavits in Support of Section 156(c) Retentions*

The strictures of Bankruptcy Rule 2014 do not apply to a proposed retention as a claims and noticing agent pursuant to 28 U.S.C. § 156(c). That, however, does not mean that a § 156(c) retention is free from any disclosure requirements. Local Bankruptcy Rule 5075-1 for the Southern District of New York governs the Clerk's use of outside noticing and claims agents, and provides that the retention of such noticing and claims agents must be in accordance with the NYSB Claims Agent Protocol. In turn, the Protocol requires, as relevant here, that (i) as a condition of retention,

14

the claims and noticing agent has a duty to *comply with all relevant statutory provisions and rules of procedure*, including local rules of procedure, general orders and applicable guidelines (*id.* at ¶ 3 (emphasis added)); and (ii) claims and noticing agents should be a disinterested person as that term is defined in Section 101(14) of the Bankruptcy Code with respect to the matters upon which it is to be engaged.  Towards that end, the form *Application for an Order Appointing [name of claims and noticing agent] as Claims and Noticing Agent for the Debtors Pursuant to 28 U.S.C. § 156(c), 11 U.S.C. § 105(a), and S.D.N.Y. LBR 5075-1* for the Bankruptcy Court for the Southern District of New York[11] requires the applicant claims agent to also file, in support of its application, a *Claims and Noticing Agent Affidavit* containing a representation that such proposed noticing and claims agent "is a 'disinterested person' as that term is defined in section 101(14) of the Bankruptcy Code with respect to the matters upon which it is to be engaged."  *Id.* at 9.

As such, where a Claims Agent seeks to be retained as a noticing and claims agent pursuant to 28 U.S.C. § 156(c) in a chapter 11 case in this Court, (as well as the Bankruptcy Court for the District of Delaware, if not in all other bankruptcy districts), its retention application must comply with all relevant statutory provisions and rules of procedure, and must be accompanied by an affirmation, sworn to under penalty of perjury, containing a representation as to such Claims Agent's disinterestedness.  Indeed, the Claims Agents here readily admit that they have essentially done so.  *See, e.g.*, Stretto Disclosure Declaration ¶ 4 ("In each case identified on Exhibit A, Stretto prepared and submitted to counsel to the debtor in possession a declaration or affidavit to

---

[11]  The form order is available at:  http://www.nysb.uscourts.gov/claims-agent-forms.

The Bankruptcy Court for the District of Delaware utilizes a similar form of order, as well as substantially similar protocols for the use and retention of outside noticing and claims agents in chapter 11 cases.  *See* http://www.deb.uscourts.gov/forms-overview http://www.deb.uscourts.gov/content/protocol-employment-claims-and-noticing-agents-under-28-usc-156c

accompany the debtor in possession's application for approval of Stretto's employment under 28 U.S.C. § 156(c) or 11 U.S.C. § 327 or § 1103.").

But these affirmations, in the hundreds of bankruptcy cases where the Claims Agents were collectively approved to serve as § 156(c) noticing and claims agents, *were false*.  First, they were false or misleading by omission, in that, like the affidavits submitted in support of the Claims Agents' retentions as § 327 or § 1103 estate professionals, none of Claims and Noticing Agents Affidavits disclosed the existence of the Exclusive Access Agreement or any connection between the Claims Agent and Xclaim.  *See, e.g., In re Automend, Inc.*, 85 B.R. 173, 178 (Bankr. N.D. Ga. 1988) (finding that attorney's failure to disclose the terms of compensation—including the taking of a security interest against the debtor—in the employment application and accompanying affidavit was "not only inadequate, but also, by omission, misleading."); *cf. In re Donahue*, No. BAP NH 11-026, 2011 WL 6737074, at *11 (B.A.P. 1st Cir. Dec. 20, 2011) (noting that "when a debtor omits a transaction from his Statement of Financial of Affairs, he has made a false oath." (*citing Smith v. Grondin (In re Grondin)*, 232 B.R. 274, 276 (B.A.P. 1st Cir. 1999))).

Second, these affidavits were false or misleading in that all of them contained boilerplate representations that the applicant Claims Agent was "disinterested" for purposes of the § 156(c) retention.  In the *Madison Square Decision*, Judge Lane noted that:

> The terms of the Access Agreement might also place Epiq outside the definition of a "disinterested person" under 11 U.S.C. § 101(14). See SDNY Protocol at 2 (requiring a claims agent to be a disinterested person). A "creditor" is not a disinterested person under section 101(14)(A) because "[i]t is presumed by the statute that a person who is a creditor . . . is incapable of the impartial judgment required of a professional in the conduct of a case under the Code." 3 COLLIER ON BANKRUPTCY ¶ 327.04[2][a][iii][C]. While Epiq is not a creditor as defined in 11 U.S.C. § 101(10), Epiq stands to benefit monetarily from the case from something other than its professional fees. Specifically, Epiq has a pecuniary interest in maximizing the volume of claims trades in a case to increase the amount of the Fee. As the Court is denying the current retention on other grounds, however, it need not resolve the question of disinterestedness.

*In re Madison Square Boys & Girls Club, Inc.*, 642 B.R. at 4967, n.16. Like Epiq, each of the other Claims Agents stood to benefit financially beyond just the professional fees in the case — *i.e.*, the Claims Agent would also receive a monetary commission from Xclaim for providing synchronized access to a debtor's claims data to Xclaim — if the Bankruptcy Court approved its proposed retention as a noticing and claims agent under § 156(c). This additional financial benefit arguably affects the Claims Agent's disinterestedness.

While the *Madison Square Decision* did not resolve the disinterestedness issue, it does not have to. For the reasons discussed above, the misconduct here is the Claims Agents' omission of their connections with Xclaim in their section 156(c) Claims and Noticing Agent's Affidavits, which is a material fact that may have been relevant to the Bankruptcy Courts and other parties in interest in evaluating the Claims Agents' disinterestedness. Whether such connections or financial arrangements actually give rise to an adverse interest is not a call for the Claims Agent to make. *See In re Fibermark, Inc.*, No. 04-10463, 2006 WL 723495, at *8 (Bankr. D. Vt. Mar. 11, 2006) ("The decision as to what facts may be relevant should not be left up to the professional, 'whose judgment may be clouded by the benefits of the potential employment.'" (quoting *In re Lee*, 94 B.R. at 177)). As with the retentions under Bankruptcy Code §§ 327 and 1103, the failure to disclose is, in and of itself, a violation of bankruptcy law.

**B.** <u>**Serious Sanctions Must be Imposed**</u>

While there is little guidance on the appropriate sanctions against a claims agent for violating its disclosure obligations in the context of a § 156(c) retention, the NYSB Claims Agent Protocol itself is the source of authority and remedies for a claims agent's violations of its duties:

> Other than the specific obligations of the applicant, debtor or the trustee set forth above in paragraphs 1, 2, 9 and 10, the failure to comply with the duties set out in this Protocol, as applicable, and with the provisions set out in a Section 156(c) Application and order *may lead to removal of the claims and noticing agent's name from the list of approved agents*.

*Id.* at 2 (emphasis added).  The Court, therefore, would be well within its discretion and authority to interpret and implement its own rules, orders and promulgated protocols in this area.  *See City of Waltham v. U.S. Postal Svc.*, 11 F.3d 235, 243 (1st Cir. 1993) ("The district court has authority to interpret its own local rules in nontechnical ways and to avoid such results.").  Given the severity of the Claims Agents' wrongdoing – entering into impermissible Exclusive Access Agreements for fees they were not entitled to receive, failing to comply with "all relevant statutory provisions and rules of procedure" by failing to meet its disclosure obligations, and filing hundreds of misleading affidavits with perfunctory representations of disinterestedness —a temporary suspension of the Claims Agents from the Clerk's list of approved agents is a reasonable sanction under the Protocol.

Alternatively, it is well established that Courts can, and have, imposed a variety of sanctions against an estate professional that has failed to comply with the disclosure requirements in connection with professional retentions under the Bankruptcy Code and Bankruptcy Rules.  *See Banner v. Cohen, Estis & Assocs., LLP (In re Balco Equities Ltd., Inc.)*, 345 B.R. 87, 112 (Bankr. S.D.N.Y. 2006) ("Courts have imposed a variety of sanctions based on a failure to make the required disclosures. The sanctions range from a denial of all fees, to a reduction of fees, to the imposition of economic sanctions.... If, however, the failure to disclose results in a professional being employed to perform services for which it is not eligible for retention under 11 U.S.C. § 327, denial of all fees for those services is required...." (*quoting In re Fretter, Inc.*, 219 B.R. 769, 776– 777 (Bankr. N. D. Ohio 1998))); *In re EBW Laser Inc.*, 333 B.R. 351, 359 (Bankr. M.D.N.C. 2005) ("The Bankruptcy Court may, in its discretion, disqualify counsel, or deny compensation, as a sanction for failure to make the disclosure required."); *In re Filene's Basement, Inc.*, 239 B.R. 845, 849 (Bankr. D. Mass. 1999) ("Failure to be forthcoming with disclosure provides the bankruptcy court with an independent ground for disqualification.").  Such sanctions can even be in the form of criminal penalties where the failure to disclose involved false affidavits.  *See United States v.*

18

*Gellene*, 182 F.3d at 597-598 (sanctioning attorney $15,000 and 15-months imprisonment for submitting false Rule 2014 affidavits in connection with retention of debtor's counsel); *cf. In re NNN 400 Cap. Ctr. 16, LLC*, 619 B.R. 802, 805 (Bankr. D. Del. 2020), *aff'd In re NNN 400 Cap. Ctr. 16 LLC*, 632 B.R. 243 (D. Del. 2021) (ordering disqualification of law firm and disgorgement of *all* fees and expenses where law firm disregarded the disclosure requirements of the Bankruptcy Code and Rules and *made false sworn statements of fact* in connection with its retention).

Moreover, a finding of bad faith is not required to impose sanctions or order disgorgement for a disclosure violation.  *See, e.g., In re Source Enterprises, Inc.*, No. 06-11707 (AJG), 2008 WL 850229, at *8 (Bankr. S.D.N.Y. Mar. 27, 2008) (stating that "[t]he term 'connections' is broad and is strictly construed for purposes of Bankruptcy Rule 2014," and denying all fees of debtor's counsel for failing to disclose all connections); *see also Diamond Lumber, Inc. v. Unsecured Creditors' Comm. of Diamond Lumber, Inc.*, 88 B.R. 773, 779 (N.D. Tex. 1988) ("The Court assumes that Akin, Gump's actions were wholly innocent. Nevertheless, Akin, Gump failed to disclose facts known to it that were unmistakably relevant to the Bankruptcy Court's determination of whether the firm was qualified under 11 U.S.C. § 327 to represent the debtors.").

In any event, a self-professed lack of bad faith is not entirely supported by the record here. None of the Claims Agents produced any evidence in support of the assertion that Xclaim or any party from the Judiciary or the Office of the United States Trustee ever advised or even suggested that the Exclusive Access Agreements were sanctioned by the Bankruptcy Courts.  To the contrary, there is evidence that Xclaim was aware, as early as 2019, that disclosure of the Exclusive Access Agreements would be required in connection with any proposed chapter 11 retention of the Claims Agents.  The discovery produced also revealed that at least one Claims Agent believed that disclosure of the Xclaim connection should be made, even if only from a best practices approach.

19

The Claims Agents had no basis for concluding that their disclosure obligations did not extend to disclosing the Xclaim arrangements, and in any event, willful ignorance is no excuse. Particularly where, as here, the Claims Agents have decades of collective experience serving as noticing and claims agents and/or administrative advisors to debtors in chapter 11 proceedings, and are sophisticated players, they should have known and understood their professional obligations of disclosure in the bankruptcy context. *See, e.g.*, Epiq Initial Response at ¶ 1 ("Epiq understands the importance of complying with court rules, orders, and protocols, and providing transparency with respect to its dealings with third parties."). *See also In re Granite Partners, L.P.*, 219 B.R. at 39 (rejecting Willkie Farr's contention that it had "concluded that further disclosure was not necessary," and noting instead that "[t]he facts of this case suggest, however, that Willkie Farr reached this conclusion because it feared the adverse consequences of full disclosure.").

## <u>Conclusion</u>

Over the last three years, since the Claims Agents first signed onto the Exclusive Access Agreements, they have collectively earned nearly $365 million in fees from being the authorized professionals in some 580-plus cases across the country, all while failing to disclose their connections with Xclaim. Yet the Claims Agents continue to deny the severity of their wrongdoing. The United States Trustee submits that the Claims Agents should be disabused of their arrogance by a stern sanction from the Court. Specifically, the Court can temporarily suspend the Claims Agents from the Clerk's List of Approved Noticing and Claims Agents for retention. The Court can also, and should, impose sanctions or order disgorgement based on a percentage of the professional fees that the Claims Agents have collected or will collect from chapter 11 debtors. Doing so is well within this Court's discretion and entirely consistent with remedial measures taken in other cases involving disclosure violations. In such cases, the percentage disgorged typically falls within a

20

range of 1 to 30 percent.[12]  Anything short of that would be a slap on the wrist without any deterrent

teeth, and sends the wrong message to the bankruptcy community.

Dated: January 13, 2023
      New York, New York             Respectfully submitted,

                                    WILLIAM K. HARRINGTON
                                    UNITED STATES TRUSTEE, REGION 2
                                    By:    */s/ Annie Wells*
                                      Annie Wells
                                    Andrea B. Schwartz
                                    Andy Velez-Rivera
                                    Trial Attorneys
                              Office of The United States Trustee – NY Office
                              One Bowling Green
                              New York, NY   10004
                              Phone: (212) 510-0500

---

[12]  *See, e.g., In re GSC Grp., Inc.*, 502 B.R. 673, 751 (Bankr. S.D.N.Y. 2013) (ordering a 25% reduction in requested fees of Capstone Advisory for reasonableness and failure to disclose fee sharing arrangement); In re Granite Partners, L.P., 219 B.R. 22, 46 (Bankr. S.D.N.Y. 1998) (ordering disgorgement of $50,000, representing approximately 5% of fees, as sanctions against the trustee for failing to disclose relevant connections of counsel in violation of Rule 2104). *Cf. In re SunEdison, Inc.*, Case No. 16-10992-SMB [ECF 5924] (Stipulated Order dated 4/19/19 between U.S. Trustee and McKinsey & Co. Inc. settling disclosure violations for disgorgement of $15 million total, with $5 million returned to SunEdison, representing 31% of the $16 million in fees paid to McKinsey in that case).  Where the non-disclosure was particularly egregious, Courts have disallowed or imposed disgorgement of the full amount of fees.  *See, e.g., In re Source Enterprises, Inc.*, No. 06-11707 (AJG), 2008 WL 850229, at *8.